**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |  |
|---|---|---|
| TEXAS MEDICAL PROVIDERS PERFORMING ABORTION SERVICES, a class represented by METROPOLITAN OB-GYN, P.A., d/b/a REPRODUCTIVE SERVICES OF SAN ANTONIO and ALAN BRAID, M.D., on behalf of themselves and their patients seeking abortions, | ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) | CIVIL ACTION |
| v. | ) ) | CASE NO. <u>11-486</u> |
| DAVID LAKEY, M.D., Commissioner of the Texas Department of State Health Services, in his official capacity; MARI ROBINSON, Executive Director of the Texas Medical Board, in her official capacity; and DAVID ESCAMILLA, County Attorney for Travis County, in his official capacity and as representative of the class of all county and district attorneys in the State of Texas with authority to prosecute misdemeanors; and their employees, agents, and successors, | ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) |  |

## CLASS ACTION COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

## I.   PRELIMINARY STATEMENT

1.   Plaintiffs are Texas medical providers who assert their rights, as well as their duties, to provide ethical and appropriate care to all of their patients ─ including those who seek abortions.  Plaintiffs bring this action on behalf of themselves, their patients, and a class of all physicians and medical facilities that provide abortions to women in the State of Texas currently

and/or in the future, asserting claims on behalf of the class members and their patients seeking abortions.

2.    Plaintiffs bring this civil rights action under the U.S. Constitution and 42 U.S.C. § 1983 to challenge the constitutionality of Texas House Bill No. 15 ("the Act"),[1] which amends the Texas "Woman's Right to Know Act," Tex. Health & Safety Code Ann. §§ 171.001 *et seq.*

3.    The Act profoundly intrudes on the practice of medicine, forces physicians to deliver ideological speech to patients, and treats women as less than fully competent adults.

4.    The Act imposes strict liability, criminal penalties, and a mandatory penalty of the non-renewal of a medical license on any physician who fails to comply with any one of myriad requirements for providing government-mandated information to a patient in advance of an abortion.  The Act imposes numerous requirements that are contrary to standard medical practice and/or violate standards of medical ethics.  For example, the Act will compel physicians to deliver to their patients government-mandated speech — including visual and auditory depictions of the fetus — that falls outside the accepted standards and practices for medical informed consent.

5.    Moreover, given its harsh penalties and vague requirements, the Act will force physicians to deliver this government-mandated speech even where a patient declines to receive it, or else risk losing his or her license.  Thus, the Act will force physicians to violate basic standards of medical ethics by compelling them to disregard the wishes of patients who do not want to receive this information.

---

[1] A copy of the Act is annexed hereto as Exhibit 1.

6.    The Act was signed by Governor Perry on May 19, 2011, takes effect on September 1, 2011, and applies to any and all abortions performed on or after October 1, 2011.  *See* the Act at secs. 13, 16.

7.    The Act threatens irreparable injury to Plaintiffs, the members of the proposed class of all Texas medical providers performing abortions, and their patients and violates their rights to free speech, privacy, equal protection of the laws, and due process.

8.    Plaintiffs seek declaratory and injunctive relief from those constitutional deprivations.

## II.    JURISDICTION AND VENUE

9.    Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3).

10.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

11.    Venue is appropriate under 28 U.S.C. § 1391(b)(1) because some Defendants reside in this district.

## III.    PLAINTIFFS

12.    Plaintiff Metropolitan Ob-Gyn, P.A., provides abortion services through the licensed abortion facility Reproductive Services of San Antonio ("the Medical Facility").  The Medical Facility provides medical services in San Antonio, Texas, including medical and surgical abortions.  The Medical Facility sues on its own behalf and on behalf of its patients seeking abortions.

13.    Plaintiff Alan Braid, M.D. ("Dr. Braid") is a physician licensed to practice medicine in the State of Texas and is board-certified in obstetrics and gynecology.  Dr. Braid is the owner, Medical Director, and Executive Administrator of the Medical Facility, where he provides

abortion services.  Dr. Braid sues on his own behalf and on behalf of his patients seeking abortions.

14.     Dr. Braid and the Medical Facility seek to serve as representatives of a class of all Texas medical providers performing abortion services, on behalf of themselves and their patients seeking abortions ("Texas Medical Providers Performing Abortion Services" or "Texas Medical Providers").

## IV.   DEFENDANTS

15.     Defendant David Lakey, M.D., is the Commissioner of the Texas Department of State Health Services ("the Department").   The Department is generally charged with enforcement of the provisions of Chapter 171 of the Texas Health and Safety Code.  Tex. Health & Safety Code Ann. § 171.005.  Commissioner Lakey is sued in his official capacity.

16.     Defendant Mari Robinson, is the Executive Director of the Texas Medical Board ("the Board").  The Board is required to undertake disciplinary proceedings against, and not renew the medical license of, a physician who violates the requirements of the Act.  The Act at sec. 10 (amending Tex. Occ. Code Ann. § 164.055(a)).  Ms. Robinson is sued in her official capacity.

17.     Defendant David Escamilla is the County Attorney for Travis County.  He is responsible for prosecuting misdemeanors — and therefore criminal violations of the Act, *see* Tex. Health & Safety Code Ann. § 171.018 — occurring in Travis County.  He is sued in his official capacity and as a representative of the class of all county and district attorneys in the State of Texas with authority to prosecute misdemeanors.

## V.      STATUTORY FRAMEWORK

<u>Woman's Right to Know Act Prior to Enactment of Texas House Bill No. 15</u>

18.    In 2003, Texas enacted a statute, known as the Woman's Right to Know Act ("the WRKA"), which mandates that certain procedures and content be used in the informed consent process when the patient is a woman seeking an abortion.   Tex. Health & Safety Code Ann. § 171.001 *et. seq.*

19.    The current version of the WRKA mandates that, except in the case of a medical emergency, the performing *or referring* physician inform the woman of:  (1) the name of the physician who will perform the abortion; (2) the medical risks "associated with the particular abortion procedure;" (3) the probable gestational age of the fetus; and (4) the medical risks of carrying a pregnancy to term.   Tex. Health & Safety Code Ann. § 171.012(a)(1).   The performing physician or the physician's agent must also inform the woman that:  (1) specified types of medical assistance benefits may be available to her; (2) the father is liable for child support; (3) public and private agencies provide pregnancy prevention counseling and referrals for obtaining birth control; and (4) she has the right to view printed state materials, which are also accessible on the Internet, describing the fetus and listing agencies that offer abortion alternatives.  *Id.* § 171.012(a)(2).  This information must be given to the woman by telephone or in person at least 24 hours before the abortion.  *Id.* § 171.012(b).

20.    Intentional performance of an abortion in violation of the WRKA constitutes a misdemeanor punishable by a fine of up to $10,000.  Tex. Health & Safety Code Ann. § 171.018.

21.    The Act amends the WRKA in a number of important respects.

<u>The Imposition of Strict Liability</u>

22.    The Act dramatically alters the penalty structure for violations of the WRKA. Previously, the WRKA contained a single penalty provision, making intentional performance of

an abortion in violation of that law a criminal offense punishable by a fine of up to $10,000. Tex. Health & Safety Code Ann. § 171.018.  The Act adds a new penalty provision that imposes strict liability for violation of any provision of the WRKA, regardless of fault or mental state. This new penalty provision requires the Texas Medical Board to take "appropriate disciplinary action" against *and* refuse to renew the license of any physician who violates the WRKA.  The Act at sec. 10 (amending Tex. Occ. Code Ann. § 164.055(a)).  The Act also provides that the Board must "refuse to admit to examination or refuse to issue a license" to any person who violates that law.  *Id.*  Thus, a physician need not be convicted of a violation of the WRKA or have intended to violate it to have his or her license renewal denied.

### The Act's Ultrasound and Heart Auscultation Requirements

23.   The Act requires that ─ in order to obtain informed consent for an abortion ─ the physician who will perform the abortion (either personally or through an agent who is a certified sonographer) must perform an ultrasound (referred to as "sonogram" in the Act) at least 24 hours before the beginning of the abortion (the "pre-abortion ultrasound"), and the physician (in some cases, personally, and in other cases, personally or through an agent who is a certified sonographer) must undertake certain steps with respect to the pre-abortion ultrasound.  The Act at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a)(4)).

24.   For women who live at least 100 miles from "the nearest abortion provider that is a [licensed abortion facility] or a facility that performs more than 50 abortions in any 12 month period," the Act provides a two-hour required waiting period instead of a 24-hour waiting period. The Act sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a)(4)).  By its terms, this two-hour waiting period is not available to a woman who lives within 100 miles of *any* abortion provider, even if the only provider(s) within 100 miles of the woman's residence is not

willing or able to provide her abortion (*e.g.*, because the facility is a hospital which only provides abortions in narrow circumstances; because the facility only provides abortions in the first trimester and the woman's pregnancy has reached the second trimester). Consequently, the Act's shorter waiting period will not apply to some women who must travel more than 100 miles to obtain an abortion.

25.    The Act does not permit the pre-abortion ultrasound or any of the required steps accompanying the pre-abortion ultrasound to be performed by a referring physician, even if the referring physician is another doctor in the same medical practice.

26.    Although the law allows a certified sonographer to perform the pre-abortion ultrasound, the Act requires the physician who will perform the abortion to personally carry out certain steps related to the pre-abortion ultrasound.

27.    Under the Act the physician who will perform the abortion must "display[] the sonogram images in a quality consistent with medical practice in a manner that the pregnant woman may view them." The Act at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a)(4)(B)).

28.    The physician who will perform the abortion must also describe the fetal image to the pregnant woman in detail. The Act at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a)(4)(C) (the physician must provide "in a manner understandable to a layperson, a verbal explanation of the results of the sonogram images, including a medical description of the dimensions of the embryo or fetus, the presence of cardiac activity, and the presence of external members and internal organs").

29.    Additionally, the physician who will perform the abortion or a certified sonographer must "make[] audible the heart auscultation for the pregnant woman to hear, if present, in a

quality consistent with current medical practice" and must verbally explain the fetal auscultation to the pregnant woman.  The Act at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a)(4)(D)).

30.    Prior to the pre-abortion ultrasound, the woman must fill out a certification form indicating that she understands that:  (1) Texas law requires she receive a ultrasound prior to receiving an abortion; (2) she has "the option to view the sonogram images;" (3) she has the "option to hear the heartbeat;" and (4) she is "required by law to hear [the physician's] explanation of the sonogram images" unless she certifies in writing that she falls into one of three limited categories.  The Act at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a)(5)).  The Act allows the woman to certify that she elects not to hear an explanation of the ultrasound images in only three circumstances:  (a) if she is "pregnant as a result of a sexual assault, incest or other violation of the Texas Penal Code that has been reported to law enforcement authorities or that has not been reported because [the woman] reasonably believe[s] that doing so would put [her] at risk of retaliation resulting in serious bodily injury;" (b) if she is a minor obtaining an abortion pursuant to a judicial bypass; or (c) if the "fetus has an irreversible medical condition or abnormality, as identified by reliable diagnostic procedures and documented in [the patient's] medical file."  *Id.*

31.    The Act states that a pregnant woman:  (1) "may choose not to view the sonogram images required to be provided to and reviewed [with her] under Section 171.012(a)(4);" (2) "may choose not to hear the heart auscultation required to be provided to and reviewed [with her] under Section 171.012(a)(4);" and (3), if she falls within one of the three designated categories, "may choose not to receive the verbal explanation of the results of the sonogram images under Section 171.012(a)(4)(C)."  The Act at sec. 3 (to be codified at Tex. Health &

Safety Code Ann. § 171.0122(b), (c), (d)).  This provision goes on to state that "the physician [performing the abortion] and the pregnant woman are not subject to a penalty under this chapter solely because" the woman chooses not to view the ultrasound images or chooses not to hear the auscultation or verbal explanations.  The Act at sec. 3 (to be codified at Tex. Health & Safety Code Ann. § 171.0122(e)).  However, this provision only provides an exemption from "a penalty under [Chapter 171 of the Texas Health and Safety Code]," which set forth criminal penalties. *See* Tex. Health & Safety Code, § 171.018.  The provision does not appear to apply to the penalties of mandatory disciplinary action and non-renewal of medical license which are contained in a different chapter, of a different code.  *Compare*, the Act, at sec. 3 (to be codified at Tex. Health & Safety Code Ann. § 171.0122(e)) ("penalty under this chapter") *with* the Act, at sec. 10 (amending Tex. Occ. Code Ann. § 164.055(a)).  Thus, the Act may expose physicians to loss of medical licensure based on the woman's choices not to view or hear the mandated information.

32.    Although the Act (sec. 3) and the required certification form indicate that the pregnant woman has the option *not* to view the ultrasound images, the Act also states that the ultrasound images are "required to be provided to" the woman and that "consent to an abortion is voluntary and informed only if," *inter alia*, the image is placed in the woman's view.  The Act at sec. 3 (to be codified at Tex. Health & Safety Code Ann. § 171.0122(b)); *id*. at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a)).

33.    Similarly, while the Act (Sec. 3) and the required certification form indicate that a woman coming within one of the three designated categories may choose not to listen to the physician's verbal description of the fetus, the Act also states that "consent to an abortion is

9

voluntary and informed only if," *inter alia*, the verbal description is provided.  The Act at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a)).

34.    Likewise, while the Act (sec. 3) and the required certification form indicate that the woman has the option not to hear the heart auscultation, the heart auscultation is "required to be provided to" the woman under the Act, and the Act also states that "consent to an abortion is voluntary and informed only if," *inter alia*, the physician "makes audible" the heart auscultation for the woman to hear, "if present."  The Act at sec. 3 (to be codified at Tex. Health & Safety Code Ann. § 171.0122(c)); *id*. at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a)).

35.    Accordingly, in order to obtain informed consent, the terms of the Act appear to require the physician to place the ultrasound images in the woman's view, describe the fetal images to the woman, make the heart auscultation audible, if present, and explain the heart auscultation regardless of the woman's choices.  *See* Act, generally.

36.    In light of the foregoing, it is not clear under the Act whether:  (1) the woman's choice not to view the ultrasound images relieves the physician of the obligation to place the ultrasound images in the woman's view; (2) the woman's choice not to hear the verbal explanation relieves the physician of the obligation to provide that verbal explanation; and (3) the woman's choice not to hear the heart auscultation relieves the physician of the obligation to make the heart auscultation audible, if present.  In light of these ambiguities, and the harsh penalties and strict liability imposed by the Act, a physician seeking to avoid those penalties, including the risk of losing his or her medical license, will be compelled to:  (1) place the ultrasound images in the woman's view even if the woman has indicated that she does not want to see them; (2) describe the ultrasound images to every woman seeking an abortion, even to a

woman who falls in one of the three designated categories and has indicated that she does not want to hear the explanation; and (3) make the heart auscultation audible (either personally or through an agent who is a certified sonographer).

37.     Moreover, the Act does not give any woman the option not to hear the mandated explanation of the heart auscultation.  *Compare* the Act, at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a)(4)(D) (requiring a verbal explanation of the heart auscultation) *with* the Act, at sec. 3 (to be codified at Tex. Health & Safety Code Ann. § 171.0122(c) (stating a woman can opt not to hear the heart auscultation but making no mention of the verbal explanation of the heart auscultation).  Thus, it appears that even where the woman has chosen not to hear the auscultation, and even where the woman falls in one of the designated categories for sexual assault victims, minors with judicial bypass, and pregnancies involving fetal anomalies, the physician apparently must (either personally or through an agent who is a certified sonographer) provide an explanation of the auscultation to the woman in order to comply with the law.

Other Provisions of the Act

38.     The Act mandates that the information provided to the woman verbally 24 hours before the abortion may be given only by the physician who will perform the procedure.  The Act at sec. 2 (amending Tex. Health & Safety Code Ann. § 171.012(a), (b)).  The Act thus prohibits the provision of the mandated information by a referring physician.  The Act also requires that the performing physician provide this information in person unless the woman lives 100 miles or more from "the nearest abortion provider that is a [licensed abortion facility] or a facility that performs more than 50 abortions in any 12 month period."  *Id.* (amending Tex.

Health & Safety Code Ann. § 171.012(b)).  Thus, in most cases, the physician is precluded from providing this information by telephone.

39.    For women who live at least 100 miles from "the nearest abortion provider that is a [licensed abortion facility] or a facility that performs more than 50 abortions in any 12 month period," the Act provides a two-hour required waiting period after provision of the mandated information, instead of a 24-hour waiting period.  The Act at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(b)).  By its terms, this two-hour waiting period is not available to a woman who lives within 100 miles of *any* abortion provider, even if the only provider(s) within 100 miles of the woman's residence is not willing or able to provide her abortion (*e.g.*, because the facility is a hospital which only provides abortions in narrow circumstances; because the facility only provides abortions in the first trimester and the woman's pregnancy has reached the second trimester).

40.    The Act dictates that during "a visit made to a facility to fulfill the requirements" described above regarding the mandated information, ultrasound, and related steps in advance of the abortion procedure, the physician and facility "may not accept any form of payment, deposit, or exchange or make any financial agreement for an abortion or abortion-related services other than for payment of a service required by Subsection (a) [of the WRKA as amended]."  The Act at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a-1)).  The Act further provides that "the amount charged for a service required by Subsection (a) may not exceed the reimbursement rate established for the service by the Health and Human Services Commission for statewide medical reimbursement programs."  *Id*.

41.    The Act requires that "[i]f after being provided with a sonogram and the information required under this subchapter, the pregnant woman chooses not to have an abortion, the

physician or an agent of the physician shall provide the pregnant women with a publication developed by the Title IV-D agency that provides information about paternity establishment and child support."  The Act at sec. 3 (to be codified at Tex. Health & Safety Code Ann. § 171.0123).

## VI.   CLASS ACTION ALLEGATIONS:  PLAINTIFF CLASS OF TEXAS MEDICAL PROVIDERS PERFORMING ABORTION SERVICES IN TEXAS

42.    Plaintiffs Dr. Braid and the Medical Facility bring this action on behalf of themselves and the class consisting of all Texas medical providers performing abortion services currently and/or in the future, asserting claims on behalf of the class members and their patients.

43.    This action is maintainable as a class action on behalf of the proposed plaintiff class under Federal Rule of Civil Procedure 23, subsections (a) and (b)(2) or, in the alternative, subsection (b)(1).

44.    Class Size:  Plaintiffs do not know the exact size of the proposed plaintiff class. A publicly available survey report states that in 2008, abortions were performed at 67 facilities (clinics, hospitals and physicians' offices) in the State of Texas.  *See* Rachel K. Jones & Kathryn Kooistra, Abortion Incidence and Access to Services in the United States, 2008, 43 Perspectives on Sexual and Reprod. Health 41 (March 2011), available at http://www.guttmacher.org/pubs/journals/4304111.pdf (last visited June 9, 2011).   Upon information and belief, this number likely underrepresents the total number of facilities as it may not include all facilities at which an occasional abortion is performed.  Some facilities at which abortions are performed are not required to be licensed as "abortion facilities" in Texas, including hospitals and some physicians' offices.  Tex. Health & Safety Code § 254.004. Plaintiffs have been able to discern the identities of only approximately 40 of the facilities that provide abortions in Texas.  Those facilities are spread over a large geographical area:  they are located in nineteen different counties, some in each of the four federal judicial districts in Texas.

Plaintiffs also do not know the total number of physicians who perform abortions at medical facilities in Texas.  More than one physician provides abortion services at some of the facilities; thus, on information and belief, the number of physicians performing abortions in Texas likely exceeds the number of facilities at which abortions are performed.  Plaintiffs do not know, and have been unable to discern through publicly-available information, the identity of many of the physicians who perform abortions in Texas.  In light of the above, Plaintiffs estimate that the proposed plaintiff class consists of more than 100 members, many of whom cannot be identified via publicly-available information.  The proposed class is so numerous and geographically dispersed that joinder of all members of the class is impracticable.

45.     Questions of Law and Fact Common to the Class:  This suit poses questions of law and fact that are common to and affect the rights of all of the Texas Medical Providers.  All members of the proposed class provide abortion services to women in Texas and all members of the proposed class are subject to the mandates and prohibitions of the Act.  The common questions presented by the case include, but are not limited to:  (a) whether the Act subjects abortion providers to vague standards; (b) whether requiring physicians who perform abortions to engage in conduct that violates standards of medical ethics violates the constitutional rights of the physicians and/or their patients; (c) whether compelling physicians to deliver to abortion patients unwanted government speech violates the constitutional rights of the physicians and/or their patients; (d) whether the Act's discriminatory treatment of physicians who perform abortions and women who seek abortions is sufficiently justified to meet the requirements of Equal Protection; and (e) whether the Act's discriminatory treatment of patients who live more than 100 miles from an abortion provider who is willing and able to provide the woman's abortion is sufficiently justified to meet the requirements of Equal Protection.  This action seeks

only class-wide injunctive and declaratory relief, and the relief sought does not turn on circumstances specific to individual members of the proposed plaintiff class.

46.    <u>Typicality of the Claims of the Class Representatives</u>:  The claims of Plaintiffs Dr. Braid and the Medical Facility are typical of the claims of all members of the proposed plaintiff class.  The claims asserted by Plaintiffs Dr. Braid and the Medical Facility are based on factual assertions and legal theories applicable to all of the Texas Medical Providers, and Dr. Braid and the Medical Facility are subject to the same requirements and penalties under the Act as all other members of the proposed plaintiff class.

47.    <u>Adequacy of Representation</u>:  Plaintiffs Dr. Braid and the Medical Facility will fairly and adequately protect the interests of the class.   In this action, they have no interests antagonistic to or in conflict with the interests of the other members of the proposed plaintiff class.  Plaintiffs' counsel are qualified and competent to represent the Texas Medical Providers in this action.  Plaintiffs' counsel have represented plaintiff classes in other class actions and have litigated numerous cases involving reproductive rights, specifically including, but not limited to, cases challenging the constitutionality of abortion-specific informed consent statutes.

48.    This case may be maintained as a class action under Rule 23(b)(2) because in enforcing the Act, Defendants will act on grounds generally applicable to the proposed plaintiff class as a whole.  This is an action asserting civil rights and constitutional claims and seeking injunctive and declaratory relief.   Plaintiffs Dr. Braid and the Medical Facility seek final injunctive and declaratory relief that will generally benefit the members of the proposed plaintiff class and their patients.  Monetary damages are not sought in this action.  In the alternative, this case may be maintained as a class action under Rule 23(b)(1)(A) because separate actions by individual members of the proposed plaintiff class challenging the constitutionality of the Act

would create a risk of inconsistent or varying adjudications, resulting in incompatible and incongruous standards of conduct for, and enforcement of the Act by, Defendants.

## VII.   CLASS ACTION ALLEGATIONS:  DEFENDANT CLASS OF PROSECUTING ATTORNEYS

49.   Plaintiffs bring this action against, *inter alia*, a class of all county and district attorneys in the State of Texas with authority to prosecute misdemeanors, represented by Defendant David Escamilla (collectively, the "Prosecutors").   Each of the members of the proposed defendant class has authority, in his or her official capacity, to prosecute violations of the Act when an element of an offense occurs within his or her jurisdiction.

50.   This action is maintainable against that defendant class under Federal Rule of Civil Procedure 23, subsections (a) and subsection (b)(1) or, in the alternative, subsection (b)(2).

51.   <u>Class Size</u>:   On information and belief, there are approximately 250 county attorneys, district attorneys, and criminal district attorneys in the State of Texas with authority to prosecute misdemeanors.  Texas has 254 counties, most of which have a county attorney with authority to prosecute misdemeanors.   Because Plaintiffs cannot discern the identities and locations of all physicians and medical facilities in Texas that provide abortions, and because one or more such physicians or facilities may exist in each Texas county, this action must be maintained against all those with prosecutorial authority under the Act in order to provide protection to all members of the proposed plaintiff class.   The members of the proposed defendant class are located throughout the State of Texas, with some members in each of the four federal judicial districts in Texas.   The proposed defendant class is so numerous and geographically dispersed that the joinder of all members is impracticable.

52.   <u>Questions of Law and Fact Common to the Class</u>:  This suit poses questions of law and fact that are common to all of the Prosecutors.  All of the Prosecutors have the authority to

prosecute misdemeanors and therefore have the authority to prosecute violations under the Act. The common questions posed by this case include those set forth in paragraph 45, *supra*. The injunctive and declaratory relief sought in this action does not turn on circumstances specific to particular members of the proposed defendant class.

53.     <u>Typicality of the Claims of the Class Representatives</u>:  The defenses of Defendant Escamilla will be typical of the defenses of the proposed defendant class.  As a Texas County Attorney, Defendant Escamilla is authorized to prosecute violations of the Act; all of the other members of the proposed defendant class also are authorized to prosecute violations of the Act. In this action challenging the constitutionality of a state statute, the defenses asserted by Defendant Escamilla will be based on legal theories that are applicable to the entire proposed defendant class.

54.     <u>Adequacy of Representation</u>:  Defendant Escamilla will fairly and adequately protect the interests of the Prosecutors.  His position as County Attorney for Travis County places him in the same position with respect to this challenge as all of the other members of the proposed defendant class.  On information and belief, in this action he has no interests antagonistic to or in conflict with the interests of other members of the proposed class.  Because the functions of all prosecuting attorneys with respect to this statute are substantially the same, Defendant Escamilla will be able to represent the interests of all county and district attorneys with authority to prosecute misdemeanors.  On information and belief, as County Attorney for Travis County, Defendant Escamilla is qualified and competent to represent the Prosecutors in this action.

55.     This case may be maintained as a class action under Rule 23(b)(1)(A) because separate actions against individual members of the proposed defendant class challenging the constitutionality of the Act would create a risk of inconsistent or varying adjudications, resulting

in incompatible enforcement and incongruous standards of conduct for Plaintiffs and members of Texas Medical Providers, as would separate actions by individual members of the proposed defendant class enforcing the Act.  In the alternative, this case may be maintained as a class action under Rule 23(b)(2) because, in enforcing the Act, the Defendants will act or refuse to act on grounds that apply generally to the Texas Medical Providers, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the proposed defendant class as a whole.

## VIII.   FACTUAL ALLEGATIONS

### Abortion Background

56.   Legal abortion is a very safe medical procedure; it is one of the safest procedures in contemporary medical practice.  Major complications from abortion are very rare.  Abortion through the 21st week of pregnancy is significantly safer than pregnancy and childbirth.

57.   Women seek abortions for a variety of psychological, emotional, medical, familial, economic and personal reasons.

58.   Abortion providers perform abortions up to differing gestational ages.  The vast majority of abortions in Texas are performed in the first trimester of pregnancy, which consists of the first twelve weeks postfertilization.  Over half of the abortions reported by the Texas Department of State Health Services for Texas residents during each of the years from 2001 through 2008 occurred at 8 or fewer weeks gestation and over three-fourths of the procedures were performed at 10 weeks gestation or earlier.  Virtually all of the abortion procedures in Texas are performed prior to viability.

59.   At very early gestational ages, it may not be possible to make fetal heart auscultation audible to the pregnant woman using any equipment.  Using equipment that is likely to be available in an obstetrics practice, the heart auscultation is not easily audible until approximately

eight to ten weeks gestational age.  Whether heart auscultation can be made audible depends on the equipment used and also on factors specific to the patient, including, but not limited to, the position of the woman's uterus, the position of the fetus, and the size of the woman.

60.    In Texas, abortions are performed in facilities licensed as abortion facilities, in some facilities licensed as ambulatory surgical centers, in some facilities licensed as hospitals, and in some physician's offices.

61.    Among hospitals and physician's offices that provide abortions, some provide abortions only in very limited circumstances.

62.    Some physicians who provide abortions in Texas do so in group (multi-physician) practices.  Typically, in these practices not all of the physicians provide services on the same day, but rotate through the facility, much as physicians in other facilities do.

63.    Abortions may be performed by surgical or medical means.  Medication abortion (also called "medical abortion") involves the administration of medication(s) to induce an abortion.  Some physicians perform both surgical and medication abortions; some physicians provide only medication abortions.

64.    Surgical abortion is analogous to a number of other outpatient procedures in terms of risks, invasiveness, instrumentation, and duration.  Medication abortion is analogous to a number of other outpatient procedures in terms of risks, procedure, and duration.

65.    Studies have shown that abortion poses little risk of negative psychological consequences or *sequelae* for women of all ages, and this risk is lower than that associated with childbirth.

Standards of Medical Ethics Governing Informed Consent

66.   In medical practice, the informed consent process takes place in the context of a confidential medical consultation between the healthcare provider and the patient.

67.   In obtaining informed consent, healthcare providers have an obligation to comply with standards of medical ethics.

68.   The purpose of the informed consent process is to ensure that the patient's consent consists of an informed and autonomous decision, and to make it possible to respect the individual patient's views about what she wants to do.

69.   Central tenets of the standards of medical ethics provide that the physician may not act upon the patient without her consent; that the physician must respect the patient's autonomy; and that the physician must act in the patient's best interests.  The Act requires physicians to violate each of these ethical obligations.

70.   As a matter of medical ethics, the informed consent process is non-directive.  In other words, the physician's role in the informed consent process is to provide the patient with information that will allow the patient to make an autonomous choice.  This includes material factual information about the nature of the proposed procedure, the patient's indications for the procedure, the procedure's medical risks and benefits, and alternatives to the procedure.  Unless requested by the patient, as a matter of medical ethics it is inappropriate for a physician to interject into the informed consent discussion the physician's own value-based views or the value-based views of the government or any other third party.

71.   If a patient says that she does not want to receive particular information in the informed consent process, as a matter of medical ethics that decision must be respected by the physician.

72.    The Act violates the most basic standards of medical ethics by requiring physicians to subject their abortion patients to an experience — of visual images and sounds as well as explanations of these images and sounds — even when the patients have chosen not to receive this information and experience and do not believe this information will inform their autonomous choices.

73.    The Act conveys to the woman the state-mandated message that she should prioritize the fetus (and the continued life of the fetus) above all other considerations.

Other Standards of Medical Practice

74.    The Act conflicts with prevailing standards of medical practice to the extent that it requires that the physician who is to perform an abortion must *personally* provide specified information to the patient in advance of the procedure and must *personally* take certain steps, such as explaining the fetal image, with respect to the patient's mandatory pre-abortion ultrasound.

75.    It is common practice for physicians (including those in obstetrics and gynecology) to work in group (multi-physician) practices, in which the responsibilities for patients' care are shared among different physicians.  It is standard, accepted and ethical practice for a physician in such a practice to perform a procedure on a patient whose preliminary "work-up" for the procedure, including obtaining the patient's informed consent, has been done by a different physician in the practice. The Act interferes with this common, accepted and ethical practice.

76.    By requiring that the same physician who will perform the abortion also perform the pre-abortion ultrasound and provide specified information to a woman and that, in most cases, the physician do so at least 24 hours before performing the abortion, the Act will impose delays greater than 24 hours for many women.   These additional delays will result from factors

including physicians' schedules, physician unavailability due to unexpected situations such as a medical emergency with another patient, and/or the women's inability to return to the facility 24 hours later due to difficulty arranging transportation and time off from work and child-care obligations.

77.    The Act conflicts with prevailing standards of medical practice to the extent that it prohibits anyone other than a physician or a "sonographer certified by a national registry of medical sonographers" from performing the pre-abortion ultrasound mandated by the Act. Ultrasounds performed prior to abortions are performed to determine the presence of an intrauterine pregnancy and to determine the gestational age of the pregnancy.  It is common, acceptable medical practice for a trained, but non-certified, individual to perform such an ultrasound, the results of which are reviewed by the physician.  The certification process required to become "certified by a national registry of medical sonographers" is not required by the standard of care for an ultrasound performed prior to an abortion.

78.    Currently, some physicians in Texas comply with the WRKA by having referring physicians provide the state-mandated information, as allowed under the WRKA prior to its amendment by the Act.

79.    Currently, some physicians comply with the WRKA by providing the state-mandated information by telephone, as allowed under the WRKA prior to amendment by the Act.

Forced Speech and Compelled Listening

80.    As explained above, the Act will compel physicians to deliver government-mandated speech to their patients.  This speech consists of both actual speech (verbal explanations) and symbolic speech (displaying ultrasound images and making audible the fetal heart auscultation). The speech and experiences which the Act compels physicians to convey to their patients are

inconsistent with general principles of informed consent and medical ethics.  Moreover, they are aimed at interjecting the state's views regarding the decision the pregnant woman should make and how she should prioritize the potential life of the fetus over all other factors in her life (*e.g.*, medical conditions, existing family obligations, socio-economic circumstances).  The Act will compel physicians to subject some of their patients to an experience and information that the patient considers unwanted, immaterial and/or irrelevant.

81.    Similarly, the Act will expose abortion patients to delivery, by their physicians, of unwanted government-mandated speech during the informed consent process.  This compulsion will take place in a private medical setting and must occur in order for the patients to receive their desired health care.

Sex Discrimination

82.    The Act rests upon and perpetuates sex-based stereotypes and imposes "protections" on women that are not imposed on men.

83.    The Act treats women as less competent, less mature, and less informed decision-makers than men.

84.    The Act seeks to steer women into gender-stereotyped roles in family and society.

85.    The Act imposes special treatment and burdens on women seeking health care that are not imposed on men, including, but not limited to:  mandating an additional trip to a healthcare facility to obtain state-mandated information and services; and requiring a woman to be subjected to visual and/or audio experiences regarding her health care when she has chosen not to be subjected to them.

86.   The differential treatment of women under the Act is not substantially or even rationally related to the promotion of women's health or any other important governmental interest.

Irrational Treatment of Physicians and Facilities Providing Abortions

87.   The Act singles out abortion providers for different and more burdensome treatment than all other healthcare providers regulated by the state.

88.   The differential treatment and special burdens imposed by the Act on physicians providing abortions include, but are not limited to:  precluding a physician from relying on a colleague physician to provide the patient's counseling or pre-abortion ultrasound; forcing a physician to violate standards of medical ethics in order to avoid loss of his or her medical license; precluding a physician from relying upon a trained ultrasound technician who has not been "certified by a national registry of medical sonographers;" dictating how much a physician may charge a private patient for services; and severely limiting a physician's ability to schedule and manage his or her medical practice by requiring the physician to personally undertake, at designated time intervals, tasks that in other areas of medical care would be delegable.

89.   The Act's differential treatment of abortion care and all other health care is not rationally related to the promotion of women's health or to any other important or legitimate governmental interest, especially in light of how safe abortion is compared to other medical procedures.

Discriminatory Treatment of Women Unable to Obtain an Abortion Within 100 Miles

90.   The Act imposes a 24 hour waiting period after receipt of the required pre-abortion ultrasound and information for women who live within 100 miles of "the nearest abortion provider that is a [licensed abortion facility] or a facility that performs more than 50 abortions in

any 12 month period;" all other women are subject to two-hour waiting period.  Act, Sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(b)).  The 24-hour waiting period is imposed on some women who do not live within 100 miles of a physician willing and/or able to perform their procedure, because they live within 100 miles of some abortion provider.

91.    The Act's differential treatment of women who live at least 100 miles from *any* abortion facility that is licensed or that performed more than 50 abortions in any 12 months and women who live at least 100 miles from an abortion facility that is willing and able to perform the woman's abortion is not narrowly tailored, or substantially, or even rationally, related to the promotion of women's health or any other compelling, important, or legitimate governmental interest.

Lack of Notice

92.    The Act appears to impose strict liability for any failure to comply with any provision in the WRKA, irrespective of the physician's mental state and irrespective of the nature of the failure.

93.    The Act imposes a number of vague requirements or prohibitions that fail to give Plaintiffs and all Medical Providers of Abortions in Texas notice of how to conform their conduct to the law.  These include, but are not limited to, the examples set forth in the following paragraphs.

94.    The Act does not make clear what effect, if any, a woman's choice not to view the ultrasound images, hear the fetal heart auscultation, and/or receive the mandatory explanations of the images and auscultation have on the physician's obligations to place the ultrasound images in the woman's view (either personally, or, in some cases, through an agent who is a certified

sonographer), make the heart auscultation audible, and/or provide a verbal explanation of the ultrasound images and/or heart auscultation.

95.    The Act does not make clear what effect, if any, its provision that "the physician [performing the abortion] and the pregnant woman are not subject to a penalty . . . solely because" the woman chooses not to view the ultrasound images or chooses not to hear the auscultation or verbal explanations, the Act sec. 3 (to be codified at Tex. Health & Safety Code Ann. § 171.0122(e)), has on a physician's obligation to place the ultrasound images in the woman's view, describe the fetal images to the woman, make the heart auscultation audible, if present, and explain the heart auscultation in order to obtain informed consent.  For example, it is not clear whether the provision means that a physician must place the ultrasound images in the woman's view but will not be penalized if the woman averts her eyes, or if it means that the physician will not be penalized for failure to place the images in her view if she chooses not to view them.  Similarly, does it mean the physician must provide the verbal descriptions to the woman but will not be penalized if the woman puts her hands over her ears, or that the physician will not be penalized for failure to provide that description if she chooses not to hear it? Moreover, the meaning of this provision is unclear in part because neither the Act nor the WRKA contain any reference to penalties to which a pregnant woman could be subject.

96.    The Act requires the display of ultrasound images "in a quality consistent with medical practice."  The Act, at sec. 2 (Tex. Health & Safety Code Ann. § 171.012(a)(4)(B)).  The Act, however, does not indicate the scope of medical practice to which it refers.  Thus, the Act does not indicate whether the images must be of a quality consistent with medical practice among outpatient abortion providers, among obstetrician-gynecologists generally, or some other scope of practice.

97.    The Act requires that the heart auscultation be made audible, if present.  The Act, at sec. 2 (Tex. Health & Safety Code Ann. § 171.012(a)(4)(D)).  The Act does not make clear what equipment or methods must be used to determine if the "heart auscultation" is "present," and Plaintiffs are unable to ascertain what equipment and methods they must use to comply with this requirement.  Moreover, the Act does not make clear how much time and effort the physician must expend to try to make the heart auscultation audible to the patient.  It is unclear whether good faith, but unsuccessful, efforts will suffice under the Act, especially in situations in which audibility might be expected based on gestational age, but factors specific to the patient make it difficult to make the heart auscultation audible.

98.    Plaintiffs are also unable to ascertain what equipment and methods they must use to comply with the requirement that the heart auscultation is made audible in a quality "consistent with current medical practice."   The Act, at sec. 2 (Tex. Health & Safety Code Ann. § 171.012(a)(4)(D)).   This requirement is particularly difficult to understand because current medical practice does not entail making heart auscultation audible to women seeking abortions.

99.    It is not clear what a physician must say about the ultrasound images to satisfy the requirements of the Act.  The Act requires a physician to provide a verbal explanation of the ultrasound images "in a manner understandable to a layperson," the Act, at sec. 2 (Tex. Health & Safety Code Ann. § 171.012(a)(4)(C)), without giving any guidance on how to ensure that requirement is met so as to avoid the risk of mandatory penalties under the Act.

100.    The Act requires the woman to certify that she is "making this election of [her] own free will and without coercion."  The Act at sec. 2 (to be codified at Tex. Health & Safety Code Ann. § 171.012(a)(5)).  It is, however, not clear whether the term "this election" refers to her

choice to have an abortion, her choices with respect to the "options" stated on the certification form, or only (where applicable) her indication on the certification form that she comes within one of the three categories listed in relation to the ultrasound image explanation.

101.    The Act does not indicate how a woman can or will know whether she lives more than 100 miles from "the nearest abortion provider that is a [licensed abortion facility] or a facility that performs more than 50 abortions in any 12 month period."  Moreover, the Act does not make clear whether an abortion provider has any obligation to provide any information to patients about the location of other abortion providers.

102.    The Act does not make clear what steps, if any, a physician providing an abortion must undertake to verify the accuracy of a woman's claim that she lives more than 100 miles from "the nearest abortion provider that is a [licensed abortion facility] or a facility that performs more than 50 abortions in any 12 month period" and thus is subject to a two-hour, rather than 24-hour, waiting period and/or is eligible to receive certain information by telephone rather than in-person.  Moreover, the Act does not make clear whether a physician may rely solely on the woman's certification, irrespective of knowledge the physician, but not the woman, may have about the location of abortion providers.  In addition, if the Act does impose some obligation on the physician to verify the accuracy of the woman's claim, it is not clear how the physician will determine in every instance whether the woman lives more than 100 miles from such a facility.

103.    The Act does not make clear what steps, if any, a physician providing an abortion must undertake to verify the accuracy of a woman's assertions that she is pregnant as a result of "a sexual assault, incest or other violation of the Texas Penal Code" and that either the violation has been reported to law enforcement authorities or it has not been reported because the woman "reasonably believe[s] that doing so would put [her] at risk of retaliation resulting in serious

28

bodily injury."  *See* the Act, at sec. 3 (Tex. Health & Safety Code Ann. § 171.0122(d)(1)).  In particular, it is not clear whether the physician has any obligation to determine if the alleged violation has been reported to law enforcement and/or to evaluate the reasonableness of the woman's alleged belief.  Moreover, it is not clear what constitutes "serious bodily injury" for purposes of the Act.  For example, if the woman fears retaliation likely to result in a black eye or broken nose, can she certify that she is a risk of "serious bodily injury"?

104.    The Act does not make clear what steps, if any, a physician providing an abortion must undertake to verify the accuracy of a woman's assertion that "her fetus has an irreversible medical condition or abnormality, as identified by reliable diagnostic procedures and documented in [her] medical file."   The Act, at sec. 3 (Tex. Health & Safety Code Ann. § 171.0122(d)(3).  In particular, it is not clear whether the physician has any obligation to determine personally whether the fetus has "an irreversible medical condition or abnormality;" whether the physician may merely rely on the woman's certification; whether the physician may rely on the conclusion of another physician and, if so, what documentation the physician must obtain; and whether the "medical file" referred to is the one maintained by the physician performing the abortion or, if different, by whomever diagnosed the condition of the fetus. Moreover, it is not clear what conditions or abnormalities would qualify for this exception.  For example, does "irreversible" apply only to conditions and abnormalities that cannot ever be fully corrected by surgery or medication or to those that are rarely fully correctable or typically not fully correctable?  Do any irreversible conditions or abnormalities qualify, irrespective of their potential impact?

105.    The meaning of the Act's provision restricting payment and financial arrangements "[d]uring a visit made to a facility to fulfill the requirements" of Texas Health and Safety Code

section 171.012(a), as amended by the Act, is unclear in several respects, including the following. *See* the Act, sec. 2 (Tex. Health & Safety Code Ann. § 171.012(a-1)).  The term "abortion-related services" is unclear; for example, does it refer to services that the woman may need prior to having an abortion even if those services would be needed if she decided to carry the pregnancy to term but might assist her in deciding whether to have an abortion (*e.g.*, pregnancy test, lab work, options counseling)?  It is unclear what constitutes a "visit made to fulfill the [Act's] requirements."  For example, if a woman comes to an abortion facility for the purpose of obtaining pre-abortion lab work and also to comply with the Act's requirements, is the abortion facility prohibited from accepting payment for the pre-abortion lab work?  Does the answer differ if the woman leaves the facility after obtaining the lab work and returns a few minutes later for the ultrasound and state-mandated information?  With respect to women who certify that they qualify to have their abortion performed two hours, rather than 24 hours, after they receive the state-mandated pre-abortion ultrasound and state-mandated information, must the woman leave the facility during that two-hour period in order for the facility to be able to accept payment for the abortion?

106.   The Act requires that "[i]f after being provided with a sonogram and the information required under this subchapter, the pregnant woman chooses not to have an abortion, the physician or an agent of the physician shall provide the pregnant women with a publication developed by the Title IV-D agency that provides information about paternity establishment and child support."  The Act, sec. 3 (Tex. Health & Safety Code Ann. § 171.0123)).  It is unclear whether this provision imposes that obligation only if the woman indicates her choice to the physician or physician's agent immediately after she is provided with the ultrasound and information, or whether this obligation is imposed if, at any time thereafter, the woman decides

not to have an abortion.  Thus, this provision imposes a mandatory obligation with no apparent end date and no limitation as to the provider's knowledge, or lack of knowledge, of the woman's ultimate decision.

<u>Irreparable Harms</u>

107.    The Act will harm the integrity of the medical profession and of the Texas Medical Providers by forcing physicians to take actions contrary to their ethical duties to act in their patients' best interests, with respect for their patients' autonomy, and with their patients' consent.

108.    The Act will inflict significant harm on the physician-patient relationship.  For example, in situations where the Act requires a physician to subject a patient to an experience or information that the patient does not want, it puts the patient in a position of protecting or defending herself against something her physician is doing to her.

109.    The Act also threatens to inflict significant harm on the health and well-being of abortion patients.  For example, in situations where the Act requires a physician to subject a patient to an experience or information that the patient has declined to accept, it will unnecessarily stress, upset, and/or anger her as she prepares to undergo a medical procedure.

110.    The Act will chill physicians in their provision of constitutionally-protected abortion procedures by imposing vague standards under a strict liability regime punishable by mandatory non-renewal of the physician's medical license and other mandatory disciplinary actions.

111.    The Act will significantly, and unjustifiably, increase the costs of providing and obtaining lawful abortion services, thereby reducing women's access to those services.  To give just one example, the mandate that a physician who provides an abortion must personally, and in-person, undertake certain steps in advance of the patient's procedure will necessitate

significant changes in the organization of group medical practices which may currently rely on the physician on duty at a particular time or day to undertake any preliminary steps needed by a patient for a procedure that a different physician will perform for the patient on a later date. Requiring that a single physician undertake (personally and in person) the host of steps that the Act requires in advance of an abortion procedure will greatly undermine the efficiencies of time, costs, and scheduling that currently exist in group practice settings, to the detriment of providers and their patients.

112.    The Act will impose irreparable harms on patients who seek, and physicians who provide, abortions by depriving them of their constitutional rights to free speech, privacy, equal protection, and due process.

## FIRST CLAIM FOR RELIEF
### (Vagueness)

113.    The allegations of paragraphs 1 through 112 are incorporated as though fully set forth herein.

114.    Texas House Bill No. 15 violates the rights of Plaintiffs and the Texas Medical Providers Performing Abortion Services under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because it fails to give Plaintiffs and the class fair notice of the requirements of the Act and encourages arbitrary and discriminatory enforcement.

## SECOND CLAIM FOR RELIEF
### (Compelled Government Speech ─ Physicians)

115.    The allegations of paragraphs 1 through 114 are incorporated as though fully set forth herein.

116.    Texas House Bill No. 15 violates the rights of Plaintiff Dr. Braid and the physician members of the Texas Medical Providers Performing Abortion Services under the First and Fourteenth Amendments to the U.S. Constitution by forcing them to deliver unwanted,

government-mandated speech; in particular, the Act compels physicians to convey to their abortion patients in a private medical setting unwanted government speech that falls outside accepted and ethical standards and practices for medical informed consent.

## THIRD CLAIM FOR RELIEF
### (Compelled Government Speech ─ Patients)

117.    The allegations of paragraphs 1 through 116 are incorporated as though fully set forth herein.

118.    Texas House Bill No. 15 violates the rights of patients seeking abortions in Texas, from Plaintiffs and/or the Texas Medical Providers Performing Abortion Services, under the First and Fourteenth Amendments to the U.S. Constitution by subjecting them to unwanted, government-mandated speech in a private setting; in particular, the Act compels patients seeking abortions in a private medical setting to be subjected to unwanted government speech that falls outside the accepted standards and practices for medical informed consent, in violation of their free speech and privacy rights.

## FOURTH CLAIM FOR RELIEF
### (Equal Protection ─ Sex Discrimination)

119.    The allegations of paragraphs 1 through 118 are incorporated as though fully set forth herein.

120.    Texas House Bill No. 15 violates the rights of women seeking abortions in Texas, from Plaintiffs and/or the Texas Medical Providers Performing Abortion Services, by impermissibly discriminating on the basis of sex, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; the Act does so by subjecting women to burdens not imposed on men; by perpetuating patronizing and paternalistic stereotypes of women as in need of special "protections" and unable to make medical decisions on their own; and by enforcing the notion that a woman's primary and proper role is that of mother.

## FIFTH CLAIM FOR RELIEF
### (Equal Protection — Discrimination Against Abortion Patients and Providers)

121.    The allegations of paragraphs 1 through 120 are incorporated as though fully set forth herein.

122.    Texas House Bill No. 15 violates the rights of Plaintiffs, the Texas Medical Providers Performing Abortion Services, and their patients under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by treating them differently than providers and patients of all other medical services in the state without any basis for the differential treatment other than discriminatory views towards women and animus toward abortion providers and patients who seek their services.

## SIXTH CLAIM FOR RELIEF
### (Equal Protection — Discrimination Against Women Who Live at Least 100 Miles from an Abortion Facility Willing and Able to Perform the Woman's Abortion)

123.    The allegations of paragraphs 1 through 122 are incorporated as though fully set forth herein.

124.    Texas House Bill No. 15 violates the rights of patients who seek abortions in Texas, from Plaintiffs and/or the Texas Medical Providers Performing Abortion Services, and who live at least 100 miles from an abortion facility willing and able to perform the patient's abortion.  Specifically, Texas House Bill No. 15 violates these patients' rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by unjustifiably treating them differently from patients who live at least 100 miles from any abortion provider.

## ATTORNEY'S FEES

125.    Plaintiffs are entitled to an award of reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

1.    Issue a declaratory judgment that Texas House Bill No. 15 is unconstitutional and unenforceable as a whole and/or in part;

2.    Issue permanent injunctive relief, without bond, restraining Defendants, their employees, agents, and successors in office from enforcing Texas House Bill No. 15 as a whole and/or in part;

3.    Grant Plaintiffs attorney's fees, costs and expenses pursuant to 42 U.S.C. § 1988; and/or;

4.    Grant such other and further relief as this Court may deem just, proper, and equitable.


Dated:  June 13, 2011

Respectfully submitted,

  /S/ Dicky Grigg                        

Dicky Grigg, TX Bar #08487500
Spivey & Grigg, LLP
48 East Avenue
Austin, TX 78701
(512) 474-6061
(512) 474-8035 Fax
dicky@grigg-law.com

Bebe J. Anderson*
Bonnie Scott Jones*
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600
(917) 637-3666 Fax
banderson@reprorights.org
bjones@reprorights.org


Susan Hays, TX Bar #24002249
Godwin Ronquillo, PC
1201 Elm Street, Suite 1700
Dallas, TX 75270
(214) 557-4819
(214) 432-8273 Fax
shays@godwinronquillo.com

Jamie A. Levitt*
J. Alexander Lawrence*
Morrison & Foerster, LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 336-8638
(212) 468-7900 Fax
alawrence@mofo.com

*Motion for Admission *Pro Hac Vice* to be filed


ATTORNEYS FOR PLAINTIFFS