**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| TEXAS MEDICAL PROVIDERS PERFORMING ABORTION SERVICES, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION |
| v. | ) ) | Case No. 1:11-cv-00486-SS |
| DAVID LAKEY, M.D., et al., | ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MOTION**

**FOR PRELIMINARY INJUNCTION**

Plaintiffs move for a preliminary injunction enjoining Defendants from enforcing amendments made by House Bill 15 (the "Act") to the Texas Woman's Right to Know Act ("WRKA"), Tex. Health & Safety Code Ann. §§ 171.001 *et seq*.  The Act takes effect September 1, 2011, and requires compliance beginning October 1, 2011.  Absent an injunction from this Court, the Act will impose irreparable harm on physicians and facilities providing abortion services in Texas and the women seeking those services.  Plaintiffs seek immediate injunctive relief to maintain the status quo while the Court considers their claims.

## Brief Statement of the Case

The Act creates a profound, unprecedented, and unconstitutional intrusion into the practice of medicine and undermines the informed consent process.  The Act forces physicians to deliver to their abortion patients government-mandated speech – consisting of visual, auditory, and verbal depictions of the fetus – that falls outside of the accepted medical standards and practices for informed consent. App. ¶¶ 9-16, 26-31.  The Act imposes mandatory disciplinary penalties, including loss of the physician's medical license, on a strict liability basis for failure to comply with any one of its myriad, and vague, requirements.  App. ¶ 20.  To avoid the Act's penalties, a physician who is to perform the abortion must, 24 hours before the procedure, perform an ultrasound examination for the express purpose of producing images and sounds of the fetus that the physician must present to the woman, along with mandated descriptions.  The physician must place the ultrasound images in the woman's view, make audible the fetal heart auscultation, if present, and describe and explain in detail the images and sounds to the woman.[1]  App. ¶¶ 21-30.  The Act will force physicians to deliver this mandated speech regardless of the patient's expressed wishes.  App. ¶¶ 26-30.

If not enjoined, the Act will impose irreparable harms on Plaintiffs and their patients. Complying with the Act in contravention of a patient's wishes violates fundamental principles of medical ethics, namely: (1) that the physician may not act upon the patient without her consent; (2) that the physician must respect the patient's autonomy; and (3) that the physician must act in the patient's best interests. App. ¶¶ 9-16, 30-31. The Act damages the relationship of trust between physician and patient, and with compelled and unwanted speech imposes stress and emotional strain on women as they prepare to undergo a medical procedure. App. ¶¶ 42-44.

The WRKA, as amended by the Act, is far more extreme than, and qualitatively different from, any abortion counseling law enforced in this country. For example, the "informed consent statute" upheld in *Planned Parenthood of Southeastern Pennsylvania v. Casey did not* require physicians to engage in speech falling outside the customary informed consent topics of the risks, benefits, and alternatives of the procedure; *did not* require physicians to violate tenets of medical ethics; *did not* require physicians performing an abortion personally to convey mandated information; and *did not* force physicians to deliver to women unwanted images, verbal descriptions, or auditory representations of the fetus. *See Casey*, 505 U.S. 833, 902-03 (1992).

## Legal Authorities Supporting the Motion

A preliminary injunction should issue here based on Plaintiffs' showing of: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) the threatened injury outweighs any harm that will result if the injunction is granted; and (4) the injunction will not disserve the public interest. *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 219 (5th Cir. 2010).

---

[1] For women who live at least 100 miles from certain abortion providers, the required waiting period is two hours. App. ¶ 22. Some of the mandated steps must be done personally by the physician and some either personally or through an agent who is a certified ultrasonographer. *Id.* ¶¶ 23-25.

I.  **Plaintiffs Are Substantially Likely to Prevail on the Merits of Their Claims.**

   A.  **The Act Violates the Due Process Rights of Abortion Providers by Imposing Vague Requirements.**

The Due Process Clause "proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974)). A law is unconstitutionally vague if it *either* (1) fails to provide those subject to it with notice of what conduct is proscribed, *or* (2) provides such indefinite standards for those applying it that it encourages arbitrary and discriminatory enforcement. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972); *Women's Med. Ctr.*, 248 F.3d at 421. A vague law is especially problematic, and the standard of a court's review is therefore more stringent, "where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Colautti v. Franklin*, 439 U.S. 379, 391 (1979) (citations omitted); *see also Kolender v. Lawson*, 461 U.S. 362, 358 n.8 (1979) (noting that a higher level of certainty is required when statutes reach constitutionally protected conduct). Under this heightened standard, a vague law may be held unconstitutional even when it could conceivably have some legitimate application. *See Kolender*, 461 U.S. at 358 n.8.

The Act is rife with vague and ambiguous requirements, which are described in the accompanying appendix. App. ¶¶ 32-41. For example: (a) the Act purports to give women a choice not to view the ultrasound images or hear the heart auscultation, but the Act also requires, without exception, that the ultrasound images be placed in the woman's view and that the heart auscultation be made audible, App. ¶¶ 33, 26-28; (b) the Act requires the physician to provide the woman a verbal explanation of the ultrasound images "in a manner understandable to a layperson," but it gives no guidance on what language and terms a physician can use to meet this

standard, App. ¶ 36; (c) the Act substitutes a two-hour waiting period for the 24-hour waiting period for women living at least 100 miles from certain abortion providers, but the Act gives no indication of what obligations, if any, the provider has to verify a woman's representations that she meets that criterion, App. ¶ 37; and (d) the Act requires that the heart auscultation be made audible, "if present, in a quality consistent with current medical practice," but how to comply is unclear because the Act does not indicate what equipment or efforts must be made to locate the heart auscultation; the majority of abortions in Texas are performed at gestational ages when heart auscultation is not readily audible; and current medical practice does not involve making the heart auscultation audible to a woman seeking an abortion, App. ¶¶ 7-8, 35.

Failure to comply with the Act's ambiguous requirements is punishable by, *inter alia*, criminal prosecution and mandatory non-renewal of the physicians' medical license, App. ¶¶ 19-20, a quasi-criminal penalty.  *See Women's Med. Ctr.*, 248 F.3d at 422.  The Act's disciplinary sanctions are imposed with no requisite *mens rea,* App. ¶ 20, thus subjecting physicians to loss of their ability to practice their profession based on violation of the Act, even if unintentional or caused by a third party.  The problems posed by vagueness are "compounded" where liability can be imposed "without regard to fault."  *Colautti*, 439 U.S. at 394.  This strict liability scheme based on vague standards sets a chilling trap for physicians seeking to provide a constitutionally-protected medical service on the basis of good faith medical judgment and in accordance with accepted standards of care.  *See* App. ¶ 46.  Such a scheme does not meet the requirements of Due Process.  *See id.* at 391.

      B.      **The Act Violates the First Amendment by Compelling Physicians to Convey to Patients in a Private Medical Setting Government Speech Falling Outside Accepted and Ethical Standards for Informed Consent.**

The Act violates the plaintiff physicians' right of free speech by using them as puppets to convey government-mandated speech (visual, verbal, and auditory) to a patient who does not

wish to receive that information and who does not believe it material to her decision. This mandated speech falls outside accepted medical practice for informed consent and requires physicians to violate basic tenets of medical ethics. This unprecedented intrusion on a physician's relationship with a patient in a private medical setting violates the First Amendment.

      1.    <u>Compelled Speech is Subject to First Amendment Scrutiny</u>.

The freedom of speech protected by the First Amendment (as applied to the states through the Fourteenth Amendment) encompasses the right to refuse to engage in speech that is compelled by the government. *See, e.g., Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795 (1988). That right is the same whether the speech at issue is factual or ideological in nature. *See, e.g., Hurley*, 515 U.S. at 573; *Riley*, 487 U.S. at 797-98; *Hersh v. United States*, 553 F.3d 743, 765-66 (5th Cir. 2008).

The level of review applied to laws affecting free speech depends on the nature of the speech at issue. Laws that compel non-commercial speech or mixed commercial/non-commercial speech are subject to strict scrutiny and therefore constitutional only if they are the least restrictive means of furthering a compelling state interest. *See*, *e.g.*, *Riley*, 497 U.S. at 795-96. Laws that compel purely commercial speech – speech that does no more than propose a commercial transaction, *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989) – are generally subject to an intermediate standard of review. *See id*. at 475. Such a restriction must directly advance a substantial governmental interest and must not be more extensive than necessary to serve that interest. *Id*.; *see also Pub. Citizen, Inc. v. La. Attorney Disciplinary Bd.*, 632 F.3d 212, 218 (5th Cir. 2011).

2.  The Act's Forced Speech Fails Under Any Standard of Review.

By requiring physicians to provide a patient with visual, verbal and auditory depictions of the fetus that the patient does not want to receive, and that are not part of the accepted and ethical process of informed consent, App. ¶¶ 13-15, 30-31, the Act compels an abortion provider to engage in forced government speech. The apparent message conveyed by this speech is that the woman's primary focus and concern should be the fetus. *See* App. ¶ 16. This forced interjection of the State's values into the informed consent process is not speech that can be characterized as speech related solely to economic interests of the physician and patient and thus is noncommercial speech.[2] Therefore it is subject to strict scrutiny.

The State cannot establish that the forced speech is the least restrictive means of furthering a compelling state interest. Although the State has a compelling interest in the woman's health, it is not furthered by the Act. *See* App. ¶¶ 44-45. While the State's interest in potential life is "important," "legitimate," and "substantial," *Casey*, 505 U.S. at 875-76, it is not "compelling" prior to viability.[3] And the State cannot establish that the interest is furthered here. Moreover, these interests could be promoted through a less restrictive alternative, such as offering the patient the viewing, sounds, and explanations, while respecting her decisions, and allowing the abortion to proceed if she declines. The State's interests in ensuring informed consent and in the integrity and ethical standards of the medical profession – whether or not "compelling" – are undermined, not furthered, by the Act. *See* App. ¶¶ 9-16, 30-31, 42-44.

---

[2] At a minimum, it is speech that inextricably intertwines noncommercial speech with commercial speech, also subject to strict scrutiny. The Supreme Court has never addressed whether speech of this nature is non-commercial speech, mixed speech, or commercial speech.

[3] *See id.* at 860 ("[V]iability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions."). Post-viability abortions are rarely performed in Texas and only under very limited circumstances. *See* Tex. Health & Safety Code Ann. §§ 170.002, 171.004; Tex. Occ. Code Ann. § 164.052(a)(18); *see also* App. ¶ 7 (vast majority of abortions are in first trimester).

Even if this Court concludes that the compelled speech is purely commercial, Defendants are unlikely to satisfy the applicable standard for review. The Act's forced speech does not directly advance these state interests and is more extensive than necessary to serve those interests. *See*, *e.g.*, *Pub. Citizen, Inc.*, 632 F.3d at 218.[4]

### 3. The First Amendment Analysis in *Casey* Does Not Govern Here.

The discussion of a First Amendment claim in *Casey* does not govern the analysis here for two reasons. First, only three justices addressed the claim, and they conducted a cursory analysis without stating the level of review they were applying. *See* 505 U.S. at 884.[5]

Second, the mandated speech at issue here is fundamentally different from that at issue in *Casey*. The Pennsylvania statute required a physician to give the patient information about standard informed consent topics: the medical risks of abortion and childbirth; the nature of and alternatives to abortion; and the probable gestational age of the fetus.[6] *Compare Casey*, 505 U.S. at 902-04 (providing text of statute) *with* Act *and* Tex. Health & Safety Code Ann. §§ 171.012-171.016. Unlike the Act, the statute at issue in *Casey* did not require a physician to convey imagery, descriptions, and auditory representations of the fetus and did not prevent a physician from respecting the stated desires of the patient not to receive the message.[7] *Id*. Nothing in *Casey* suggests that the First Amendment permits states to require physicians to provide messages beyond what is required for the informed consent process, contravene patients' expressed wishes, and violate principles of medical ethics. To the contrary, *Casey* instructs that

---

[4] A lower standard of review is applied to requirements imposed on commercial advertising that has the potential to deceive consumers; they must be "reasonably related to the State's interest in preventing deception of consumers." *Zauderer v. Office of Disciplinary Counsel of the Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985).

[5] The plaintiffs consented below to application of the purely commercial speech standard, so the issue of applicable standard was not litigated. *Casey*, 947 F.2d 682, 705 (3d Cir. 1991), *aff'd in part & rev'd in part*, 505 U.S. 833.

[6] This statute also required an agent of the physician to notify the woman of the availability of state materials the woman could view and the possible availability of medical assistance benefits and child support. *Id.* at 902-04.

[7] Moreover, it allowed the physician to rely on a referring physician to convey the information. 505 U.S. at 903.

the physician-patient relationship in the abortion context should be accorded "the same solicitude it receives in other contexts." 505 U.S. at 884. That standard is not met here.

### C. The Act Violates the First and Fourteenth Amendment Rights of Women Seeking Abortions by Forcing on Them, in a Private Medical Setting, an Unwanted Experience of Government Speech Outside Accepted and Ethical Standards for Informed Consent.

The Act violates the First and Fourteenth Amendments by subjecting abortion patients to visual, verbal, and auditory depictions of the fetus that they do not want, and do not consent to receive, and that are not part of the accepted and ethical process of informed consent. Individuals have "a recognizable privacy interest in avoiding unwanted communication" in certain private settings, which is "an aspect of the broader 'right to be let alone' . . . characterized as 'the most comprehensive of rights and the right most valued by civilized men.'" *Hill v. Colorado*, 530 U.S. 703, 716-17 (2000) (citation omitted). This "right to avoid unwelcome speech" has "special force" in settings such as the home and medical facilities. *Id.*, 530 U.S. at 717; *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 772-73 (1994).

Where, as here, the unwelcome speech seeks to compel a particular decision by the listener, the listener's First Amendment, as well as privacy, rights are violated. The ability to decide for oneself "the ideas and beliefs deserving of expression, consideration, and adherence" is a fundamental principle of the First Amendment. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994); *see also Abood v. Bd. of Educ.*, 431 U.S. 209, 234-35 (1977) (noting that "at the heart of the First Amendment is the notion . . . that in a free society one's beliefs should be shaped by [her] mind and [her] conscience rather than coerced by the State"). Requiring a patient to hear an unwanted message not relevant to her decision-making and in contravention of medical necessity and the standard of care turns the informed consent process into a transmission of government-sponsored, ideological-based messages against abortion.

The Supreme Court has held that the right to avoid unwanted speech justifies limitations by the government on the free speech rights of private individuals. *See, e.g., Frisby v. Schultz*, 487 U.S. 474, 487 (1988) ("The First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech."). The reasoning of those decisions is equally applicable to unwanted speech forced on a medical patient by the government.[8] The fact that the State believes that it would be good for abortion patients to hear its message is of no moment: "no one has a right to press even 'good' ideas on an unwilling recipient." *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 738 (1970); *id.* at 737 ("[n]othing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit").

Here, while "held 'captive' by medical circumstance," *Madsen*, 512 U.S. at 768, the patient is forced to receive unwanted government speech about the State's prioritizing of the fetus over all other concerns informing the woman's decision. The State's interests can be achieved without these intrusions on free speech and privacy rights, *see* Section I.B, *supra*, and therefore the Act violates the Free Speech and Due Process Clauses of the federal Constitution.

## II.     All Other Requirements for Granting a Preliminary Injunction Are Satisfied.

Plaintiffs and their patients will suffer irreparable injury absent an injunction. *See* App. ¶¶ 42-48. It is well established that the threatened violation of a constitutional right constitutes irreparable injury, for such deprivations cannot be made whole through damages. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (finding irreparable injury where

---

[8] As discussed above, the unwanted speech at issue here is not a part of normal informed consent speech, nor is it the type of abortion-specific speech that courts have allowed states to mandate. *See supra*.

women's right to privacy was threatened or impaired). Indeed, when a constitutional right is threatened, no further showing of irreparable injury is necessary. *See* 661 F.2d at 338.[9]

In contrast, Defendants face little, if any, injury, from issuance of an injunction. The injunction sought will impose no affirmative obligation, administrative burden, or cost upon Defendants. It will serve only to maintain the status quo while the Court assesses the constitutionality of the Act. Abortion providers will continue to be subject to the requirements of the current WRKA, as well as to their professional obligation to obtain informed consent from their patients prior to any abortion procedure. Even if Defendants could show they faced some potential injury, it would certainly be outweighed by the threatened injuries to Plaintiffs. Indeed, government officials benefit from the issuance of an injunction against unconstitutional enforcement of a law, for the same reason that the public interest is not disserved by preventing such constitutional violations. *See infra*.

Finally, preliminarily enjoining the Act will not disserve the public interest. It is a well-established principle that the "public interest [is] not disserved by an injunction preventing [the] implementation" of a law that violates constitutional rights. *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). Moreover, the public does not have an interest in allowing government officials to interfere with constitutional rights. *See Deerfield Med. Ctr.*, 661 F.2d at 338-39. The constitutional rights of Plaintiffs and their patients are threatened by enforcement of the Act, and the only way to ensure that Plaintiffs and their patients will not be denied their constitutionally protected rights is by issuance of an injunction.

## III.  Conclusion

Plaintiffs respectfully ask this Court to grant their motion for a preliminary injunction.

---

[9] Were such showing required, it has been met by evidence that the Act will harm the integrity of the medical profession, the physician-patient relationship, and the well-being of women seeking abortions. App. ¶¶ 42-45.

Dated: June 30, 2011

Respectfully submitted,

| | |
|---|---|
| /S/ Dicky Grigg<br>Dicky Grigg, TX Bar #08487500<br>Spivey & Grigg, LLP<br>48 East Avenue<br>Austin, TX 78701<br>(512) 474-6061<br>(512) 474-8035 Fax<br>dicky@grigg-law.com | Bebe J. Anderson*<br>Bonnie Scott Jones*<br>Center for Reproductive Rights<br>120 Wall Street, 14th Floor<br>New York, NY 10005<br>(917) 637-3600<br>(917) 637-3666 Fax<br>banderson@reprorights.org<br>bjones@reprorights.org |
| Susan Hays, TX Bar #24002249<br>Godwin Ronquillo, PC<br>1201 Elm Street, Suite 1700<br>Dallas, TX 75270<br>(214) 557-4819<br>(214) 432-8273 Fax<br>shays@godwinronquillo.com | Jamie A. Levitt*<br>J. Alexander Lawrence*<br>Morrison & Foerster, LLP<br>1290 Avenue of the Americas<br>New York, NY 10104<br>(212) 336-8638<br>(212) 468-7900 Fax<br>alawrence@mofo.com<br><br>*Admitted *Pro Hac Vice* |