IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TEXAS MEDICAL PROVIDERS PERFORMING | ) | |
| ABORTION SERVICES, a class represented by | ) | |
| METROPOLITAN OB-GYN, P.A., d/b/a | ) | |
| REPRODUCTIVE SERVICES OF SAN ANTONIO | ) | |
| and ALAN BRAID, M.D., on behalf of themselves | ) | |
| and their patients seeking abortions, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | CASE NO. 11-486-SS |
| DAVID LAKEY, M.D., Commissioner of the Texas | ) | |
| Department of State Health Services, in his official | ) | |
| capacity; MARI ROBINSON, Executive Director of | ) | |
| the Texas Medical Board, in her official capacity; and | ) | |
| DAVID ESCAMILLA, County Attorney for Travis | ) | |
| County, in his official capacity and as representative | ) | |
| of the class of all county and district attorneys in the | ) | |
| State of Texas with authority to prosecute | ) | |
| misdemeanors; and their employees, agents, and | ) | |
| successors, | ) | |
| | ) | |
| Defendants. | ) | |

BRIEF OF 317 TEXAS WOMEN INJURED
BY ABORTION AS *AMICI CURIAE*
IN SUPPORT OF DEFENDANTS

**TABLE OF CONTENTS**

I.     TABLE OF CONTENTS.........................................................................................i

II.    TABLE OF AUTHORITIES................................................................................ii

III.   IDENTITY OF *AMICI*.......................................................................................1

IV.    INTEREST OF *AMICI*......................................................................................4

V.     ARGUMENT......................................................................................................8

      I.     *AMICI* ARE TEXAS WOMEN PERSONALLY INJURED BY THEIR ABORTIONS, EITHER PHYSICALLY OR EMOTIONALLY.  THEY HAVE A DEEP INTEREST IN SEEING THAT OTHER TEXAS WOMEN ARE NOT HURT BY ABORTION AND ARE PROTECTED BY THE SONOGRAM ACT. THEY BELIEVE THAT WOMEN SHOULD BE GIVEN FULL ACCESS TO SONOGRAM INFORMATION BEFORE MAKING AN ABORTION DECISION.  *AMICI* BELIEVE THOUSANDS OF TEXAS WOMEN EACH YEAR COULD BE SAVED FROM ABORTION TRAUMA IF THE STATUTE WERE IN FORCE……………………………………………………………...8

          A.  The Real Life Experiences of Post-Abortion Women Demonstrate that Abortion Hurts Women...................................................................................10

          B.   The Problem of Guilt: Women Suffer – Abortionists Want to Ignore It…....12

          C.  Other Recent State Legislative Findings Also Support Texas' Legitimate Concern For The Serious Physical, Emotional, And Psychological Harm To Women From Abortion…………………………………………………...12

VI.    CONCLUSION………………………………………………………….…16

VII.   APPENDIX……………………………………………………………... ..1

# TABLE OF AUTHORITIES

Page

**CASES**

*Casey v. Planned Parenthood*, 505 U.S. 833 (1992)………………………….…………………..5, 7, 8

*Gonzalez v. Carhart,* 550 U. S. 124, (2007)...............................................................1, 2, 4, 5, 7, 8

*McCorvey v. Hill*, 385 F3d 846 (5th Cir. 2004), *cert. denied.* .......................................................9

*Planned Parenthood v. Rounds* 530 F. 3rd 724 (8th Cir. Court 2008)............................................7

**STATUTES**

Women's Right to Know Act of 2003, TEX. HEALTH & SAFETY CODE § 171.001
et seq. (2003) ........................................................................................................................12

**OTHER**

Brief for Sandra Cano et al as *Amici Curiae*  Gonzalez v. Carhart, 550 U.S. 124, in No.
05-380, pp. 22-24…..…….……………………………………………………………………..7

"Abortion as a Public Health Issue,"
http://afterabortion.org/1999/abortion-complications/..................................................10

Texas Dep't of Health, "Woman's Right To Know" booklet available at
www.dshs.state.tx.us/wrtk/pdf/booklet.pdf  .................................................................12

Report of the South Dakota Task Force to Study Abortion
(December 2005), available at
http://www.dakotavoice.com/Docs/South%20Dakota%20Abortion%20Task%20Force%20Repor
t.pdf  ....................................................................................................................13, 14, 15

## IDENTITY OF THE *AMICI* CURIAE

*Amici* are 317 Texas women who have personally suffered the adverse emotional and psychological effects of abortion.[1]  Almost all of these women had their abortions performed in Texas, but some had abortions elsewhere and now live in Texas.  These women attest to the fact that there are adverse emotional and psychological health effects from abortion that have affected their lives.

In balancing the equities and potential harms concerning whether the Texas H.B. 15 should remain in place, *Amici* want the Court to know that some women will be harmed if it is enjoined.  Because abortion is so painfully difficult, some women might not want to see the truth of a sonogram, but that is not an "informed decision".  Why should that woman's objection be allowed to stop many, many others from being helped?  Without the statute, women simply will not see or hear the sonogram's truth, and many of them will be irreparably injured.

The U.S. Supreme Court recently recognized that "… some women come to regret aborting the infant life they once created and sustained… Severe depression and loss of esteem can follow."  *Gonzalez v. Carhart,* 550 U. S. 124, (2007).  Yet the Abortionists/Plaintiffs in this case deny this fact and go to great lengths to attempt to hide this fact from women that they claim they want to help.  The *Amici* herein provide this Court with their real life perspective and attest that abortion in actual practice, contrary to the rhetoric put forth by abortion supporters, hurts women's health.  *Amici* Texas women were asked, "How has your abortion affected you?" in Sworn Affidavits and Declarations Under Penalty of Perjury.  Excerpts in answer to this question are cited in this brief.  More expanded answers to that question and the questions:

---

[1] Counsel for amici authored the brief in whole. The Justice Foundation is a nonprofit legal foundation that handles cases in landmark decisions. The Foundation is supported through private contributions of donors who have made the preparation and submission of this brief possible. No party contributed to the writing or financing of this brief.

"Were you adequately informed of the consequences of abortion?" and "Were you adequately informed of the nature of abortion, what it is, what is does?" from *Amici* are included in Appendix Exhibit A. Appendix A is included for the purpose of demonstrating to the Court the interest of *Amici*. It is the explanation for their passion and perspective as *Amici*. This is the same type of *Amici* perspective that was provided to and cited by the U.S. Supreme Court in *Gonzales, supra.*

The post-abortion women *Amici* are:

| | | |
|---|---|---|
| Myra M. Myers* | Kelly | Teresa |
| Nona Ellington | Jessica | Adrienne |
| Mayela Bank | Jolean | Rosa |
| Carmen Pate | Khristina | Carol |
| Bobbi | Rachel | Karen |
| Michele | Stephanie | Leella |
| Carolyn* | J.W. | T.C. |
| Pamela* | Julie | L.C. |
| Karen* | Cathy | Kathryn |
| Lori* | Sarah | Mary |
| Lynn* | K.R. | P.C. |
| Kaye* | A.G. | Lisa |
| Kathleen* | Priscilla | Mary |
| Kristene* | Mikaila | Lynne |
| Rhonda* | Lisa | Janet |
| S.E.** | Keri | F.C. |
| Maria | Dalila | Jackie |
| Cassandra | Tammie | Darlene |
| M.F. | Lisa | Christi |
| K.H. | Kay | Annette |
| L.S. | Linda | M.J.D.R. |
| Amanda | B.B. | Dayna |
| Jorea | K.B. | Saundra |
| B.L. | Patricia | Anne |
| Jennifer | Rebecca | M.D. |
| D.O.R. | Donna | Marian |
| Terra | Misty | P.D. |
| Britany | Amy | Crystal |
| E.R. | A.B. | Mary |
| J.A. | Loretta | Betsy |
| Angela | Lisa | J.D. |
| M.V. | N.C. | Kay |

| | | |
|---|---|---|
| R.D. | Janet | Rhonda |
| Elizabeth | Jill | Margaret |
| Mary Ann | Stephanie | Arcilla |
| Beatrice | Sue | Karen |
| K.D. | Kate | Betty |
| Debby | Sandra | J.R. |
| Julie | Berlinda | Kellie |
| M.E. | Claudia | Irene |
| Lisa | K.M. | Lynn |
| Lisa | Debra | Jennifer |
| Rosalie | Jennifer | Jill |
| Rebecca | Judy | Jennifer |
| Barbi | Marga | Amy |
| Celinda | Jeri | Linda |
| Tina | Erica | Renee |
| Wanda | Laura | Rolanda |
| Melissa | Aimee | Nicole |
| A.G. | Marion | Lisa |
| Mary | Sharon | Dian |
| Carla | Beth | Victoria |
| Crystal | Ruth | Rande |
| Jane | Rhonda | L.S. |
| Stacey | Diana | Myrna |
| Dorinda | Debra | C.S. |
| Jeri | L. | Christina |
| Marsha | Yvonne | R.S. |
| S.H. | Melanie | Deanna |
| Maria Teresa | Viola | Betty |
| Cami | Donna | Joanne |
| M.H. | Kim | P.T. |
| Rochelle | Llana | Stella |
| Bonnie | Diana | J.T. |
| Lynn | Thelma | R.T. |
| M.M.H. | Suzanne | Carrie |
| D.J. | Kimberly | M.T. |
| Velda | Shelley | E.B.U. |
| Carrie | P.O. | Nikki |
| Katherine | Gale | Mary |
| Penny | Lelar | Sherre |
| Angie | D.P. | Alison |
| Rebecca | L.P. | P.W. |
| Thon | B.P. | T. Antoinette |
| X.K. | Debra | Januari |
| D.K. | T.P. | J.W. |
| Kristin | Mary | L.W. |
| Maureen | Sue | Valerie |

| | | |
|---|---|---|
| Cathy | Lisa Marie | Lisa |
| Cathy | Laura | Sharon |
| Megan | S.D. | Ana |
| Vickie | Grace | Sylvia |
| L.B. | Ashton | Mitzi |
| Maria | Nina | O.R.H. |
| Andrea | J.B.F. | Randa |
| Esmeralda | P.R.G. | Aleyda |
| Gail | Shirley | Theresa |
| Ketra | Corie Ann | Kathy |
| Cari | Victoria | V.S. |
| Katherine | Laura | Theresa |
| Wendy | Amy | Mary Kathryn |
| Lisa | Natasha | Sylvia |
| Patti | Karen | Susie |
| Sharra | Alisa | Rhonda |
| Kimberly | Sandra | Michelle |
| Meg | Janet | Davida |
| Elena | Dawn | Tiffany |
| Christine | Janet | Beverly |
| Nancy | Dee Ann | Pamela |
| Diane | Stacy | Sonya |
| Sherry | L.M. | Lou Ann |
| Kim | Debra | Patricia |
| Kelly | Carol | Susan |
| Sandra | Lillie | Rhonda |
| Susan | Kimberly | Rhonda |
| Shaina | Debra | |

*These *Amici* perspectives were provided to U.S. Supreme Court in the Brief of Sandra Cano and 180 Women Hurt by Abortion which was cited by the Court in *Gonzales v. Carhart*, 550 U. S. 124 (2007).

** Some women have asked to be identified by their initials only to protect their identity and others have requested only their first name be used.

## **INTEREST OF *AMICI***

All of the *Amici* are Texas women who have been injured psychologically, physically, or both, by their abortions.  The *Amici* seek to protect the rights of Texas women to have truly informed consent before deciding to have abortions.  *Amici* have an interest in informing this Court regarding the statute at issue from the unique perspective of women who personally have

experienced abortion.  **Each Texas woman considering an abortion is at risk** of suffering severe emotional consequences, especially if she is not equipped with truthful, accurate information regarding the nature of abortion prior to deciding whether to abort the child in her womb. *Casey v. Planned Parenthood*, 505 US 833 (1992); *Gonzales v. Carhart,* 550 U. S. 124 (2007)*.*  Because a woman's experience with abortion is such a deep, dark, and painful secret, the information being offered to this Court by *Amici* women is difficult to obtain and is crucial to a proper decision by this court in this litigation.  For years, even decades following abortion, most women who have experienced an abortion are still not willing to publicly talk about their injuries even when they are tormented by thoughts of suicide, guilt, shame, nightmares, sleeplessness, and depression.[2]

It is from this unique woman-friendly perspective that *Amici* seek to assist this Court in making its decision in this case.  This perspective is different from the interest of the State of Texas, and, in fact, different from all residents of the State of Texas who have not had an abortion.   Clearly, the best perspective regarding the consequences of not being informed regarding the nature of abortion is testimony from real Texas women that have experienced abortion.  *Amici's* interest is **to prevent other Texas women from experiencing the emotional trauma which they have been forced to endure** because they were not adequately informed regarding the nature and consequences of abortion.  That perspective is uniquely different from the State of Texas.

*Amici* collectively believe the abortion industry does not adequately disclose to women the true nature of abortion, which a sonogram viewing and explanation would show, and its

---

[2] E.g., K.H.- "It severely hurt my marriage and almost caused us to divorce. I am emotionally scarred forever and live with daily guilt and regret. I dream about my baby and cry regularly, even now, over a year later. I wish constantly for another baby and beg my husband on a regular basis despite the fact that we cannot financially support another child at this time. It has made me obsess over wanting another baby to the point of driving a wedge between my husband and I." Appendix Exhibit A at p. 6.

consequences, especially the resulting psychological trauma and harm.[3]

     *Amici* also believe, based on their own experiences, and that of other Texas women, that there is no real personal, doctor-patient relationship in most abortions performed in Texas, since most women never see the doctor until he is performing the abortion.[4]  See Declaration of Alan Braid, M.D. in support of Motion for Preliminary Injunction, ¶ 12, p. 3 (no personal contact with patients, only telephone recording warnings).  In addition, abortionists have a conflict of interest as demonstrated in part by the fact that the abortionists herein are suing to stop disclosure of extremely relevant information to Texas women in this lawsuit.  If the injunction is granted, standard practice will continue to be to hide this scientifically accurate information.

---

[3] D.K. - "Were you adequately informed of the nature of abortion, what it is, what it does?  No, I was told that I would have counseling before the procedure, the counseling constituted of an explanation of the payment for the procedure.  I was a scared teenager that didn't want to have an abortion in the first place, my parents were forcing me to do it, I thought through the counseling I would be able to talk to an adult about what I was going through and that they would help me personally.  They did not.  How has abortion affected you?  I have suffered guilt and shame throughout my adult life.  I have cried endless tears for the baby that I wasn't allowed to have."  Appendix Exhibit A at p. 42-43.  K.M. – "Were you adequately informed of the nature of abortion, what it is, what it does?  No, it was explained as ending a pregnancy, that the fetus was just a blob of cells, it was minimized for sure.  There was never any counseling or mention of the emotional or possible physical harm it would cause.  How has abortion affected you?  It has left me with a profound sense of loss and shame."  Appendix Exhibit A, p. 45-46.  Erica – "Were you adequately informed of the nature of abortion, what it is, what it does?  No, not being very sure of how far along I was, less than a month for sure, I did not know how well formed my baby was.  Having been indoctrinated in the pro-choice movement and thinking it was all ok, I didn't realize I was actually killing my child.  I thought it was just a blob.  Appendix Exhibit A at p. 47.  Laura – "Were you adequately informed of the nature of abortion, what it is, what it does?  No, nobody explained a thing.  They just said they would suck the products of conception out and it would be all over.  Nobody said it was a real baby.  I thought of it as a "blob" at this point in its growth.  How has abortion affected you?  It has always been a sad shadow on my heart.  Appendix Exhibit A, p. 48.  Rhonda – "Were you adequately informed of the nature of abortion, what is is, what it does?  No, I just went in and told them I wanted an abortion.  A price was quoted to me, after it was paid, the procedure was performed without any explanation of what would happen.  Appendix Exhibit A, p. 49.  L. – "Were you adequately informed of the nature of abortion, what it is, what it does?  No, I was unaware that my baby already had a heartbeat.  Appendix Exhibit A, p. 50.  Suzanne – "Were you adequately informed of the nature of abortion, what it is, what it does?  No, I was told it was just a "blob of tissue."  <u>About a month afterwards, I saw a front page story in the newspaper with a photo of a 10-week old fetus's perfectly formed foot, and realized that my baby was fully formed – a real baby that I had let be destroyed by being pulled apart.</u>  How has your abortion affected you?  Guilt, sadness, self-destruction, self-hatred."  Appendix Exhibit A, p. 52. (Emphasis added.)  Lisa – "Were you adequately informed of the nature of abortion, what it is, what it does?  No, I did not know that it was a fully formed baby with arms, legs and hands. I heard the term "products of conception" and that as long as I "terminated" (I recall that term being used over abortion) before 12 weeks it wasn't a big deal. It was just tissue.  <u>It wasn't until two years later that I saw pictures of fetal development at 11 weeks...and I was so mortified and grief-stricken all over again.</u>" (Emphasis added.)  Appendix Exhibit A. p. 61.

[4] Teresa – "No, we were just lined up like a cattle call.  There are no happy faces and caring physicians, nurses, or technicians in an abortion clinic…"  Appendix Exhibit A at p. 20.

As women who have been hurt by abortion, *Amici* are part of the class of women that the Act is designed to protect or have a special perspective. *Amici* seek to expose the truth about abortion and its devastating impact on women, men, and families. The first purpose stated in the text of HB 15 is "protecting the physical and psychological health and well-being of pregnant women." P. Ex. 1 at 14. Texas has "a substantial government interest justifying a requirement that a woman be apprised of the health risks of abortion and childbirth," including mental health considerations. *Casey*, 505 U.S. at 882. Further, "[i]t cannot be questioned that psychological well-being is a facet of health." *Id*. Texas, "[i]n attempting to ensure that a woman apprehend the full consequences of her decision … furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed. If the information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible." *Id*. The women's psychological injuries are directly attributable to non-existent, inadequate, or inaccurate disclosure by abortionists about the nature of abortion, namely; that abortion will terminate the life of a "whole, separate, unique, living human being." See *Planned Parenthood v. Rounds*, 530 F. 3d 724 (8th Cir. Court 2008) (upholding South Dakota statute requiring abortionists to give this statement to women). The sonogram would reveal the truth. It is undeniable that many women come to believe the above to be true, often with devastating emotional consequences. *Amici* know from their personal experiences that concealing the nature of abortion from Texas women contemplating abortion will force countless women to suffer devastating psychological injuries which may last a lifetime. See *Carhart v. Gonzales* 550 U.S. 124 (2007). A sonogram reveals the true nature of abortion in a way which is aesthically pleasing and scientifically accurate. See sample sonogram photo, Appendix Exhibit B.

7

*Amici's* perspective such as this was presented by Sandra Cano and 180 Women Hurt by Abortion through an *Amici* Brief prepared by The Justice Foundation and cited by the United States Supreme Court in *Gonzales v. Carhart*.  Citing the women's brief, the Supreme Court recognized the significance of the women's own perspective:

> Respect for human life finds an ultimate expression in the bond of love the mother has for her child. . . .  Whether to have an abortion requires a difficult and painful moral decision. *Casey, supra,* at 852-853, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (opinion of the Court). While we find no reliable data to measure the phenomenon, **it seems unexceptionable to conclude some women come to regret their choice to abort the infant life they once created and sustained.**  *See Brief for Sandra Cano et al. as Amici Curiae* in No. 05-380, pp 22-24.  **Severe depression and loss of esteem can follow.**

550 U.S. 124 (2007) (emphasis added).

The Supreme Court's conclusion referenced extensive quotes from women who had an abortion at pp. 22-24.  See Appendix Exhibit C, Excerpt of Brief for Sandra Cano, et al. as *Amici Curiae,* pp. 22-24.  The 180 women hurt by abortion cited by the U. S. Supreme Court filled out Declarations and Affidavits, and provided excerpts similar to Appendix Exhibit A.

## ARGUMENT

I.    *AMICI* ARE TEXAS WOMEN PERSONALLY INJURED BY THEIR ABORTIONS, EITHER PHYSICALLY OR EMOTIONALLY.  THEY HAVE A DEEP INTEREST IN SEEING THAT OTHER TEXAS WOMEN ARE NOT HURT BY ABORTION AND ARE PROTECTED BY THE SONOGRAM ACT.  THEY BELIEVE THAT WOMEN SHOULD BE GIVEN FULL ACCESS TO SONOGRAM INFORMATION BEFORE MAKING AN ABORTION DECISION. *AMICI* BELIEVE THOUSANDS OF TEXAS WOMEN EACH YEAR COULD BE SAVED FROM ABORTION TRAUMA IF THE STATUTE WERE IN FORCE

In *Casey v. Planned Parenthood*, the Supreme Court stated that "psychological wellbeing is a facet of health."[5]  The Court also stated that there could be "devastating psychological consequences" if a woman's decision was not fully informed, truthful, and **not misleading**.[6]  The

---

[5] *Planned Parenthood v. Casey*, 505 U.S. 833, 882 (1992).
[6] *Id.*

*Amici* know the devastating "psychological consequences" that they experienced when they were not fully informed of the nature of and psychological consequences of abortion and the information they were given by the abortionist, or the abortion facility staff, was in fact misleading. The abortionists' own pleadings in this case attempt to mislead this Court by a complete failure to disclose law or scientific evidence contrary to their own view. When there is conflicting law and science, both this Court and women considering abortion should be presented both sides so they can make an informed decision.

Abortionists state in their Summary of Facts, ¶ 5 in support of Motion For Preliminary Injunction and ¶ 65 of their Complaint that **"Studies have shown that abortion poses little risk of negative psychological consequences or *sequelae* for women of all ages, and this risk is lower than that associated with childbirth."** This is the great lie Texas abortionists tell Texas women, but *Amici* can inform this Court about their personal psychological trauma from their abortions. See Appendix Exhibit A.

The abortionists' statement that there are no psychological complications from abortion is part of a misleading sales tactic, which completely fails to reveal to women the conflicting peer reviewed scientific studies, which show that there are significant psychological injuries to women. See Appendix Exhibit D (Scientific Articles Documenting Increased Risk of Psychological harm from abortion.) (See also *Gonzales v. Carhart, Supra,* and *Ginsburg, dissenting FN7,* discussing conflicting evidence.)

Justice Edith Jones, concurring, in *McCorvey v. Hill* stated:

> "McCorvey presented evidence that goes to the heart of the balance *Roe* struck between the choice of a mother and the life of her unborn child. First, there are about a thousand affidavits of women who have had abortions and claim to have suffered long-term emotional damage and impaired relationships from their decision. Studies by scientists, offered by McCorvey, suggest that women may be affected emotionally and physically for years afterward and may be more prone to engage in high-risk,

self-destructive conduct as a result of having had abortions. Second, Roe's assumption that the decision to abort a baby will be made in close consultation with a woman's private physician is called into question by affidavits from workers at abortion clinics, where most abortions are now performed. According to the affidavits, women are often herded through their procedures with little or no medical or emotional counseling." (Footnotes omitted.)  (holding that Rule 60 Motion was moot, but suggesting that such evidence should be considered by Courts). (The thousand affidavits referenced by Justice Jones include some of these excerpts in Appendix Exhibit A.)

385 F.3d 846 (5th Cir. 2004) *cert. denied*.

### A.    The Real Life Experiences of Post-abortion Women Demonstrate that Abortion Hurts Women

Dr. David Reardon, one of the world's leading experts on the effects of abortion on women, further demonstrates the devastating psychological consequences of abortion.  Dr. Reardon states that following temporary feelings of relief, there is emotional "paralysis" or post-abortion "numbness," guilt and remorse, nervous disorders, sleep disturbances, sexual dysfunction, depression, loss of self-esteem, self-destructive behavior such as suicide, thoughts of suicide, and alcohol and drug abuse, chronic problems with relationships, dramatic personality changes, anxiety attacks, difficulty grieving, increased tendency toward violence, chronic crying, difficulty concentrating, flashbacks, and difficulty in bonding with later children.[7]

The real life experiences of the post-abortion women also confirm what the research has discovered. The women were asked: ***How has abortion affected you?***  Typical responses from their sworn Affidavits[8] and Declarations under penalty of perjury included depression,[9] suicidal

---

[7] "Abortion as a Public Health Issue," http://afterabortion.org/1999/abortion-complications/ (calling abortion a public health issue and listing the physical and psychological effects of abortion).
[8] In addition, approximately 2,000 similar Affidavits from post-abortion women were given to the Task Force on Abortion in South Dakota which provided evidence that led to that State's ban, which was later repealed by referendum.
[9] Mary – 'For several years I struggled with depression and guilt that I killed my baby even though I told the doctor I had changed my mind.  Then when I married a few years later I had a miscarriage and difficulty getting pregnant, which added to the guilt as I knew the abortion had caused damage to my uterus.  I had a hysterectomy when I was thirty years old." Appendix Exhibit A, p. 67.  Sherre – "Depression; difficulty in "attachment" relationships with my husband & children…"  Appendix Exhibit A, p. 67.  Esmeralda – "I struggle with depression and anxiety.  I am

thoughts,[10] bonding issues,[11] alcohol and/or drug use,[12] promiscuity,[13] guilt,[14] and anger.[15]  Each

of them made the "choice" to abort their baby, and they have regretted their "choices."[16]  The

motional and psychological pain does not go away,[17] and therefore, abortion is a short-term

solution with long-term negative consequences.

The findings of the South Dakota Task Force on Abortion, infra, and excerpts from sworn

Affidavits and Declarations of the women in Appendix Exhibit A are only the tip of the abortion

iceberg.  It is estimated that there are more than one million abortions each year.  If even 1 in 10

---

seeing a therapist and a psychiatrist.  I was suicidal and felt like a monster for killing my baby."  Appendix Exhibit A, p. 71.

[10]  Rhonda - "There were so many times of suicidal thoughts, hatred, low self-esteem … It ruined my life."  Appendix Exhibit A, p. 89.

[11]  Mary – "… I have never been the same again. I lost myself that day. I became a shell of a person. First, I developed severe depression and used "cutting" as a coping mechanism to deal with the grief. I had three other children and had much difficulty bonding with them when they were infants… Appendix Exhibit A, p. 23.  Sharon – **"**It changed who I was for 40 years and prevented me from completely bonding with the child I later did have."  Appendix Exhibit A, p. 49.

[12]  Ruth – "I became very promiscuous, addicted to drugs and alcohol; I basically tried everything to kill the memory, the thoughts and the way I felt.  So dirty and ugly."  Appendix Exhibit A, p. 49.  Lisa Marie – "I spiraled down a life full of drugs and alcohol trying to block out what I had done then."  Appendix Exhibit A, p. 77.  Sandra – "Lots of depression I have alienated myself from people. I have a lot of trust issues. Drugs and alcohol issues, unable to forgive myself. Religion problems, I blamed God, and was angry at him. Lots of sadness and emotion problems."  Appendix Exhibit A, p. 81.

[13]  Mary Kathryn – "After my abortion, my life seemed to take a downward spiral.  … I engaged in self destructive behavior such as promiscuity, bulimia, and I had an entanglement with the law and went to jail…"  Appendix Exhibit A, p. 86.  L. – **"**Initially I seemed unaffected, though I spiraled into drug abuse and promiscuity.  Appendix Exhibit A, p. 50.

[14]  J.A. – "Depression for 5 years. Was on medications, after abortion I was consumed with guilt and shame. I wanted to end my life."  Appendix Exhibit A, p. 9.  Dalila – "Initially, it was traumatizing. I had a lot of guilt. I would drink and cry a lot. My depression worsened and I became suicidal." Appendix Exhibit A, p. 15.  B.B. – "How has abortion affected you?  There are not enough words to express the guilt and shame I lived through after the abortion." Exhibit Appendix A, p. 16.

[15]  K.D. – "For 14 years after having an abortion I shut down emotionally.  The only emotion that I felt was anger. I hated certain times of the year like Mother's Day, the month my child would have been born, the month the abortion occurred, etc..." Appendix Exhibit A, p. 31.  Cami - How has abortion affected you?  I kept this secret from 1982 until 2007 thinking that I would go to my grave without letting anyone know."  Appendix Exhibit A, p. 38.

[16]  L.S. – "I have felt guilty and regretted my abortion for the majority of my life. Somehow my abortion made me feel unloved, and displaced."  Appendix Exhibit A, p. 62.  Debra – "I had my abortion 16 years ago but I still feel as if a part of me is missing.  I will always regret having my abortion.  I will always wonder what my child would have looked like and become.  I still cry for that baby and the decisions I made that led me to have my abortion.  That baby should have come first before other decisions I made."  Appendix Exhibit A, p. 82.

[17]  Beatrice – "I have an emotional ache that never goes away. I am distant from relatives who have children because I have killed my own child and it is painful to get close. I do not hold babies. The emotional pain has become a wall I will never scale in this life. Being childless is a hole that will never fill in on this side of eternity."  Appendix Exhibit A, p. 31.

women, only ten percent, suffer from negative psychological consequences of abortion, that would be 100,000 women per year suffering from abortion *sequelae* the abortionists would prefer to and do conceal.  Texas should be allowed to protect women's health from the negative physical and psychological effects of abortion, and women should at least hear both sides and all the evidence.

### B.        THE PROBLEM OF GUILT: WOMEN SUFFER –
###           ABORTIONISTS WANT TO IGNORE IT

Defendant Braid admits that "showing the sonogram to the woman may produce guilt in the woman,"  (Braid Declaration, ¶ 21) "and that subjecting the patient to images and detailed explanations is likely to have a negative impact on the mental health of some women," Braid Declaration, ¶ 23.  The sonogram is beautiful.  See Appendix Exhibit B.  How contradictory and irrational to argue that merely showing a picture of a child in the womb may have a negative impact, but an actual abortion of that child does not.  *Amici* were not shown a sonogram by the abortionists, since they admit they do not do so routinely, yet when *Amici* later viewed other sonogram information, many did feel guilt or additional guilt because they then knew or believed that they had killed a human being, a "baby."[18]

### C.  OTHER RECENT STATE LEGISLATIVE FINDINGS ALSO SUPPORT
###     TEXAS' FINDINGS OF THE SERIOUS PHYSICAL, EMOTIONAL, AND
###     PYSCHOLOGICAL HARM TO WOMEN FROM ABORTION.

In Texas, the Legislature passed the "Women's Right to Know" Act[19] in 2003.  As a result, the medical board of the Texas Department of Health held hearings and ultimately produced a

---

[18] Karen – "Were you adequately informed of the nature of abortion, what it is, what it does?  No, I was told that my baby was not really a live baby, but that it was only a blob of flesh, and since it really wasn't alive, I wouldn't be killing anything.  Later, when I saw the sonogram of my second living child, I saw that he was VERY ALIVE… and the guilt overwhelmed me." (Emphasis added by underlining)  Appendix Exhibit A at p. 21.

[19] Women's Right to Know Act, TEX. HEALTH & SAFETY CODE.

booklet entitled "A Woman's Right to Know" which was to be distributed to women who are thinking about having an abortion.[20]

The Texas Department of Health's pamphlet warns of the "emotional side of an abortion."[21] It states:

> Some women may feel guilty, sad, or empty, while others may feel relief that the procedure is over. Some women have reported serious psychological effects after their abortion, including depression, grief, anxiety, lowered self-esteem, regret, suicidal thoughts and behavior, sexual dysfunction, avoidance of emotional attachment, flashbacks, and substance abuse.  These emotions may appear immediately after an abortion, or gradually over a longer period of time. These feelings may recur or be felt stronger at the time of another abortion, or a normal birth, or on the anniversary of the abortion.[22]

Yet the abortionists do everything in their power to hide these facts from women and do not tell them such in practice.  *See* Declaration of Alan Braid, M.D. In Support of Plaintiff's Motion for Preliminary Injunction, ¶ 12 which states:  "All of the Medical Facility's patients receive information at least 24 hours before their abortion as required by the Women's Right to Know Act.  Currently I provide the information required under the Women's Right to Know Act by telephone to all of my patients,  so that they can obtain the information 24 hours before their abortion without having to make an extra trip to the Medical Facility for that purpose." (Emphasis added.) What normal doctor provides disclosure of risks by telephone recording?

Currently, a number of state legislatures have conducted hearings on the actual practice and real world consequences of abortion.  A notable example is South Dakota which made substantial and detailed findings after extensive hearings.[23]

---

[20] § 171.001 et seq. (2003).

[21] *Id*. at 16.

[22] *Id*.

[23] Report of the South Dakota Task Force to Study Abortion 42-43 (December 2005), available at http://www.dakotavoice.com/Docs/South%20Dakota%20Abortion%20Task%20Force%20Report.pdf. (emphasis added)

"The Task Force heard live testimony of approximately fifty-five witnesses, including thirty-two experts, and considered the written reports and testimony from another fifteen experts," with the live testimony "**divided almost equally between witnesses who support the position that abortion is harmful to women and should be illegal and those who think it should be legal**."[24]   (Emphasis added.)   The Task Force also received approximately 3,500 pages of written materials.[25]   The Task Force also reviewed affidavits of almost 2,000 women and  stated that "[o]f these post-abortion women, *over 99% of them* testified that abortion is destructive of the rights, interests, and health of women and that abortion should not be legal."[26] After hearing all of the evidence from experts and post-abortion women, the Task Force stated:

> Further, the Task Force finds that **the pre-abortion counseling provided often does not prepare women who have abortions for the psychological outcomes** they may experience after their abortions. … **Due to the very limited information disclosed by abortion providers, women are not fully aware that abortion carries with it the potential to damage their physical, emotional, interpersonal, and spiritual well-being**.[27]

The Task Force also addressed the issue of the psychological consequences of terminating the life of the child.  The Task Force stated:

> Perhaps worse, the pregnant mother is not told prior to her abortion that the procedure will terminate the life of a human being. The psychological consequences can be devastating **when that woman learns, subsequent to the abortion, that this information was withheld** – information that would have resulted in her declining to submit to an abortion. Her anger at being deceived and being prevented from making an informed decision for herself is exacerbated by her realization that she was implicated in the killing of her own child in utero. Aside from the injustice of her being deprived of making her own informed decision (see Section II-D), the psychological harm of knowing she killed her child is often devastating.[28]

The Task Force found the following mental health outcomes:

---

[24] *Id*. at 6-7.
[25] *Id*. at 7.
[26] *Id.* (emphasis added).
[27] *Id.* at 47.  (emphasis added).
[28] *Id.*(emphasis added)

1. "Based on methodological improvements characterizing these studies, <u>prior works indicating that abortion is an emotionally benign medical procedure for most women are invalid and little reliance can be placed upon them;  (emphasis added)</u>

2. Women with a history of induced abortion are at a significantly higher risk for the following problems: a) inpatient and outpatient psychiatric claims, particularly adjustment disorders, bipolar disorder, depressive psychosis, neurotic depression, and schizophrenia; b) substance use generally, and specifically during a subsequent pregnancy; and c) clinically significant levels of depression, anxiety, and parenting difficulties ..." *supra.*

On the other hand, seeing a sonogram and having it accurately explained at the time can change some women's minds, and thus many women would not suffer the guilt of killing their child.  Declaration of Kathy Hill, State's Evidence.  A sonogram is a delightful picture when the child is wanted.  See Appendix Exhibit B.  There is nothing inherently damaging or guilt producing in a sonogram.  It is not a gruesome picture of the aborted child in the womb after abortion. Caution:  See Appendix Exhibit E, which also reveals truth.  If women who have never seen a sonogram say they do not want to see it, on what basis are they making an informed decision?[29]   The standard of care in Texas is whether the doctor is "negligent in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent." Texas C.P.R.C. § 74.101.  The sonogram reveals information that

---

[29] Some Amici women definitely did not want to hear any information, but know now that was not an informed decision as required by law.  K.D. – "Were you adequately informed of the nature of abortion, what it is, what it does?  No, the fetus was constantly referred to as tissue.  But I have to say that I was in no frame of mind to listen, I just wanted it over."  Appendix Exhibit A, p. 31.  M.E. – "Were you adequately informed of the nature of abortion, what it is, what it does?  No, the dr. [sic] assumed I was old enough to understand what the procedure was designed to do."  Appendix Exhibit A, p. 32.  Stacey – "Were you adequately informed of the nature of abortion, what it is, what it does?  No, I was only 16. I did not have a clue what they were saying to me and frankly, I didn't care at the time."  Appendix Exhibit A, p. 37.  Maria – "Were you adequately informed of the nature of abortion, what it is, what it does?  No, honestly, I remember sitting one on one with a "counselor" at the clinic but I couldn't tell you one thing that the woman said to me.  According to "them" it was a "procedure", not a little life."  Appendix Exhibit A, p. 71.

could definitely influence many women's decisions for the benefit of their health.

If the preliminary injunction is granted, many more children in the womb will die and many more women will feel like "murderers."[30]  Texas should be allowed to protect even one woman who would be helped by this law, not bow to one woman who might not want the information that will help others, and which she herself may later come to regret not having been told.

## V.   CONCLUSION

For the foregoing reasons, Texas' law giving truthful scientific information to women should be not be preliminarily enjoined.

Respectfully submitted,

ALLAN E. PARKER, JR.
State Bar Card No.: 15505500
Supreme Court Admission: 1994
7210 Louis Pasteur Dr., Suite 200
San Antonio, Texas 78229
(210) 614-7157
(210) 614-6656

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, in the year of our Lord, 2011; I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

**Bebe J. Anderson**
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600

---

[30] Elizabeth – "I should be in prison with the other murderers." Appendix Exhibit A, p. 30.

16

(917) 637-3666 (fax)
banderson@reprorights.org

**Elaine A. Casas**
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767-1748
(512) 854-9197
512/854-4808 (fax)
elaine.casas@co.travis.tx.us

**Arthur C. D'Andrea**
Assistant Solicitor General
Office of the Solicitor General of Texas
P.O. Box 12548 (MC 059)
Austin, TX 78711
(512) 936-2868
arthur.dandrea@oag.state.tx.us

**William T. Deane**
Office of the Attorney General
General Litigation Division-019
P.O. Box 12548
Austin, TX 78711-2548
(512) 463-2120
512/320-0667 (fax)
Bill.Deane@oag.state.tx.us

**Richard Alan Grigg**
Spivey & Grigg, LLP
48 East Ave.
Austin, TX 78701
(512) 474-6061
512/474-1605 (fax)
dicky@grigg-law.com

**Susan L. Hays**
Goodwin Ronquillo, PC
1201 Elm St., 17th Flr.
Dallas, TX 75270
(214) 939-4400
(214) 760-7332 (fax)
shays@godwinronquillo.com

**Bonnie Scott Jones**
Center for Reproductive Rights

120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600
(917) 637-3666 (fax)
bjones@reprorights.org

**Jennifer Kraber**
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767
(512)854-9531
512/854-4808 (fax)
jennifer.kraber@co.travis.tx.us

**J. Alexander Lawrence**
Morrison & Foerster, LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 336-8638
(212) 468-7900 (fax)
alawrence@mofo.com

**Jamie A. Levitt**
Morrison & Foerster, LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 336-8638
(212) 468-7900 (fax)
jlevitt@mofo.com

**Jonathan Franklin Mitchell**
Attorney General of Texas
209 W. 14th St., 7th Floor (MC-059)
Austin, TX 78701
(512) 936-1695
512/474-2697 (fax)
jonathan.mitchell@oag.state.tx.us

**Daniel C. Perkins**
Assistant Attorney General
Texas Attorney General's Office
P.O. Box 12548
Capitol Station
Austin, TX 78711-2548
(512) 463-2120
512/320-0667 (fax)

dan.perkins@oag.state.tx.us

**Sherine Elizabeth Thomas**
Assistant County Attorney
Travis County, Texas
P.O. Box 1748
Austin, TX 78767
(512) 854-9513
512/854-4808 (fax)
sherine.thomas@co.travis.tx.us

Allan E. Parker