# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

**TEXAS MEDICAL PROVIDERS PERFORMING**
**ABORTION SERVICES, et al.,**
                    **Plaintiffs,**

**-vs-**                                                    **Case No.  A-11-CA-486-SS**

**DAVID LAKEY, M.D., et al.,**
                    **Defendants.**

_____

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Plaintiffs' Motions to Certify Classes [#10, 42], Defendants' responses [#20, 46, 47] thereto, and Plaintiffs' replies [#23, 58]; Plaintiffs' Amended Motion for Preliminary Injunction [#18], Defendants' response [#29] thereto, and the parties' supplemental memoranda [#39, 41, 52]; Defendant David Escamilla's Motions to Dismiss [#22, 49], Plaintiffs' responses [#32, 59] thereto, and Escamilla's reply [#62]; and Defendants' Motions to Strike [#26, 27, 28], and Plaintiffs' responses [#36, 37, 38] thereto.  Having reviewed the documents, the relevant law, and the file as a whole, the Court now enters the following opinion and orders.

As an initial matter, the Court notes some of the motions listed as pending are now moot. Specifically, Plaintiffs' filing of an amended complaint on July 21, 2011, technically mooted Defendant Escamilla's original motion to dismiss [#22], a fact he appears to have acknowledged with the filing of his second motion.  Additionally, Defendants' Motion to Continue the Preliminary Injunction Hearing [#25] is still listed as pending but, as that hearing was held as scheduled on July

6, 2011, Defendants' motion is clearly no longer relevant. Accordingly, these stale motions [#22, 25] are DISMISSED WITHOUT PREJUDICE as moot.

## Background

Plaintiffs, who seek to represent the class of all Texas medical providers performing abortions and the patients of such providers, challenge the constitutionality of Texas House Bill Number 15, an Act "relating to informed consent to an abortion." H.B. 15, 82nd Leg., Reg. Sess. (Tex. 2011) ("H.B. 15"). For the following reasons, the Court finds several portions of the Act are unconstitutionally vague; and further finds the Act violates the First Amendment by compelling physicians and patients to engage in government-mandated speech and expression. Accordingly, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Preliminary Injunction [#18].

In part and in summary, the Act amends Chapter 171 of the Texas Health and Safety Code to require the following as prerequisites for a woman's informed and voluntary consent to an abortion: (1) the physician who is to perform the abortion, or a certified sonographer agent thereof, must perform a sonogram on the pregnant woman; (2) the physician must display the sonogram images "in a quality consistent with current medical practice" such that the pregnant woman may view them; (3) the physician must provide, "in a manner understandable to a layperson," a verbal explanation of the results of the sonogram images, including a variety of detailed descriptions of the fetus or embyro; and (4) the physician or certified sonographer agent must "make[] audible the heart auscultation for the pregnant woman to hear, if present, in a quality consistent with current medical practice and provide[], in a manner understandable to a layperson, a simultaneous verbal explanation

of the heart auscultation." H.B. 15, Sec. 2 (amending Tex. Health & Safety Code Ann. Ann. § 171.012).

Under the Act, the timing of the sonogram and the accompanying displays and descriptions varies, depending on how far away a woman lives from an abortion provider, as that term is defined under the Act. If a woman certifies she lives 100 or more miles away from an abortion provider, she may satisfy the informed consent prerequisites two hours prior to an abortion; otherwise, the Act requires they be satisfied twenty-four hours in advance.

The Act further amends the Texas Health and Safety Code by adding section 171.0122, which, in part and in summary, allows women to "opt out" of viewing the sonogram images or hearing the heart auscultation required by amended section 171.012, but requires all women to receive the detailed verbal description of the sonogram images mandated by that section, except in cases of sexual assault, incest, or under other limited, enumerated circumstances. Section 171.0122 further provides neither the physician nor the pregnant woman are subject to a penalty under Chapter 171 "solely because the pregnant woman chooses not to view the printed materials or the sonogram images, hear the heart auscultation, or receive the verbal explanation," if a proper waiver is executed. Amended section 171.012(a)(5) specifies a particular election form a pregnant woman must sign before receiving an abortion, and newly-added section 171.0121 requires both that the form be placed in the woman's medical records, and that it be retained by the facility performing the abortion for at least seven years.

Both the Act and current Texas law contain severe compliance, enforcement, and penalty provisions relating to informed consent. First, the Act amends Texas Health and Safety Code section 245.006, mandating inspection of abortion facilities "at random, unannounced, and reasonable times

as necessary to ensure compliance" with the informed consent provisions of Chapter 171.  Second, the Act amends Texas Occupations Code section 164.055 to require mandatory disciplinary action, refusal to issue a medical license, and non-renewal of a medical license, for failure to comply with Chapter 171 of the Health and Safety Code.  Finally, existing Texas law makes it a misdemeanor offense for a physician to intentionally perform an abortion in violation of the informed consent provisions of Chapter 171, an offense punishable by a fine of up to $10,000.  TEX. HEALTH & SAFETY CODE ANN. § 171.018.

Plaintiffs bring eight claims in their amended complaint: (1) the Act is unconstitutionally vague; (2) the Act compels physicians to engage in government-mandated speech, in violation of the First and Fourteenth Amendments; (3) the Act violates the First and Fourteenth Amendments by requiring patients to submit to such speech, regardless of whether it is wanted or medically necessary; (4) the Act unconstitutionally discriminates on the basis of sex, in violation of the Equal Protection Clause of the Fourteenth Amendment; (5) the Act unconstitutionally discriminates between abortion providers and other medical facilities, in violation of the Equal Protection Clause; (6) the Act unconstitutionally discriminates between women who live within 100 miles of an abortion provider, and those who live 100 or more miles away from an abortion provider, in violation of the Equal Protection Clause; (7) the Act violates women's Fourteenth Amendment right to bodily integrity by requiring them to submit to ultrasounds procedures which are neither typical nor medically necessary; and (8) the Act violates the Fourth and Fourteenth Amendments by subjecting abortion facilities to random, unannounced, and warrantless searches.  *See* Am. Compl. [#40] at ¶¶ 125–40.

Plaintiffs name as defendants David Lakey, M.D., the Commissioner of the Texas

Department of State Health Services; Mari Robinson, the Executive Director of the Texas Medical Board; and David Escamilla, the County Attorney for Travis County, in his official capacity and as a representative of the proposed class of all county and district attorneys in the State of Texas with authority to prosecute misdemeanors.

### Procedural History

On June 13, 2011, Plaintiffs filed their original complaint. On June 16, 2011, Plaintiffs filed a motion to certify [#10] the proposed plaintiff class.

On June 30, 2011, Plaintiffs filed a motion for a preliminary injunction [#18], asking the Court to enjoin Defendants from "enforcing amendments made by House Bill 15 (the "Act") to the Texas Woman's Right to Know Act ("WRKA"), Tex. Health & Safety Code Ann. §§ 171.001 *et seq.*," Pls.' Mot. [#18] at 1, to which they attached supporting declarations from Drs. Grimes, Lyerly, and Braid. On July 5, 2011, Defendants filed motions to strike [#26, 27, 28] these declarations, in part because they do not meet the requirements of Federal Rule of Civil Procedure 26 pertaining to expert reports.

On July 6, 2011, the Court held a hearing on Plaintiffs' motion for preliminary injunction, at which it heard the argument of counsel, and at the conclusion of which it gave the parties fifteen days to supplement the evidentiary record. The Court also ordered the parties to submit supplemental memoranda on certain issues, most notably the effect, if any, of the Act's severability clause on Plaintiffs' challenges. The parties both filed supplements [#39, 41] on July 21, 2011, and Defendants filed a second supplement [#52] on August 5, 2011.

Also on July 21, 2011, Plaintiffs filed an amended complaint [#40]. Defendant David Escamilla filed a motion to dismiss [#49] the claims against him on August 4, 2011.

Finally, on July 22, 2011, Plaintiffs filed a motion to certify [#42] the proposed defendant class.

Now, for the following reasons, the Court GRANTS Plaintiffs' Motions to Certify [#10, 42]; DENIES Defendant Escamilla's Motion to Dismiss [#49]; DENIES Defendants' Motions to Strike [#26, 27, 28]; and GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Preliminary Injunction [#18].

## Analysis

## I.    Motions to Certify Classes [#10, 42]

## A.    Motion to Certify Plaintiff Class [#10]

Plaintiffs seek to certify a plaintiff class consisting of "all medical providers who perform abortion services in Texas currently and/or in the future," on behalf of themselves and their patients. Pls.' Mot. [#10] at 1.  Defendants argue the class should not be certified for three reasons: (1) the "necessity doctrine" precludes such certification; (2) the named plaintiffs will not fairly and adequately represent the interests of the class; and (3) class-wide declaratory or injunctive relief is not appropriate.  For the following reasons, the Court rejects Defendants' arguments and GRANTS Plaintiffs' motion.

In order for the Court to certify a class, the proposed class must meet the requirements of Federal Rule of Civil Procedure 23.  Specifically, they must satisfy the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and Rule 23(b), which has three subparts.  Plaintiffs seek certification under Rule 23(b)(2), which allows certification if the requirements of Rule 23(a) are met, and "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

## 1. "Necessity Doctrine"

First, Defendants argue the "necessity doctrine" precludes certification of the plaintiff class. Defendants claim there is no reason to certify a plaintiff class because any declaration of unconstitutionality will be binding across the entire State of Texas. Specifically, Defendants argue, "State officials do not defy a federal court's declaratory judgment by continuing to enforce unconstitutional statutes against non-parties to the litigation." Defs.' Resp. [#20] at 3–4. And although Defendants acknowledge "class certification can thwart nonacquiescence by government defendants," they claim certification is unnecessary in this case because "unlike certain federal agencies, the State of Texas has no practice of refusing to enforce its laws consistent with adverse rulings of the federal courts." *Id.* at 4.

The Court does not doubt Defendants' good faith in making this argument. However, the Court rejects it for two reasons. First, although final declaratory relief may be binding on all Texas officials, the same is not necessarily true of preliminary injunctive relief.

Second, and more important, Defendants' position is significantly undermined by Defendant Escamilla's motion to dismiss, and his brief in opposition to certification of a defendant class. As discussed further below, Escamilla argues he should be dismissed from this lawsuit because no named plaintiff has standing against him, and opposes certification of a defendant class on the same grounds.

Taken together, then, Defendants appear to argue: (1) the Court should deny certification of the plaintiff class; then (2) conclude the named plaintiffs, standing alone, lack standing to bring suit

against Escamilla; and finally (3) deny certification of the defendant class because Escamilla, the proposed representative, has already been dismissed. The net result would be the removal of *all* defendants who could potentially enforce the criminal provisions of this statute.

As a practical matter, any injunction this Court issues may well be heeded by all Texas prosecutors. However, the Court has some doubt the prosecutors would be legally obligated to do so if they were non-parties to this suit. Being that there are hundreds of district and county attorneys in Texas, the Court is disinclined to leave to chance the possibility one or more might choose to test the scope of a ruling by this Court. Accordingly, the Court rejects Defendants necessity argument.

## 2.      Inadequate Representation

With respect to the requirements of Rule 23(a), Defendants do not dispute the proposed class is so numerous that joinder of all members is impracticable; or that there are common questions of law and fact; or whether the claims or defenses of the named plaintiffs are typical of those of the class. However, they do challenge whether the named plaintiffs and their counsel will fairly and adequately represent the proposed class.

In support of their challenge, Defendants argue "this case is shot through with conflicts of interests among the doctors and clinics that constitute the proposed class—as well as the patients on whose behalf they purport to sue." Defs.' Resp. [#20] at 5. Defendants then proceed to invent a number of potential conflicts of interest based on hypothetical class plaintiffs and speculative results of the named plaintiffs' challenges in this lawsuit.

Defendants' conjectural conflicts are unpersuasive in light of the proposed class members' obviously aligned interests, the challenges asserted in this lawsuit, and the single statute at issue. However, in the unlikely event conflicts of interest arise in the future, the Court believes such

conflicts can be adequately addressed through amendment of this certification order under Rule 23(c)(1)(C). Accordingly, the Court rejects Defendants' argument on this point.

### 3. Appropriateness of Class-Wide Injunctive Relief

Finally, Defendants argue certification of the proposed plaintiff class is improper under Rule 23(b)(2) because final injunctive relief or corresponding declaratory relief is not appropriate respecting the class as a whole. Defendants argue the severability clause of the Act, which is discussed more below in the context of Plaintiffs' motion for preliminary injunction, precludes any class-wide injunctive relief; accordingly, they argue, class certification is improper.

Defendants' argument is unavailing. First, if this Court accepted their argument, any legislature could preclude Rule 23(b)(2) certification of a class simply by including similar severability clauses in all of its statutes; the Court doubts a state legislature may circumvent the Federal Rules in this fashion. The Court is similarly skeptical a severability clause, no matter how strongly worded, can preclude facial challenges to statutes—if a law, on its face, violates the Constitution, no amount of legislative legerdemain can save it.

Moreover, Defendants' argument once again relies on speculation about how the Court *might* rule on Plaintiffs' challenges. Unquestionably, Plaintiffs seek class-wide injunctive relief and, if they prevail upon their claims, they may receive it. The Court cannot assess the merits of Plaintiffs' claims before deciding whether to certify a proposed class, but neither can it join Defendants in assuming any relief will be less than class-wide.

Finally, the Court once again believes the best way to handle any potential non-class-wide injunctive relief is to amend this certification order to create appropriate subclasses. Accordingly, Defendants' third argument is rejected.

### 4.    Conclusion — Certification of Plaintiff Class

The Court concludes the proposed plaintiff class meets the requirements of Rule 23. Accordingly, the Court GRANTS Plaintiffs' Motion to Certify Plaintiff Class [#10].

## B.    Motion to Certify Defendant Class [#42]

Plaintiffs seek to certify a defendant class "consisting of all county and district attorneys in the State of Texas with authority to prosecute misdemeanors, represented by Defendant David Escamilla, County Attorney of Travis County." Pls.' Mot. [#42] at 2.

Plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(1)(A), which allows certification of a class when the four requirements of Rule 23(a) are satisfied and "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." FED. R. CIV. P. 23(b)(1). Plaintiffs argue certification is proper under this rule because there is a risk of inconsistent or varying adjudications if they are required to bring separate lawsuits challenging the constitutionality of the Act against individual Texas prosecutors.

Defendants oppose certification of a defendant class for four reasons. First, Defendants argue certification is improper because the named plaintiffs do not have standing to bring suit against Defendant Escamilla, the proposed representative of the defendant class. Second, Defendants reiterate their "necessity" argument, claiming there is no need to certify a defendant class in this case. Third, Defendants claim the proposed defendant class should not be certified under Rule 23(b)(1)(A) because Defendants do not consent, and because there is no danger of inconsistent or varying adjudications in the absence of certification. Finally, Defendants argue the proposed defendant class

does not satisfy the requirements of Rule 23(a).

For the following reasons, the Court rejects Defendants' arguments and GRANTS Plaintiffs' motion to certify the proposed defendant class.

**1.     Named Plaintiffs Lack Standing**

As noted above, Defendants argue certification of the proposed defendant class is improper because at least one named plaintiff does not have standing to bring each claim against each named defendant. In support of this argument, Defendants cite *James v. City of Dallas, Tex.*, 254 F.3d 551 (5th Cir. 2001), which indicates, for standing to be proper in the class action context, "at least one named Plaintiff must have standing to seek injunctive relief on each of the claims against" the named defendants. 254 F.3d at 563.

Although *James* may well state the general rule for standing in class actions, it is distinguishable from this case in many ways. Most notably, this case is intended as a suit between a class of plaintiffs, each of whom will allegedly suffer constitutional harm through enforcement of a criminal statute, and a class of defendants, each of whom is a state official with the authority to enforce that statute. As commentators have noted, typical standing rules do not clearly apply in such situations:

> The application of standing requirements becomes somewhat complicated when an action is brought by a plaintiff class against a defendant class. In those cases a particular problem arises because the named plaintiff typically can claim an injury as a result of the conduct of only one of the defendant class members, not each individual in the defendant class. Thus, a question is raised concerning whether the named plaintiff's representative status in a Rule 23 action can be of sufficient scope to cure whatever defects may exist as to standing vis-a-vis defendant class members. Most commonly, the answer to this question has been no.

7AA Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus,

Federal Practice and Procedure § 1785.1 (3d ed.).

However, Wright and Miller go on to indicate some courts have recognized an exception to

this general rule:

> An exception to this conclusion has been made in several cases in which the defendant class was composed of public officials, however. In these cases standing has been found even though the representative was injured by the conduct of only one of the officials because the court determined that the defendants were so closely related that they should be treated substantially as a single unit. . . . In that situation, allowing a class suit against a defendant class really is an alternative means of permitting plaintiffs to sue the state itself.

*Id.* (footnotes omitted).

This exception, sometimes referred to as the "juridical link" doctrine, has been

acknowledged, though not previously adopted, by the Fifth Circuit:

> The Fifth Circuit has not yet addressed the juridical link doctrine, which arose out of the Ninth Circuit's decision in *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir.1973). *LaMar* held that a plaintiff without a cause of action against a specific defendant cannot "'fairly and adequately' protect the interests of those who do have such causes of action" for purposes of Rule 23(a). *Id.* at 466 (citations omitted). Nevertheless, the court went on to hold that if the plaintiffs as a group-named and unnamed-have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or otherwise "juridically related in a manner that suggests a single resolution of the dispute would be expeditious," the claim could go forward. *Id.* This doctrine is premised on the notion that the class, not the class representative, is the relevant legal entity for the purpose of Article III justiciability concerns.

*Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 248 (5th Cir. 2008).

The members of the proposed defendant class are clearly "juridically related in a manner that

suggests a single resolution of the dispute would be expeditious," as *LaMar* requires for application

of the juridical link exception. Indeed, Defendants themselves acknowledge this when they claim

certification of a defendant class is not necessary because every state prosecutor will be identically bound by any ruling of this Court, even without certification.

Under the circumstances of this case, certification of the proposed defendant class simply allows for comprehensive and uniform injunctive relief for all members of the plaintiff class who might be harmed by the Act. Texas prosecutors, as the state officials responsible for enforcing the criminal penalties of the Act, are the "relevant legal entity" for the purposes of Article III justiciability concerns. Accordingly, the Court finds the juridical link exception is applicable to this case. Consequently, the Court rejects Defendants' first argument.

## 2.    Necessity of Class Certification

Once again, Defendants argue certification of a class is unnecessary in this case: "Class certification should be denied because class certification is unnecessary and will serve no useful purpose since all of the individuals who are not part of this action, but who are aggrieved by the statute, will have the benefit of this Court's ruling concerning the constitutionality of the Act." Defs.' Resp. [#47] at 6.

The Court rejects this argument for the same reason it rejected it before: although Defendants are likely correct all Texas prosecutors would adhere to any injunction issued by the Court in this case even if they were not technically legally bound to do so, Defendants cannot guarantee this, and the Court is not inclined to tempt fate. Certification is not unnecessary where, as here, hundreds of individual state actors, properly accustomed to exercising their prosecutorial discretion, might choose to disregard a non-binding ruling from a federal court.

### 3. Certification Improper Under Rule 23(b)(1)(A)

Defendants make two arguments why certification of the proposed defendant class is improper under Rule 23(b)(1)(A). First, they claim "certification of the defendant class is inappropriate under Rule 23(b)(1)(A) without the defendant's consent." *Id.* at 8. Second, Defendants argue, "Plaintiffs have not established that they will not be able to comply with one judgment without violating the terms of another." *Id.* The Court rejects these arguments.

Defendants' first argument is without merit. In support of their position, they rely on *Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185 (5th Cir. 2010). However, that very case unequivocally states exactly the opposite rule: "We find nothing in the plain text of Rule 23 that permits a defendant's veto over (b)(1)(A) certification." *Id.* at 197. "Instead," the *Casa Orlando* court continued, "we hold that a court may certify a class under (b)(1)(A) if the court finds that separate lawsuits could create inconsistent results that would establish incompatible standards of conduct for the party opposing the class." *Id.* Defendants' first argument is thus rejected.

The Court likewise rejects Defendants' second argument. Whether the Court considers members of the plaintiff class or the proposed defendant class, if the Act is deemed entirely constitutional in some lawsuits, and partially or wholly unconstitutional in others, people in Texas—abortion providers, pregnant women, and prosecutors alike—will be subject to inconsistent standards of conduct. In some parts of Texas, physicians and pregnant women may be free to disregard the Act, while similarly situated people in other parts of Texas may be subject to serious penalties for doing so. Likewise, some Texas prosecutors might be forbidden from enforcing the Act, while others might be allowed or required to do so. Rule 23(b)(1)(A) exists precisely to prevent such disparate results to identical legal claims.

## 4. The Proposed Defendant Class Does Not Satisfy Rule 23(a)

Defendants finally argue certification of the proposed defendant class is improper under Rule 23(a). In particular, Defendants argue the proposed class members' prosecutorial discretion, and the varying political landscapes of the various counties and districts in Texas, makes it impossible to determine which prosecutors will actually enforce the Act. Accordingly, Defendants conclude, Plaintiffs have failed to demonstrate numerosity, typicality, commonality, and adequacy of representation, as required by Rule 23(a). The Court disagrees.

Although it is theoretically possible some prosecutors may not enforce the Act, that possibility seems both politically and practically unlikely. Certainly, all Texas prosecutors with the authority to prosecute misdemeanors *could* enforce the Act, and no reasonable amount of discovery is likely to resolve whether any individual prosecutor actually would. The Court thinks Plaintiffs are entitled to rely on the assumption that, as a general matter and in the absence of evidence to the contrary, Texas prosecutors will enforce Texas law. Because the Act does not go into effect until September 1, 2011, such evidence is obviously not feasibly available at this point. If the Court receives credible evidence in the future that one or more individual prosecutors will not enforce the Act, it may of course amend its certification order accordingly. At the present time, however, the Court is satisfied the proposed defendant class satisfies the requirement of Rule 23(a).

## 5. Conclusion — Certification of Defendant Class

The Court concludes the proposed defendant class satisfies the requirements of Rule 23(a) and Rule 23(b)(1)(A). Accordingly, the Court GRANTS Plaintiffs' Motion to Certify Defendant Class [#42].

## II. Defendant Escamilla's Motion to Dismiss [#49]

In his motion to dismiss, Defendant Escamilla mostly repeats, with some slight variations, his arguments against class certification. The Court rejects these arguments and denies his motion.

To the extent Defendant Escamilla challenges Plaintiffs' standing to bring suit against him, that argument is foreclosed by the Court's rulings on class certification above, as well as its application of the juridical link doctrine. This case is a facial constitutional challenge to a criminal statute in which Plaintiffs request injunctive relief against the Texas officials who have authority to enforce it. Under such circumstances, it is not necessary that each named plaintiff have a cause of action against Defendant Escamilla personally; as Wright and Miller state, *supra*, this procedural mechanism is simply another way to allow Plaintiffs to sue the State of Texas, while ensuring any preliminary injunction issued by the Court is binding on all Texas prosecutors with the authority to enforce the Act.

Second, to the extent Escamilla argues Plaintiffs should actually sue the State of Texas itself, that argument is faulty because such a suit is forbidden by the Eleventh Amendment. *See Okpalobi v. Foster*, 244 F.3d 405, 411 (5th Cir. 2001) ("The Eleventh Amendment bars suits by private citizens against a state in federal court, irrespective of the nature of the relief requested."). Likewise, a suit against the Attorney General of Texas, even for prospective injunctive relief, might run afoul of Texas' sovereign immunity:

> If, because they were law officers of the state, a case could be made for ... testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general.... That would be a very convenient way for obtaining a speedy judicial determination of ... constitutional law ..., but it is a mode which cannot be applied to the states ... consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit

of private persons ... In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, ... such officer must have *some connection* with the enforcement of the act, or else it is merely making ... the state a party.

*Id.* at 411–12 (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)) (emphasis in original).

Here, Plaintiffs have done exactly what *Okpalobi* and *Young* require: they have sued officers who have a connection with enforcement of the Act. It is unclear to the Court how Plaintiffs could possibly obtain a legally-binding state-wide injunction against enforcement of the Act without doing exactly what they have done in this case; more to the point, it is unclear how any plaintiff could ever obtain comprehensive injunctive relief when facially challenging the constitutionality of a statute. Accordingly, the Court rejects Defendant Escamilla's arguments and DENIES his motion to dismiss.

## III.    Motions to Strike [#26, 27, 28]

Defendants' motions to strike all challenge declarations by physicians, offered by Plaintiffs in support of their motion for a preliminary injunction. Specifically, Defendants argue the declarations should be struck because they are not proper expert reports, do not satisfy the requirements of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and are otherwise inadmissible under the Federal Rules of Evidence. These arguments lack merit.

"[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993). One reason for this relative evidentiary laxity is because "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (5th Cir. 1981). "Given this limited purpose, and given the haste that is often

necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* In short, "[a] party . . . is not required to prove his case in full at a preliminary-injunction hearing." *Id.*

Although the declarations from Drs. Braid, Grimes, and Lyerly were not crucial to the Court's resolution of Plaintiffs' motion for a preliminary injunction, they were properly read and considered by the Court at this stage. Accordingly, Defendants' motions to strike are DENIED.

## IV.    Motion for Preliminary Injunction [#18]

Although Plaintiffs in their complaint challenge the Act on eight grounds, they base their request for a preliminary injunction on only four: Equal Protection, subjecting pregnant women to unwanted speech, vagueness, and compelling speech by physicians and patients.[1] For the following reasons, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion.

A preliminary injunction is only appropriate if Plaintiffs demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

The Court focuses its analysis on the first of these factors because, if it is satisfied in this case, the rest naturally follow. That is, if Plaintiffs have a substantial likelihood of success on the merits, that implies the Act, or parts of the Act, are unconstitutional. Enforcement of an

---

[1] Although Plaintiffs did not include an Equal Protection argument in their motion for preliminary injunction, they did raise the issue in their supplemental memorandum, and Defendants responded to it without objection. Accordingly, the Court addresses Plaintiffs' Equal Protection arguments.

unconstitutional statutory provision represents an irreparable injury, and enjoining such unconstitutional enforcement neither causes harm nor disserves the public interest. Accordingly, the Court considers Plaintiffs' various challenges to the Act in turn.

## A.    Equal Protection

Plaintiffs argue the Act violates the Equal Protection Clause because "no rational relationship exists between the Act's singling out of abortion providers and patients and the Act's imposition of intrusive burdens on medical practice." Pls.' Supp. Br. [#41] at 9.  Plaintiffs' argument lacks merit, and the Court quickly disposes of it.

"[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). As Plaintiffs note, "even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained." *Id.* at 632. However, Plaintiffs conveniently ignore the language contained two sentences later: "In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Id.*

As the Supreme Court has made clear, "the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992). This legitimate interest obviously justifies "singling out" abortion providers and the patients thereof, because they pose a serious potential risk to "the life of the fetus that may become a child." *Id.*

The Court has grave doubts about the wisdom of the Act, but that is no legal basis for invalidating it. The Act's onerous requirements will surely dissuade or prevent many competent doctors from performing abortions, making it significantly more difficult for pregnant women to obtain abortions. Forcing pregnant women to receive medical treatment from less-skilled providers certainly seems to be at odds with "protecting the physical and psychological health and well-being of pregnant women," one of the Act's stated purposes. H.B. 15, Sec. 12(1). However, rational basis review requires this Court to accept even tenuous rationales for the advancement of a legitimate government interest.

In short, if the Texas Legislature wishes to prioritize an ideological agenda[2] over the health and safety of women, the Equal Protection Clause does not prevent it from doing so under these circumstances. Accordingly, the Court must reject Plaintiffs' Equal Protection arguments.

**B.      Subjecting Women to Unwanted Speech**

Plaintiffs argue the Act "violates the First and Fourteenth Amendments by subjecting abortion patients to visual, verbal, and auditory depictions of the fetus that they do not want, and do not consent to receive, and that are not part of the accepted and ethical process of informed consent." Pls.' Mot. [#18] at 8. For the following reasons, the Court rejects Plaintiffs' argument on this point.

In support of their argument, Plaintiffs rely on language from the Supreme Court's decision in *Hill v. Colorado*:

> The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases. It is an aspect of the broader "right to be let alone"

---

[2] It is ironic that many of the same people who zealously defend the state's righteous duty to become intimately involved in a woman's decision to get an abortion are also positively scandalized at the government's gross overreaching in the area of health care.

that one of our wisest Justices characterized as "the most comprehensive of rights and the right most valued by civilized men."

530 U.S. 703, 716–17 (2000) (quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)).

*Hill* also contains additional language consistent with Plaintiffs' position:

[W]e have continued to maintain that no one has a right to press even 'good' ideas on an unwilling recipient. None of our decisions has minimized the enduring importance of a right to be free from persistent importunity, following and dogging after an offer to communicate has been declined. While the freedom to communicate is substantial, the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate.

*Id.* at 718 (quotations and citations omitted).

These statements give the strong impression a listener has some constitutional right not to receive unwanted messages. However, *Hill* seems to have carefully backed away from explicit recognition of such a right. Indeed, in discussing Justice Brandeis' "most comprehensive of rights," the court said: "This common-law 'right' is more accurately characterized as an 'interest' that States can choose to protect in certain situations." *Id.* at 717 n.24. This is consistent with the *Hill* court's later statement: "[W]e are merely noting that our cases have repeatedly recognized the interests of unwilling listeners in situations where the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Id.* at 718 (quotation omitted). Thus, it seems as though *Hill*, and the cases cited therein, actually stand for the proposition a private citizen's interest in being left alone is sufficiently weighty to justify certain state-imposed restrictions on speech.

This conclusion is supported by the nature of the statutes at issue in *Hill* and the related cases. In *Hill*, the Supreme Court considered a Colorado statute that regulated speech-related conduct within 100 feet of the entrance to a health care facility, and specifically prohibited people from

approaching within eight feet of another person, without that person's consent, for the purpose of engaging in various forms of speech. *Id.* at 707. The *Hill* Court relied on the interest of people to be left alone, particularly when seeking medical care, in upholding the law as a reasonable regulation of speech:

> Persons who are attempting to enter health care facilities-for any purpose-are often in particularly vulnerable physical and emotional conditions. The State of Colorado has responded to its substantial and legitimate interest in protecting these persons from unwanted encounters, confrontations, and even assaults by enacting an exceedingly modest restriction on the speakers' ability to approach.

*Id.* at 729.

Here, of course, the situation is exactly the opposite: the State of Texas wishes to force a particular message upon a captive, and potentially unwilling, audience. While the Court acknowledges the intuitive logic of Plaintiffs' argument, and there surely are limits to the government's power to impose whatever message it desires, on whomever it likes, under any circumstances it desires, those limits seem fairly undefined, at least as applied to this case. The most the Court can say is that *Hill* does not seem to support Plaintiffs' argument.

Because Plaintiffs have not provided any case law in support of their argument, and the Court is not aware of any, it rejects Plaintiffs' second argument.

## C. Vagueness

Plaintiffs raise such a litany of vagueness challenges to the Act, one would think they must not share a language in common with the drafters. Absent such a linguistic barrier, however, the Court is inclined to agree with Defendants' characterization that "plaintiffs have chosen to throw everything at the wall and hope something sticks." Defs.' Supp. Br. [#52] at 6. The Court will

respond in kind, and will discuss only those challenges which have arguable merit or otherwise warrant discussion.

## 1.    Legal Standard

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. However, "while there is little doubt that imagination can conjure up hypothetical cases in which the meaning of . . . terms will be in nice question, because we are condemned to the use of words, we can never expect mathematical certainty from our language." *Id.* at 733 (quotations, internal citations, and alterations omitted).

"The degree of vagueness that the Constitution tolerates-as well as the relative importance of fair notice and fair enforcement-depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Accordingly, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498–99. "The vice of unconstitutional vagueness is further aggravated where . . . the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." *Cramp v. Bd. of Pub. Instruction of Orange Cnty., Fla.*, 368 U.S. 278, 287 (1961). Indeed, "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes

with the right of free speech or of association, a more stringent vagueness test should apply."

*Hoffman*, 455 U.S. at 499.

Finally, while "[t]here is certainly some difference between compelled speech and compelled silence, . . . in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say." *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796 (1988).

**2.    Challenged Sections of the Act**

**a.    Section 171.002(3) — "Medical Emergency"**

The Act defines "Medical emergency" as follows:

> "Medical emergency" means a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that, as certified by a physician, places the woman in danger of death or a serious risk of substantial impairment of a major bodily function unless an abortion is performed.

H.B. 15, Sec. 1 (amending Tex. Health & Safety Code Ann. § 171.002).

Plaintiffs argue this provision is unconstitutionally vague because it "does not clearly allow physicians to provide prompt abortion services in some medical emergencies that, as a matter of medical practice and ethics, require urgent action to protect the patient." Pls. Supp. Br. [#41], Att. 1 at ¶ 28. Plaintiffs provide the specific examples of a woman who suffers from a life-threatening psychological condition, and a pregnant woman who is in need of immediate cancer treatment, which treatment cannot begin until her pregnancy is terminated.

However, this does not seem properly to be a vagueness challenge, so much as a challenge to the constitutional sufficiency of the substance of the definition. Put another way, Plaintiffs do not

claim they cannot understand what the definition requires; rather, they complain the definition is not broad enough to provide an adequate exception to the informed consent requirement in cases where the life or health of the pregnant woman are threatened. This challenge may have merit under some other constitutional theory, but the Court does not find the definition unconstitutionally vague. Accordingly, the Court rejects Plaintiffs' vagueness challenge to this term.

**b.     Section 171.002(4) — "Sonogram"**

The Act defines "sonogram" as follows: "'Sonogram' means the use of ultrasonic waves for diagnostic or therapeutic purposes, specifically to monitor an unborn child." H.B. 15, Sec. 1 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.002).

Plaintiffs do not argue this definition is unconstitutionally vague in itself. Rather, they challenge the Acts' associated requirements, that the sounds and images associated with the sonogram be presented to the pregnant woman "in a quality consistent with current medical practice," H.B. 15, Sec. 2 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.012), as nonsensical. Because these requirements are themselves not consistent with current medical practice, Plaintiffs argue, it is unclear what sort of sonogram a physician must perform to comply with the dictates of the Act.

While this argument might support Plaintiffs' position the phrase "in a quality consistent with current medical practice" is unconstitutionally vague, it is not a challenge to the sufficiency of the Act's definition of "sonogram." Indeed, the Court finds the Act's definition of "sonogram" is broad enough to allow a physician to choose a medically appropriate procedure, while not leaving the physician unconstitutionally adrift in a sea of possibility and potential liability. Plaintiffs' vagueness challenge on this term is denied.

**c.      Section 171.012(a)(1), (2), (3), (4), (6) — "the physician who is to perform the abortion"**

The Act, tracking existing statutory language in the Texas Health and Safety Code, imposes a variety of pre-abortion duties on "the physician who is to perform the abortion." *See* H.B. 15, Sec. 2 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.012); TEX. HEALTH & SAFETY CODE ANN. § 171.012. Notably, however, the Act modifies the disclosure requirements of the current statutory scheme by removing the provision allowing certain information to be provided by "the referring physician." *See* H.B. 15, Sec. 2 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.012(a)(1)).

Plaintiffs complain this provision is unconstitutionally vague because it "does not explain how physicians in multi-doctor practices can comply with its requirements if a physician who performs the patient's pre-abortion 'sonogram' and provides her with the state-mandated information is unavailable on the day the patient chooses to return for the procedure." Pls. Supp. Br. [#41], Att. 1 at 10–11. Under such circumstances, Plaintiffs argue, the available physician is put in the unconstitutionally impermissible situation of having to decide whether to perform the abortion; or to perform a second sonogram, provide the required descriptions, images, and sounds, and then tell the pregnant woman to come back twenty-four hours later, when hopefully one of the two physicians will be available.

Defendants respond the Act "accommodates this situation by using the phrase 'the physician *who is to perform* the abortion' rather than 'the physician *who winds up performing* the abortion.'" Defs. Supp. Br. [#52], Att. 1 at 5–6. Further, Defendants argue the Act uses the phrase "the physician" rather than "a physician" because "in the vast majority of abortions there is only one physician involved," and the Act "envisions that a single physician will provide the required information." *Id.* at 6. Thus, Defendants conclude, "in abortions that involve more than one

physician, [fulfillment of the requirements by] a single physician will suffice." *Id.*

Defendants' arguments, while not unreasonable, are unfortunately nothing more than that—arguments. For obvious reasons, no Texas court or agency has yet issued any definitive interpretation of the Act, nor may this Court do so itself. And while Defendants do provide some evidence in the form of affidavits from people who may eventually be in a position to participate in the creation of such binding interpretations and regulations for enforcement of the Act, these statements are essentially unofficial "advisory opinions" at best; as such, they cannot weigh heavily in our analysis.

In the absence of some official and binding interpretation of the phrase "the physician who is to perform the abortion," the Court concludes it is unconstitutionally vague under some circumstances. If the penalty provisions were less severe, the Court might conclude otherwise, but a physician should not have to gamble his or her entire career (to say nothing of $10,000 and a criminal record) on the mere hope a judge or jury will agree with the physician's interpretation of that phrase. Accordingly, the Court finds injunctive relief is proper on this issue.[3]

**d.      Section 171.012(a)(3) and Section 171.013(b) — Furnishing Printed Materials**

The Act amends Texas Health and Safety Code § 171.012(a)(3) by requiring physicians to actually provide the written informational materials described in section 171.014 to the pregnant woman, whereas the existing statutory scheme simply requires that the pregnant woman be told she has the right to review them. *See* H.B. 15, Sec. 2 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.012(a)(3)); TEX. HEALTH & SAFETY CODE ANN. § 171.012(a)(3). Section 171.013(b),

---

[3] The exact nature of the injunctive relief, and the effect of the Act's severability clause, are discussed after the resolution of Plaintiffs' challenges to the Act.

however, which is not changed by the Act, states: "A physician or the physician's agent is not required to furnish copies of the materials [described by section 171.014] if the woman provides the physician with a written statement that she chooses to view the materials on the Internet website sponsored by the department." TEX. HEALTH & SAFETY CODE ANN. § 171.013(b).

Plaintiffs argue: "Given these conflicting statements, it is unclear how physicians should comply with the Act if the patient indicates a preference for viewing the materials on the Internet." Pls.' Supp. Br. [#41], Att. 1 at ¶ 30. The Court disagrees.

As Defendants note, section 171.013(b) is simply an exception to the requirement contained in section 171.012(a)(3). Conflicting statutory provisions are not vague when one creates a duty and another relieves the actor of that duty under limited circumstances. While the overall statutory scheme could be more artfully written, it is not unconstitutionally vague. Plaintiffs' argument, which the Court suspects was somewhat disingenuous, is rejected.

**e.** **Section 171.012(a)(4) — "in a quality consistent with current medical practice"**

As noted above, the Act requires a sonogram image be displayed, and a heart auscultation be made audible, "in a quality consistent with current medical practice."[4] *See* H.B. 15, Sec. 2

---

[4] The relevant sections of the Act read as follows:

(4) before any sedative or anesthesia is administered to the pregnant woman and at least 24 hours before the abortion or at least two hours before the abortion if the pregnant woman waives this requirement by certifying that she currently lives 100 miles or more from the nearest abortion provider that is a facility licensed under Chapter 245 or a facility that performs more than 50 abortions in any 12–month period:

(A) the physician who is to perform the abortion or an agent of the physician who is also a sonographer certified by a national registry of medical sonographers performs a sonogram on the pregnant woman on whom the abortion is to be performed;

(B) the physician who is to perform the abortion displays the sonogram images in a quality consistent with current medical practice in a manner that the pregnant woman may view them;

(amending TEX. HEALTH & SAFETY CODE ANN. § 171.012).

Plaintiffs argue these procedures are, in the context of most abortions, themselves not consistent with current medical practice. Accordingly, they continue, this requirement is self-contradictory and unconstitutionally vague. The Court disagrees.

While it would probably be unconstitutionally vague for the state to create entirely new medical practices and then require conformity with them "consistent with current medical practice," that is not what the Act requires. Under the Act, what must be "consistent with current medical practice" is the *quality* of the image or sound, not the procedure itself. Indeed, the Court has little doubt the *procedure*—the mandatory performance of a sonogram on a potentially unwilling patient and regardless of the procedure's medical necessity—is entirely at odds with current medical practice and ethics. However, if Plaintiffs wish to attack the sonogram requirement itself, a vagueness challenge to nearby phrases is not the proper avenue.

Likewise, the phrase "in a quality consistent with current medical practice" modifies the verbs "displays" and "makes audible," not the mandatory sonogram and accompanying descriptions. The Act requires physicians to perform a sonogram, a defined term the Court has already determined is not unconstitutionally vague, and then display the resulting images, and make audible the resulting

---

...

(D) the physician who is to perform the abortion or an agent of the physician who is also a sonographer certified by a national registry of medical sonographers makes audible the heart auscultation for the pregnant woman to hear, if present, in a quality consistent with current medical practice and provides, in a manner understandable to a layperson, a simultaneous verbal explanation of the heart auscultation.

H.B. 15, Sec. 2 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.012).

heart auscultation, if any, in a quality consistent with current medical practice. If the physician performs a sonogram that meets the definition of the Act and the resulting image is, despite the physician's adherence to current medical practice, incomprehensible or meaningless, that is perfectly consistent with the requirements of the Act. Likewise, as Defendants note, if no heart auscultation is audible, the Act is satisfied. Nothing in the Act requires a physician to create a crystal clear image or make audible a heart auscultation where none is present.

Accordingly, the Court rejects Plaintiffs' argument on this issue.

**f.      Section 171.012(a)(4)(D) — "in a manner understandable to a layperson"**

The Act requires physicians to describe the sonogram images and explain the heart auscultation to the pregnant woman "in a manner understandable to a layperson." *See* H.B. 15, Sec. 2 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.012).

Plaintiffs argue this requirement is unconstitutionally vague because the Act "gives no guidance" about what, exactly, a physician must say to satisfy it. Pls.' Supp. Br. [#41], Att. 1 at ¶ 26. The Court disagrees.

Physicians routinely describe medical ailments, procedures, and test results to their patients; it is to be hoped they are able to do so in a manner understandable to those patients, most of whom are not themselves physicians. If they are unable to do so, however, that can hardly be held against the Texas Legislature. Although the Court might question the wisdom of imposing on physicians what appears to be an objective standard of understandability, rather than requiring explanations in a manner understandable by each individual patient, wisdom and clarity are two different things. Whatever else it may be, this requirement is not unconstitutionally vague.

**g.  Section 171.012(a-1) — limitations on financial arrangements**

Section 171.012(a-1), added by the Act, reads:

> During a visit made to a facility to fulfill the requirements of Subsection (a), the facility and any person at the facility may not accept any form of payment, deposit, or exchange or make any financial agreement for an abortion or abortion-related services other than for payment of a service required by Subsection (a). The amount charged for a service required by Subsection (a) may not exceed the reimbursement rate established for the service by the Health and Human Services Commission for statewide medical reimbursement programs.

H.B. 15, Sec. 2 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.012).

Although Plaintiffs' arguments why this section is unconstitutionally vague are not well developed, it appears they challenge the terms "visit" and "abortion-related services."  In support of their argument, they raise a variety of hypothetical scenarios designed to test the limits of what constitutes a "visit" (what if the pregnant woman walks out the door, turns around, and walks right back inside?), and what qualifies as "abortion-related services" (what if a woman suspects she is pregnant and comes in for both a pregnancy test and an ultrasound?).

Defendants argue the term "abortion-related services" is not vague because it is used elsewhere in the law and, in addition to making an unprofessional *ad hominem* attack on Plaintiffs' counsel, Defendants argue the scope of a "visit" is "perfectly clear":

> [W]hen a woman visits the clinic for a pre-abortion sonogram, that "visit" is made to fulfill the Act's requirement, and "during" the visit, "the facility may not accept any form of payment." So, in answer to the complaint's question, the clinic may not charge for lab work or accept payment for any service whatsoever while the woman is there for her pre-abortion sonogram visit.

Defs.' Supp. Br. [#52], Att. 1 at 10.

Although the Court is skeptical Defendants' "perfectly clear" explanation actually resolves Plaintiffs' hypothetical scenarios, the Court agrees this provision is not unconstitutionally vague.

The terms "visit" and "abortion-related services" are, of course, subject to multiple interpretations. And the Court is ever mindful of the serious penalties the Act imposes for failure to comply with its mandates. However, the meanings of these terms are reasonably definite when considered in good faith and, as noted above, the Constitution does not require "mathematical certainty" from the language of our statutes. *Hill v. Colorado*, 530 U.S. 703, 733 (2000). Accordingly, the Court rejects Plaintiffs' argument on this point.

**h.      Section 171.012(b) — manner of disclosures to pregnant women**

Section 171.012(b), as amended by the Act, specifies two different sets of procedures by which the disclosures required under sections 171.012(a)(1) and (a)(2) may be delivered to a pregnant woman, depending on where she lives:

> The information required to be provided under Subsections (a)(1) and (2) may not be provided by audio or video recording and must be provided at least 24 hours before the abortion is to be performed:
>
>> (1) orally and in person in a private and confidential setting if the pregnant woman currently lives less than 100 miles from the nearest abortion provider that is a facility licensed under Chapter 245 or a facility that performs more than 50 abortions in any 12–month period; or
>>
>> (2) orally by telephone or in person in a private and confidential setting if the pregnant woman certifies that the woman currently lives 100 miles or more from the nearest abortion provider that is a facility licensed under Chapter 245 or a facility that performs more than 50 abortions in any 12–month period.

H.B. 15, Sec. 2 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.012).

Plaintiffs argue this provision is unconstitutionally vague for two reasons. First, they argue, "[t]he Act does not indicate how a woman can or will know whether" she lives within 100 miles of an abortion provider of the type described in section 171.012(b). Pls.' Mot. [#18], Att. 1 at ¶ 37.

Second, they argue: "The Act gives no indication of what obligations, if any, the abortion provider has to verify the accuracy of a woman's claim in this regard, or to provide her with information about the location of other abortion providers." *Id.* The Court disagrees.

Plaintiffs' first argument is more fairly characterized as a challenge to the burden the Act places upon pregnant women, than it is a challenge to the clarity of the Act's requirements. Indeed, there seems to be little question *what* the Act requires of a pregnant woman; that it is silent about *how* she must comply does not render it vague.

Plaintiffs' second challenge is foreclosed by the language of their own argument. Plaintiffs are absolutely correct, the Act does *not* contain any indication what duties a physician has to verify the truth or falsity of a pregnant woman's representations; accordingly, the Act does not create any. Statutory silence is not the equivalent of unconstitutional vagueness, for which we can all be thankful—in addition to making legislation impossible, such a rule would have the far worse result of making laws even more verbose than they already are.

For the foregoing reasons, the Court rejects Plaintiffs' arguments on this point.

i.    **Section 171.012(a)(4) and Section 171.0122 — Conflicting Provisions**

As discussed above, section 171.012(a)(4) of the Act requires a physician to display to the pregnant woman the sonogram images and make audible to her the heart ausculation, if present. However, newly-added section 171.0122 states, in part:

> (a) A pregnant woman may choose not to view the printed materials provided under Section 171.012(a)(3) after she has been provided the materials.

> (b) A pregnant woman may choose not to view the sonogram images required to be provided to and reviewed with the pregnant woman under Section 171.012(a)(4).

(c) A pregnant woman may choose not to hear the heart auscultation required to be provided to and reviewed with the pregnant woman under Section 171.012(a)(4).

(d) A pregnant woman may choose not to receive the verbal explanation of the results of the sonogram images under Section 171.012(a)(4)(C) if:

> (1) the woman's pregnancy is a result of a sexual assault, incest, or other violation of the Penal Code that has been reported to law enforcement authorities or that has not been reported because she has a reason that she declines to reveal because she reasonably believes that to do so would put her at risk of retaliation resulting in serious bodily injury;

> (2) the woman is a minor and obtaining an abortion in accordance with judicial bypass procedures under Chapter 33, Family Code; or

> (3) the fetus has an irreversible medical condition or abnormality, as previously identified by reliable diagnostic procedures and documented in the woman's medical file.

(e) The physician and the pregnant woman are not subject to a penalty under this chapter solely because the pregnant woman chooses not to view the printed materials or the sonogram images, hear the heart auscultation, or receive the verbal explanation, if waived as provided by this section.

H.B. 15, Sec. 3 (adding TEX. HEALTH & SAFETY CODE ANN. § 171.0122).

Plaintiffs argue the conflict between sections 171.012(a)(4) and 171.0122 renders the Act unconstitutionally vague. Plaintiffs focus on the first words of section 171.012(a), which read: "Consent to an abortion is voluntary and informed only if . . . ." H.B. 15, Sec. 2 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.012(a)). Because section 171.012 itself contains no exceptions, Plaintiffs argue, it is unclear whether failure to comply with section 171.012(a) precludes informed consent, even when such failure is explicitly authorized by section 171.0122.

This lack of clarity is compounded, according to Plaintiffs, by at least three other statutory provisions. First, existing section 171.011 states: "A person may not perform an abortion without

-34-

the voluntary and informed consent of the woman on whom the abortion is to be performed." Tᴇx. Hᴇᴀʟᴛʜ & Sᴀғᴇᴛʏ Cᴏᴅᴇ Aɴɴ. § 171.011. Second, as noted above, existing section 171.018 makes it a misdemeanor offense, punishable by up to a $10,000 fine, for a physician to intentionally perform an abortion "in violation of [the informed consent] subchapter." *Id.* § 171.018. Finally, also noted previously, the Act amends the Texas Occupations Code to require mandatory disciplinary action and denial of licensure for physicians who violate Chapter 171. *See* H.B. 15, Sec. 10 (amending Tᴇx. Oᴄᴄ. Cᴏᴅᴇ Aɴɴ. § 164.055).

In response, Defendants argue "the statute is clear that the requirements of sections 171.012(a)(4)(B)–(D) are subject to the exceptions provided for non-consenting women in sections 171.0122(b)–(d)," and "no one could seriously maintain that the void-for-vagueness doctrine precludes legislatures from crafting their statutes in this manner." Defs.' Resp. [#29] at 4.

The Court agrees with Defendants' general proposition, that a statute may impose requirements in one section, and create exceptions to those requirements in another. Indeed, the Court said as much in its analysis of the Act's conflicting requirements for the provision of printed materials to a pregnant woman. However, this statute does not do that—or, in this Court's view, at least not as clearly as the Constitution requires.

If sections 171.012(a)(4) and 171.0122 simply contained conflicting requirements, the Court would have less difficulty interpreting the conflict as a rule and its exceptions. However, the text of the Act does not lend itself well to such an interpretation: Section 171.012(a)(4) imposes duties upon the physician who is to perform the abortion; and Texas Health and Safety Code § 171.018 and Texas Occupation Code § 164.055, as amended by the Act, impose penalties upon physicians who fail to perform those duties. By contrast, section 171.0122 is phrased in terms of what the pregnant

woman is allowed to do, and there is nothing in the text of the Act that suggests this is an "exception" to the informed consent requirement. That is, one set of provisions dictate what the physician must do, and the other indicates what the pregnant woman may do. Looking simply at these sections, therefore, and keeping in mind the substantial penalties for failure to comply with the requirements of the Act, the Court finds this lack of clarity does not pass constitutional muster.

However, the Act does contain another statutory provision, one which Defendants claim conclusively resolves any vagueness that may exist: "In all events, section 171.0122(e) removes any uncertainty that might remain by explicitly exempting both doctor and patients from penalties in situations where a woman declines to view the images, hear the heartbeat, or listen to the verbal explanation after waiving her right to do so." *Id.*

Section 171.0122(e) reads: "The physician and the pregnant woman are not subject to a penalty under this chapter solely because the pregnant woman chooses not to view the printed materials or the sonogram images, hear the heart auscultation, or receive the verbal explanation, if waived as provided by this section." H.B. 15, Sec. 3 (adding TEX. HEALTH & SAFETY CODE ANN. § 171.0122). Defendants claim: "The statute could not be more clear than that: Doctors are not required to present sonogram images or heartbeat sounds to women who choose not to hear them." Defs.' Resp. [#29] at 4. The Court disagrees with Defendants.

There are two reasons why section 171.0122(e) does not resolve the troubling uncertainty within the Act. First, 171.0122(e) refers to penalties for both physicians and women, even though Chapter 171, both as currently written and as amended by the Act, does not appear to contain any penalties for women receiving abortions.

Second, and more important to the Court's conclusion, is the word "solely": by stating a

person is not subject to a penalty "solely" for doing something, the natural, if not inevitable, conclusion is that the person will be subject to a penalty for doing that thing in combination with something else. However, the Act contains nothing to indicate what this "something else" might be, leaving conscientious readers to speculate what might subject them to liability. Indeed, to the cautious ear, section 171.0122(e)'s "solely because" language practically smacks of exactly the sort of legislative "gotcha" tactics the Constitution forbids. Thus, far from clearing up the confusion created by the conflicting provisions in sections 171.012(a)(4) and 171.0122, as Defendants argue, the Court finds section 171.0122(e) further muddies the waters.

The Court has little doubt the troubling interactions between these sections is the result of inartful drafting and unforeseen inconsistencies. And again, the Court thinks Defendants' interpretation of how the provisions work together is not unreasonable. However, the penalties associated with these statutory provisions are so serious that neither physicians nor women should have to trust Defendants' representations (which are, after all, in no way official or binding), or otherwise guess what the Act requires of them. The Court therefore concludes sections 171.012(a)(4) and 171.0122 are, together, unconstitutionally vague.

**j.      Section 171.0123 — additional materials if a woman opts not to get an abortion**

If, after she receives the sonogram and the other information required by the Act, the pregnant woman chooses not to have an abortion, the Act requires the physician or the physician's agent to provide the woman with information about paternity and child support:

> If, after being provided with a sonogram and the information required under this subchapter, the pregnant woman chooses not to have an abortion, the physician or an agent of the physician shall provide the pregnant woman with a publication developed by the Title IV–D agency that provides information about paternity establishment and child support, including:

-37-

(1) the steps necessary for unmarried parents to establish legal paternity;
(2) the benefits of paternity establishment for children;
(3) the steps necessary to obtain a child support order;
(4) the benefits of establishing a legal parenting order; and
(5) financial and legal responsibilities of parenting.

H.B. 15, Sec. 3 (adding Tex. Health & Safety Code Ann. § 171.0123).

Plaintiffs argue this section is unconstitutionally vague because it "imposes an obligation with no apparent end date and no limitation as to the provider's knowledge, or lack of knowledge, of the woman's ultimate decision." Pls. Mot. [#18], Att. 1 at ¶41.

In response, Defendants argue the provision "requires the physician to provide the information only when he or she is aware of the woman's decision, and within a reasonable time after the woman has made that decision." Defs.' Supp. Br. [#52], Att. 1 at 13. Defendants conclude: "The lack of strict specificity concerning when, where, and how the physician or his agent must comply is an accommodation that affords flexibility to the physician, something Plaintiffs cannot convert into a constitutional infirmity." *Id.* The Court disagrees with Defendants.

The most glaring problem with Defendants' interpretation is its complete lack of textual support in the Act. The provision makes no mention of the physician's knowledge, and contains no language suggesting the physician is ever exempt from the obligation to provide additional information. Thus, the Act is not merely silent on exactly *how* a physician must comply with this duty—something the Court agrees is not constitutionally required—but exactly *what* a physician must do to comply with the requirements of the Act.

A person of reasonable intelligence might adopt Defendants' construction of this section, or that person might interpret the unqualified language of the Act as imposing an affirmative obligation

on physicians to follow up with women who are considering abortions, determine their ultimate decision, and provide them with the required materials if the women ultimately choose not to get an abortion. The Constitution does not allow the Texas Legislature to put physicians in this position. Accordingly, the Court finds this section is unconstitutionally vague.

### 3.     Conclusion — Vagueness

The Court has concluded the Act contains three provisions that are, at least under some circumstances, unconstitutionally vague. First, the phrase "the physician who is to perform the abortion," a phrase used in section 171.012(a)(4), is unclear as it relates to both multi-physician procedures and unplanned physician substitutions. Second, the conflict between sections 171.012(a)(4) and 171.0122 creates unconstitutionally impermissible uncertainty regarding what will, and what will not, subject a physician or a pregnant woman to liability. Finally, section 171.0123 is unconstitutionally vague regarding the scope of a physician's duty to provide paternity and child support information to women who choose not to get abortions.

Some form of injunctive relief is appropriate as to these sections, but the Court is mindful it should tread especially lightly in areas of state law, neither enjoining more broadly than is required to address the constitutional deficiencies, nor acting as a substitute legislator by rewriting suspect provisions as the Court sees fit. However, the Court cannot make a meaningful decision about the appropriate scope of an injunction without considering all of Plaintiffs' challenges. Accordingly, the Court will reserve until the conclusion of this opinion its consideration of the appropriate injunctive relief.

**D.    Compelled Speech**

Plaintiffs argue certain provisions of the Act are unconstitutional because they compel physicians to engage in speech, in violation of the First Amendment.  In their slightly more colorful words:

> The Act violates the plaintiff physicians' right of free speech by using them as puppets to convey government-mandated speech (visual, verbal, and auditory) to a patient who does not wish to receive that information and who does not believe it material to her decision. This mandated speech falls outside accepted medical practice for informed consent and requires physicians to violate basic tenets of medical ethics. This unprecedented intrusion on a physician's relationship with a patient in a private medical setting violates the First Amendment.

Pls.' Mot. [#18] at 5–6.

In response, Defendants argue Plaintiffs' argument is foreclosed by the Supreme Court's decision in *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), and the issue of whether the Act violates medical ethics "has no legal relevance."  Defs.' Resp. [#29] at 8.

For the following reasons, the Court disagrees with Defendants, and finds the Act compels speech in violation of the First Amendment.

**1.    Legal Standard**

"[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  "There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance . . . ."  *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796 (1988).

Outside the commercial context, "content-based regulations of speech are presumptively invalid." *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 188 (2007). "[A]ny restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City, Utah v. Summum*, 129 S.Ct. 1125, 1132 (2009). Likewise, where commercial and fully protected speech is mixed, and the component parts are "inextricably intertwined, . . . we apply our test for fully protected expression." *Riley*, 487 U.S. at 496. Similarly, where a statute compels speech, the nature of the compelled speech determines the standard of review a court must apply: "Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Id.*

**2.     Analysis**

The Court finds the provisions of the Act that compel speech by physicians are subject to strict scrutiny. Defendants do not suggest the speech at issue here is purely commercial, nor could they do so in good faith.[5] Although physicians often have a commercial interest in a woman's decision to get an abortion, the Act compels speech that is, at best, unrelated to a physician's commercial motivations, and that is, in reality, likely to be adverse to those motivations. Moreover, in the context of abortion, the speech between physician and patient, taken as a whole, implicates a variety of medical, ethical, legal, practical, and commercial concerns. Because these concerns are all closely related, the Court finds any commercial speech involved is "inextricably intertwined" with the non-commercial components, such that strict scrutiny is appropriate.

---

[5] In fact, Defendants do not meaningfully address the First Amendment issues in this case at all, instead arguing Plaintiffs' arguments are categorically foreclosed by the Supreme Court's decision in *Casey*.

Consequently, Defendants must prove that the compelled speech portions of the Act further a compelling government interest and are narrowly tailored to achieve that interest. *See Citizens United v. Federal Election Comm'n*, 130 S.Ct. 876, 898 (2010). Defendants make no attempt to meet this burden. Instead, as noted above, they argue Plaintiffs' entire compelled speech challenge is foreclosed by *Casey*, *supra*. Because Defendants have neither identified a compelling government interest, nor explained how the Act is narrowly tailored to advance that interest, Plaintiffs will prevail if *Casey* does not foreclose their First Amendment claim. Accordingly, an examination of that case is warranted.

a. *Planned Parenthood of Southeastern Pennsylvania. v. Casey*, **505 U.S. 833 (1992)**

In *Casey*, the Supreme Court considered constitutional challenges to five provisions of the Pennsylvania Abortion Control Act of 1982, as amended in 1988 and 1989. 505 U.S. at 844. The provision relevant to the case currently before this Court is the informed consent provision, which the Supreme Court summarized as follows:

> Except in a medical emergency, the statute requires that at least 24 hours before performing an abortion a physician inform the woman of the nature of the procedure, the health risks of the abortion and of childbirth, and the "probable gestational age of the unborn child." The physician or a qualified nonphysician must inform the woman of the availability of printed materials published by the State describing the fetus and providing information about medical assistance for childbirth, information about child support from the father, and a list of agencies which provide adoption and other services as alternatives to abortion. An abortion may not be performed unless the woman certifies in writing that she has been informed of the availability of these printed materials and has been provided them if she chooses to view them.

*Id.* at 881. Current Texas law contains substantially similar requirements. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 171.011–171.016.

The Supreme Court began its discussion of the Pennsylvania provision by noting, "as with any medical procedure, the State may require a woman to give her written informed consent to an abortion." *Id.* However, the Court acknowledged, "[t]he conclusions reached by a majority of the Justices in the separate opinions filed today and the undue burden standard adopted in this opinion require us to overrule in part some of the Court's past decisions" regarding informed consent, including both *Akron v. Akron Ctr. for Reproductive Health, Inc.*, 462 U.S. 416 (1983) (*Akron I*), and *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747 (1986). *Id.* at 881–82. With respect to these cases, the Court stated:

> To the extent *Akron I* and *Thornburgh* find a constitutional violation when the government requires, as it does here, the giving of truthful, nonmisleading information about the nature of the procedure, the attendant health risks and those of childbirth, and the "probable gestational age" of the fetus, those cases go too far, are inconsistent with *Roe* [*v. Wade*, 410 U.S. 113 (1973)]'s acknowledgment of an important interest in potential life, and are overruled. This is clear even on the very terms of *Akron I* and *Thornburgh*. Those decisions, along with [*Planned Parenthood of Cent. Mo. v.*] *Danforth*, recognize a substantial government interest justifying a requirement that a woman be apprised of the health risks of abortion and childbirth. It cannot be questioned that psychological well-being is a facet of health. Nor can it be doubted that most women considering an abortion would deem the impact on the fetus relevant, if not dispositive, to the decision. In attempting to ensure that a woman apprehend the full consequences of her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed. If the information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible.

*Id.* at 882 (citations omitted).

The *Casey* Court went on to say: "We also see no reason why the State may not require doctors to inform a woman seeking an abortion of the availability of materials relating to the consequences to the fetus, even when those consequences have no direct relation to her health." *Id.*

Summarizing its undue burden analysis, the Court said:

-43-

> [W]e depart from the holdings of *Akron I* and *Thornburgh* to the extent that we permit a State to further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed, even when in so doing the State expresses a preference for childbirth over abortion. In short, requiring that the woman be informed of the availability of information relating to fetal development and the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion. This requirement cannot be considered a substantial obstacle to obtaining an abortion, and, it follows, there is no undue burden.

*Id.* at 883.

**b.    *Casey's* Undue Burden Analysis**

This Court quotes substantial portions of *Casey* because Defendants rely heavily on the above language in arguing Plaintiffs' First Amendment challenge lacks merit. However, three points cut against Defendants' argument. First, as the last quotation makes clear, the Supreme Court's discussion is in the context of a constitutional challenge based upon a woman's Fourteenth Amendment Due Process right to an abortion, not a First Amendment challenge. Accordingly, while the Court's statements may be instructive on the First Amendment issue, they are not dispositive.

Second, while *Casey* refers to the government's interest in potential life as "important," "substantial," and "legitimate," it stops short of characterizing it as "compelling." Indeed, one of the holdings of *Roe v. Wade*, and one this Court does not interpret *Casey* as having overruled, was that "[w]ith respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability." 410 U.S. at 163; *see Casey*, 505 U.S. at 846 (reaffirming *Roe*'s three-part "essential holding," including "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State," and "a confirmation of the State's power

to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health").

Similarly, *Casey* indicates "[i]f the information the State requires to be *made available* to the woman is truthful and not misleading, the requirement *may* be permissible." *Casey*, 505 U.S. at 882 (emphasis added). *Casey* thus approved of some state regulations under which physicians are required to give pregnant women the option of receiving certain kinds of information; it did not, however, give governments *carte blanche* to force physicians to deliver, and force women to consider, whatever information the government deems appropriate.

Finally, and perhaps most importantly, the Supreme Court's summary of the Pennsylvania informed consent provision reveals that, while that provision is similar to current Texas law in many respects, its requirements are far less burdensome than the Act's. Indeed, even ignoring the Act's additional mandates, Texas' current informed consent requirements are more far-reaching than those in *Casey*. *See generally* TEX. HEALTH & SAFETY CODE ANN. §§ 171.011–171.018.

The Act imposes requirements that are both more onerous, and less medically relevant, than those in *Casey*. In particular, whereas the Pennsylvania statute only required a physician to inform a pregnant woman of the "probable gestational age" of the fetus (which, as noted, is already required by existing Texas law, *see* TEX. HEALTH & SAFETY CODE ANN. § 171.012(a)(1)(C)), the Act additionally requires, at an absolute minimum, a detailed description of the embryo or fetus.

Accordingly, for the foregoing reasons, the Court thinks *Casey*'s approval of the Pennsylvania informed consent provision is not necessarily dispositive of the issues in this case.

c.    *Casey's* **Compelled Speech Analysis**

To be fair, however, Defendants do not rely solely on the language quoted above.  *Casey* also addressed a First Amendment compelled speech challenge to the Pennsylvania statute, and summarily dismissed it, saying:

> All that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State. To be sure, the physician's First Amendment rights not to speak are implicated, but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State. We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.

*Casey*, 505 U.S. at 884 (internal citations omitted).

Defendants contend this language entirely forecloses Plaintiffs' First Amendment compelled speech challenge.  However, they ignore the final words of the quoted paragraph, to say nothing of the obvious jurisprudential fact the Supreme Court was only ruling—indeed, *could* only rule—on challenges to the particular statute with which it was presented.

d.    **Analysis and Application**

The Court agrees, the speech compelled by the Pennsylvania statute is not constitutionally impermissible, because it satisfies strict scrutiny.  The government has a compelling interest in ensuring patients are accurately informed about the nature of medical procedures they are considering, the health risks attendant to those procedures, and the risks and benefits of any alternatives.  Information about the probable gestational age of the embryo or fetus, being directly indicative of how advanced the woman's pregnancy is, is relevant to not only the health risks associated with an abortion, but also the particular procedure the physician may employ.

Further, the Court sees nothing constitutionally impermissible about the Pennsylvania statute's additional requirements that a physician or qualified nonphysician: (1) inform a pregnant woman about the availability of materials describing the fetus or embryo; (2) give her information about medical assistance for childbirth and child support; and (3) provide her with a list of agencies which provide adoption and other services as alternatives to abortion. To the extent the pregnant woman feels this information is pertinent to her decision, she may review it; to the extent she does not, she need not. Requiring a physician to inform a pregnant woman about her various medical options, and further requiring the physician to facilitate the woman's access to additional truthful information about those options at her request, does not violate the First Amendment. *Casey* says as much, and even if this Court had the authority to depart from this precedent, it would not.

As *Casey* further notes, the practice of medicine is "subject to reasonable licensing and regulation by the State." *Id.* However, while the government's power to license and regulate a profession may be a factor in a court's First Amendment compelled speech analysis, Defendants are incorrect in suggesting this power forecloses any challenge to compelled speech in a professional setting. Indeed, *Casey* acknowledges the physician's First Amendment rights are implicated by the Pennsylvania statute. The Supreme Court rejected the petitioners' compelled speech argument because physicians are, in a professional setting, subject to "reasonable" regulation by the state, and the Court correctly concluded the information mandated by the state in the Pennsylvania statute is reasonable.

Two final notes undercut Defendants' argument that *Casey* forecloses Plaintiffs' challenge here. First, the Supreme Court described the petitioners' argument as asserting a purported "First Amendment right of a physician not to provide information about the risks of abortion, and

childbirth, in a manner mandated by the State." *Id.* As noted above, there is no question the government has a compelling interest in making sure patients are accurately informed about the risks of any medical procedure they are considering, including those associated with both abortion and childbirth.

Second, and related, is the fact the Supreme Court barely discussed the petitioners' First Amendment argument. Nor is the reason for the *Casey* Court's summary dismissal a mystery: the petitioners' First Amendment challenge was meritless, if not frivolous, under the facts of that case.

Not so here. As discussed above, the Pennsylvania statute in *Casey* simply required physicians to inform pregnant women about the risks of an abortion, the potential alternatives thereto, and the availability of additional informational materials related to those alternatives. By contrast, the Act under consideration here requires physicians to provide, in addition to those legitimate disclosures, additional information such as descriptions of "the presence of cardiac activity," and "the presence of external members and internal organs" in the fetus or embryo. The Court does not think the disclosures required by the Act are particularly relevant to any compelling government interest, but whatever relevance they may have is greatly diminished by the disclosures already required under Texas law, which are more directly pertinent to those interests.

Nor are physicians' forced statements to their patients the only speech compelled by the Act. Section 171.012(a)(5) requires a pregnant woman to complete and sign a specified election form that certifies her understanding of many of the Act's various requirements. The most troubling aspect of the required certification is paragraph (6),[6] which reads:

---

[6] A close second is the almost perverse paragraph (7), which requires a woman to certify she is making her government-mandated election "of [her] own free will and without coercion." H.B. 15, Sec. 2 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.012).

(6) I UNDERSTAND THAT I AM REQUIRED BY LAW TO HEAR AN EXPLANATION OF THE SONOGRAM IMAGES UNLESS I CERTIFY IN WRITING TO ONE OF THE FOLLOWING:

_____ I AM PREGNANT AS A RESULT OF A SEXUAL ASSAULT, INCEST, OR OTHER VIOLATION OF THE TEXAS PENAL CODE THAT HAS BEEN REPORTED TO LAW ENFORCEMENT AUTHORITIES OR THAT HAS NOT BEEN REPORTED BECAUSE I REASONABLY BELIEVE THAT DOING SO WOULD PUT ME AT RISK OF RETALIATION RESULTING IN SERIOUS BODILY INJURY.

_____ I AM A MINOR AND OBTAINING AN ABORTION IN ACCORDANCE WITH JUDICIAL BYPASS PROCEDURES UNDER CHAPTER 33, TEXAS FAMILY CODE.

_____ MY FETUS HAS AN IRREVERSIBLE MEDICAL CONDITION OR ABNORMALITY, AS IDENTIFIED BY RELIABLE DIAGNOSTIC PROCEDURES AND DOCUMENTED IN MY MEDICAL FILE.

H.B. 15, Sec. 2 (amending TEX. HEALTH & SAFETY CODE ANN. § 171.012).

The Court need not belabor the obvious by explaining why, for instance, women who are pregnant as a result of sexual assault or incest may not wish to certify that fact in writing, particularly if they are too afraid of retaliation to even report the matter to police. There is no sufficiently powerful government interest to justify compelling speech of this sort, nor is the Act sufficiently tailored to advance such an interest.

Compounding this problem is newly-added section 171.0121, which requires both that a copy of the above certification be placed in the pregnant woman's medical records (presumably permanently), and that the facility that performs the abortion retain a copy for at least seven years. *See* H.B. 15, Sec. 3 (adding TEX. HEALTH & SAFETY CODE ANN. § 171.0121). Given the nature of the certification and the Act's retention requirements, it is difficult to avoid the troubling conclusion

the Texas Legislature either wants to permanently brand women who choose to get abortions, or views these certifications as potential evidence to be used against physicians and women.

The net result of these provisions is: (1) a physician is required to say things and take expressive actions with which the physician may not ideologically agree, and which the physician may feel are medically unnecessary; (2) the pregnant woman must not only passively receive this potentially unwanted speech and expression, but must also actively participate—in the best case by simply signing an election form, and in the worst case by disclosing in writing extremely personal, medically irrelevant facts; and (3) the entire experience must be memorialized in records that are, at best, semi-private.[7] In the absence of a sufficiently weighty government interest, and a sufficiently narrow statute advancing that interest, neither of which have been argued by Defendants, the Constitution does not permit such compulsion.

**3.      Conclusion**

The Act does not compel physicians to apprise women of the risks inherent in abortion, inform the women of available alternatives, and facilitate access to additional information if the women wish to review it before making their decisions; existing Texas law already compels such speech by physicians, in conformity with *Casey*.  Instead, the Act compels physicians to advance an ideological agenda with which they may not agree, regardless of any medical necessity, and irrespective of whether the pregnant women wish to listen.  These factual differences persuade the Court that *Casey* does not foreclose Plaintiffs' First Amendment challenge to the Act.

---

[7] It does not require a tremendous creative leap to imagine a lawsuit in which such a certification would be not only discoverable, but also probably admissible at trial.

As noted above, Defendants have failed to prove the Act furthers a compelling government interest, or that it is narrowly tailored to advance that interest. Accordingly, the Court finds the Act's compelled speech requirements, and specifically the requirements contained in Texas Health and Safety Code sections 171.012(a)(4)(B), (C), and (D), and section 171.012(a)(5), are unconstitutional violations of the First Amendment right to be free from compelled speech.[8]

## E.     Appropriate Injunctive Relief

To review, the Court has concluded: (1) the phrase "the physician who is to perform the abortion," as used throughout section 171.012(a)(4), is unclear as it relates to both multi-physician procedures and unplanned physician substitutions; (2) sections 171.012(a)(4) and 171.0122, taken together, create unconstitutionally impermissible uncertainty regarding the scope of liability under the Act; (3) section 171.0123 is unconstitutionally vague regarding the scope of a physician's duty to provide paternity and child support information to women who choose not to get abortions; and (4) the compelled speech requirements of sections 171.012(a)(4)(B), (C), and (D), and section 171.012(a)(5), are unconstitutional violations of the First Amendment.

What is left for the Court to decide is how to enjoin enforcement of the Act to address these constitutional deficiencies. In crafting injunctive relief, the Court is guided by four considerations. First, the injunction must be as narrow as possible, while still being broad enough to prevent enforcement of all unconstitutional provisions or applications of the Act. Second, the Court cannot

---

[8] Although sections 171.012(a)(4)(B) and (D) require a physician to display images and a heart auscultation, respectively, rather than speech, the Court finds these sections are both attempts to compel content-based expression by physicians. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Because of the constitutional equivalence between restrictions on speech and compelled speech, articulated by *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796 (1988), the Court concludes the government can no more compel such content-based expression than it could restrict such expression.

rewrite the Act, substituting its legislative judgment for that of the elected Texas lawmakers.  Finally, within the constraints imposed by the first two considerations, the Court must adhere to the intent of the Legislature as expressed in the Act.

## 1.    The Severability Clause

Thanks to the tireless efforts of parties and non-parties alike, it has come to the Court's attention that H.B. 15 contains a severability clause.  That clause reads:

> Every provision in this Act and every application of the provisions in this Act are severable from each other. If any application of any provision in this Act to any person or group of persons or circumstances is found by a court to be invalid, the remainder of this Act and the application of the Act's provisions to all other persons and circumstances may not be affected. All constitutionally valid applications of this Act shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the legislature's intent and priority that the valid applications be allowed to stand alone. Even if a reviewing court finds a provision of this Act invalid in a large or substantial fraction of relevant cases, the remaining valid applications shall be severed and allowed to remain in force.

H.B. 15, Sec. 15.

As Defendants argue with almost painful frequency, this clause demonstrates a clear legislative intent to preserve as much of the Act as possible in light of this Court's conclusions.  Nor does the Court agree with Plaintiffs' argument the unconstitutional portions of the Act cannot be severed from the remainder.  Accordingly, the Court finds the following injunction is appropriate.

## 2.    The Court's Injunction

First, Defendants are enjoined from penalizing a physician, criminally or otherwise, when multiple physicians perform an abortion, and any one of those physicians, or a combination of them, comply with the Act's requirements.

Second, Defendants are enjoined from penalizing either physician, criminally or otherwise,

when one physician is scheduled to perform an abortion and complies with the requirements of the Act, but a different physician actually performs the abortion because the original doctor is unexpectedly unavailable on the procedure date.

Third, the Court severs the word "solely" from section 171.0122(e), for enforcement purposes; and enjoins enforcement of the Act against either a physician or a pregnant woman if the physician does not place the sonogram images where the pregnant woman may view them, or does not make audible the heart auscultation, if the pregnant woman elects not to view the images or hear the heart auscultation.

Fourth, the Court enjoins Defendants from penalizing a physician, criminally or otherwise, for the physician's failure to provide the materials required by section 171.0123 of the Act, in cases where the physician does not know whether the woman has chosen to have an abortion.

Fifth, the Court severs the entirety of sections 171.012(a)(4)(B), (C), and (D), and section 171.012(a)(5), from the Act for enforcement purposes.

Six, the Court enjoins enforcement of any portion of the Act that conflicts with any of the above relief. This includes, but is not limited to, any penalty provision of the Act or any other statute that would impose a penalty for a person acting in compliance with this opinion. The Court anticipates Defendants will comply with this requirement in good faith, as the only alternative remedy if they do not is for this Court to strike down the law in its entirety. The Court is bound to respect legislative intent, but not at the expense of the Constitution.

### Conclusion

Accordingly,

IT IS ORDERED that Plaintiffs' Motion for Preliminary Injunction [#18] is

GRANTED IN PART and DENIED IN PART, as described in this opinion;

IT IS FURTHER ORDERED that Defendants are enjoined from penalizing a physician, criminally or otherwise, under the Act when multiple physicians perform an abortion, and any one of those physicians, or a combination of them, comply with the Act's requirements;

IT IS FURTHER ORDERED that Defendants are enjoined from penalizing either physician, criminally or otherwise, under the Act when one physician is scheduled to perform an abortion and complies with the requirements of the Act, but a different physician actually performs the abortion because the original doctor is unexpectedly unavailable on the procedure date;

IT IS FURTHER ORDERED that the word "solely" is severed from section 171.0122(e) of the Act, for enforcement purposes;

IT IS FURTHER ORDERED that Defendants are enjoined from enforcing the penalty provisions of the Act against either a physician or a pregnant woman if the physician does not place the sonogram images where the pregnant woman may view them, or does not make audible the heart auscultation, if the pregnant woman elects not to view the images or hear the heart auscultation;

IT IS FURTHER ORDERED that Defendants are enjoined from penalizing a physician, criminally or otherwise, for the physician's failure to provide the materials required by section 171.0123 of the Act, in cases where the physician does not know whether the woman has chosen to have an abortion;

IT IS FURTHER ORDERED that Defendants are enjoined from enforcing any part

of sections 171.012(a)(4)(B), (C), or (D) of the Act;

IT IS FURTHER ORDERED that Defendants are enjoined from enforcing any part of section 171.012(a)(5) of the Act;

IT IS FURTHER ORDERED that the Court enjoins Defendants from enforcing any portion of the Act that conflicts with any of the prior orders, as described above in this opinion. This injunction applies to, but is not limited to, section 171.0122(d) of the Act, in its entirety; and any penalty provision of the Act or any other statute that would impose a penalty for a person acting in compliance with this opinion;

IT IS FURTHER ORDERED that Plaintiffs' Motions to Certify [#10, 42] are GRANTED;

IT IS FURTHER ORDERED that Defendants' Motions to Strike [#26, 27, 28] are DENIED;

IT IS FINALLY ORDERED that the parties' stale motions [#22, 25] are DISMISSED WITHOUT PREJUDICE.


SIGNED this the 30th day of August 2011.


_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE