IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TEXAS MEDICAL PROVIDERS PERFORMING ABORTION SERVICES, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION |
| v. | ) ) | Case No. 1:11-cv-00486-SS |
| DAVID LAKEY, M.D., et al., | ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

ny-999360

**INTRODUCTION**

House Bill No. 15 ("the Act") is an unprecedented intrusion on women's and physicians' constitutional rights. The Act requires physicians providing abortions to perform medically unnecessary tests on their patients and obtain medically unnecessary information from their patients' bodies, even against the patient's wishes. In doing so, the Act turns the common law notion of informed consent on its head and violates women's right to bodily integrity.

The Act mandates this intrusion on women's bodies so that it can force physicians to act as the State's mouthpiece in delivering information that the State hopes will convince women seeking abortions to change their mind. Unlike pre-existing Texas law, which required physicians to inform women of the *availability* of materials on embryonic development published by the State, the Act requires physicians themselves to communicate the State's message and forces women to listen to it, even against the women's wishes. Thus, the Act requires that physicians provide to every woman seeking an abortion a verbal description of the ultrasound of the embryo or fetus and requires that physicians point out aspects of the ultrasound that the State deems important to convey its message. The Act also commands that physicians make any fetal heartbeat audible and describe it, all in violation of the First Amendment.

The Act imposes other restrictions that are contrary to medical practice, all of which are detrimental to women's health. In imposing these medically baseless restrictions, the Act relies on outdated gender stereotypes and therefore violates the Equal Protection Clause.

The Court should reject the State's attempt to minimize the differences between the Act and other laws ostensibly governing the informed consent process. Contrary to the State's argument, this case is not about whether the State itself can express its preference for childbirth over abortion or whether the State can make fetal development information available to pregnant women but rather *how* the State can express its preference and whether there are limits on what

ny-999360

the State can require.  Plaintiffs contend that it is unconstitutional for the State to command that physicians obtain information from women's bodies so that the State can force physicians to deliver that information in an attempt to convince women to carry a pregnancy to term. Plaintiffs respectfully request that the Court permanently enjoin portions of the Act.

**I.    The Act Violates Women's Right to Bodily Integrity.**

By requiring women to provide information from their own bodies so that the State can use that information in an effort to convince them to carry their pregnancies to term, the State has gone too far and has violated women's right to bodily integrity.  The Act's use of the woman's body to obtain information is one of the primary ways in which the Act is different from the vast majority of other laws ostensibly governing informed consent for abortion.[1]

The right to bodily integrity is protected by the right to "liberty" guaranteed in the Due Process Clause.  *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin v. California*, 342 U.S. 165 (1952)).  Indeed, "[b]ecause our notions of liberty are inextricably entwined with our idea of physical freedom and self-determination, the [Supreme] Court has often deemed state incursions into the body repugnant to the interests protected by the Due Process Clause."  *Cruzan v. Dir., Mo. Dep't. of Health*, 497 U.S. 261, 287 (1990) (O'Connor, J., concurring) (collecting cases).  The Fifth Circuit also has recognized the right to bodily integrity in a variety of factual contexts.  *See*, *e.g.*, *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450-51 (5th Cir. 1994) (en banc) (recognizing due process right "to be free from state-occasioned damage to a person's bodily integrity" in case involving sexual abuse of student by teacher); *Jefferson v. Ysleta Indep. Sch. Dist.,* 817 F.2d 303, 305 (5th Cir. 1987) (recognizing right to

---

[1] Indeed, only two other states have laws with similar requirements and courts have enjoined those requirements in both states.  Okla. Stat. tit. 63, §§ 1-738.3d(B)(1)-(4) (preliminarily enjoined by Order in *Nova Health Sys. v. Edmondson et al.*, No. CV-2010-533, (Okla. Dist. Ct. Aug. 3, 2010)); N.C. Session Law 2011-405 (to be codified at N.C. Gen. Stat. §§ 90-21.80-21.92) (ultrasound requirements preliminarily enjoined by *Stuart v. Huff*, No. 11-cv-804, 2011 WL 5042110 (M.D.N.C. Oct. 25, 2011)).

ny-999360                                2

bodily integrity in context of corporal punishment of students); *see also, e.g.*, *United States v. Leveck-Amirmokri*, EP-04-CR-0961-DB, 2005 WL 1009791, at *3-4 (W.D. Tex. Mar. 10, 2005) (applying right to bodily integrity in context of involuntary administration of drugs).

In particular, the concept of bodily integrity sets limits on the government's power to mandate medical treatment. *See Cruzan*, 497 U.S. at 278; *see also Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 857 (1992) (citing cases standing for that principle). As the Fifth Circuit has stated, "[t]here is no question that a competent person has a 'liberty interest . . . in refusing unwanted medical treatment.'" *Thompson v. Uphsur County*, 245 F.3d 447, 461 n.10 (5th Cir. 2001); *see also Cruzan*, 497 U.S. at 278.

Because the right to bodily integrity is a fundamental right, a law interfering with this right is subject to strict scrutiny and can be upheld only if the restriction is narrowly tailored to further a compelling state interest through the least intrusive means. *See Glucksberg*, 521 U.S. at 719-20 (identifying bodily integrity as fundamental right under the Due Process Clause); *see also Sell v. United States*, 539 U.S. 166, 180 (2003) (holding that even the reduced right of prisoners to refuse medical treatment is subject to intermediate scrutiny).

The "sonogram"-related requirements in the Act intrude on women's bodily integrity in at least two ways. First, the Act requires all women, regardless of their wishes, to be subjected to fetal heart auscultation. Fetal heart auscultation is not medically indicated prior to an abortion, App. ¶¶ 39, 44, 62, and the Defendants have not suggested any medical reason for this procedure. Indeed, fetal heart auscultation is entirely unnecessary for the safe performance of an abortion, and therefore physicians providing abortions do not require their patients to submit to this unnecessary medical test. *Id.*

Second, the Act requires that physicians perform ultrasounds for non-medical reasons. Plaintiffs routinely perform ultrasounds prior to an abortion procedure. App. ¶ 25. However, those ultrasounds are performed to verify that the woman is pregnant; to confirm that the pregnancy is inside the uterus, rather an ectopic pregnancy; and to date the woman's pregnancy. *Id.* This information is medically relevant to the abortion procedure. *Id.* By contrast, it is not relevant to the safe performance of an abortion procedure to identify any internal organs or external members, as the Act requires. *Id.* at ¶¶ 39, 47, 54(d). Thus, physicians performing abortions in Texas do not display the ultrasound image to a patient unless the patient wants to view it and do not provide this information unless a patient has a question about her ultrasound. *Id.* at ¶ 39. The Act, however, requires physicians to obtain this information and to do so even if the woman has stated that she does not want this information and that it is not relevant to her decision.

The fact that physicians in Texas are already performing ultrasounds for routine medical reasons does not eliminate the intrusive nature of the Act. The Supreme Court has held that an individual's constitutional right can be implicated when the State requires that physicians obtain medical information from patients specifically for the State's own purposes, even when the physician was already performing the medical test for other reasons as well. *See Ferguson v. City of Charleston*, 532 U.S. 67, 84-85 (2001). In *Ferguson*, the Supreme Court held that the State had to comply with the Fourth Amendment when physicians, doing urine screens for standard pre-natal care reasons, also tested the urine of pregnant women for the purpose of reporting to the police whether the patient tested positive for cocaine. 532 U.S. at 78 n.13, 84-85. Similarly, the Act requires that physicians perform ultrasounds to obtain information from the woman's body that the State wants, not the woman or the physician.

ny-999360                              4

The Act's intrusions on bodily integrity cannot be justified under strict scrutiny or any standard.  The State's interest in promoting potential life may be important, but it is not compelling until viability, *Casey*, 505 U.S. at 846, 876, and the Act applies throughout all stages of pregnancy, even the earliest stages.  Further, none of the Act's requirements is medically necessary; to the contrary, the Act imposes requirements that are contrary to accepted medical practice and that require physicians to violate medical ethics.  App. ¶¶ 28-30, 39, 44-53, 62; *see also* Ltr. of Texas Med. Ass'n to Texas Legislature (attached as Ex. B to Campbell Decl.) (opposing requirements in Act and stating that they set a "dangerous precedent" by "allow[ing] non-physicians to mandate what tests, procedures, or medicines must be provided to patients and in what timeframe" and are "contrary to established ethics principles pertaining to the patient-physician relationship and informed consent").

Further, any asserted interest by the State in obtaining information from women's bodies is diminished by the fact that detailed embryonic and fetal development information is already available to women under current Texas law for their review, if they so choose.  *See supra*; *cf. Winston v. Lee*, 470 U.S. 753, 765 (1985) (holding that State's argument that it needed to obtain bullet lodged inside individual suspected of armed robbery was not compelling where there was substantial other evidence available for use in prosecution).  Finally, the Act does not further any interest through the least intrusive means because it *mandates* medical testing and information gathering from women's bodies; it would be less intrusive to offer such testing and information to women and then provide it only if the woman chooses it.

Indeed, by forcing medical treatment such as fetal heart auscultation against a patient's wishes, the Act turns the doctrine of informed consent on its head.  As the Supreme Court has held, "the common law doctrine of informed consent is viewed as generally encompassing the

ny-999360                                                     5

right of a competent individual to *refuse* medical treatment." *Glucksberg*, 521 U.S. at 724 (internal citations omitted) (emphasis added). "Given the common-law rule that forced medication was a battery," the Supreme Court has described the right to refuse medical treatment as supported by a "long legal tradition." *Id.* at 725.

The State will undoubtedly argue that the information available from women's own bodies is unique. However, the fact that the State would like to use this information does not make it constitutional to obtain it from the woman's body against her wishes. The Supreme Court has enforced limits on the State's ability to use a citizen's body to further governmental interests, even when those interests are arguably very important and even when the information in the individual's body is arguably unique. *See, e.g.*, *Ferguson*, 532 U.S. at 71-72; *Lee*, 470 U.S. at 765; *Rochin*, 342 U.S. at 166.

In sum, by requiring physicians to obtain medically unnecessary information from the woman's own body, the Act goes much further than, and is qualitatively different from, the statutes of the vast majority of states with consent for abortion laws. Accordingly, the Court should permanently enjoin enforcement of the entirety of §§ 171.012(a)(4), (5), (6) (as amended by the Act) on the ground that they violate women's right to bodily integrity.

## II.     The Act Violates Physicians' and Women's Rights Under the First Amendment.

Plaintiffs incorporate and rely upon the First Amendment arguments made in their Motion and Supplemental Brief In Support of Their Motion for Preliminary Injunction (Docket Nos. 18, 41). Specifically, Plaintiffs seek summary judgment both on the compelled speech claims of physicians (the symbolic and verbal speech mandated by the "sonogram"-related requirements) and their women patients (the speech mandated by the certification form-related requirements), as well as on the patients' compelled listening claim.

The State seeks to sidestep the novel First Amendment issues posed by the Act by suggesting that the Act can be upheld on the ground that it promotes the State's interest in potential life and provides basic information about fetal development, just like any other consent for abortion statute, including the law upheld in *Casey*. What the State's argument ignores is that Texas *already* has such a statute in the pre-existing Woman's Right to Know Act ("WRKA"). Like the law at issue in *Casey*, WRKA makes available to the pregnant woman detailed information published by the State about the embryo or fetus, including high resolution color pictures of the embryo or fetus at various gestational ages. *See* www.dshs.state.tx.us.[2] Thus, entirely apart from the Act, current Texas law already provides to women what the State views as relevant and "truthful information about fetal development." *See* Docket No. 52 at 10.

What makes the Act different is that it requires physicians, using information obtained from women's own bodies, to be the mouthpiece for the State's views and requires that women listen to those views. Specifically, the Act goes far beyond the law upheld in *Casey* in at least two key ways.[3] First, WRKA and the Pennsylvania statute required physicians or their agents to inform women seeking abortions about the *availability* of materials printed by the State "describ[ing] the unborn child and list[ing] agencies that offer alternatives to abortion." Tex. Health & Safety Code § 171.012(a)(2)(D) (currently Tex. Health & Safety Code § 171.012(a)(3)(B)(iii)); 18 Pa. Const. Stat. § 3205(a)(2)(i). The pre-Act version of WRKA also specifically stated that women could choose to consult and review these materials *or not*. Tex. Health & Safety Code § 171.013(a). By contrast, the Act requires physicians themselves to engage in the symbolic speech of displaying the ultrasound and making any heartbeat audible, as

---

[2] For instance, the development materials already available from the State under WRKA provide a detailed image of an embryo at 6 weeks gestation, including the information that "the heart is more developed and is beating" and that the embryo is "less than 1/4 inch." *Id.* at www.dshs.state.tx.us/wrtk/develop/week6.shtm.

[3] *See Casey* Chart.

well as the verbal speech of delivering a description of "the unborn child," and requires women to consider this speech even against their wishes. *See Stuart v. Huff*, No. 11-cv-804, 2011 WL 5042110, at *5 (M.D.N.C. Oct. 25, 2011) (holding that very similar requirements were "well beyond" those in *Casey* statute, which required that certain information be made "available" to pregnant women).[4]

Further, in describing the embryo or fetus, the Act requires physicians to communicate only certain information that the State has selected. In § 171.012(a)(4)(C), the Act specifies that a physician's description of the ultrasound images must include "the presence of cardiac activity, and the presence of external members or internal organs," but does not require physicians to point out the *absence* of these or other developmental features in the embryo or fetus. Thus, for example, the Act would require a physician to inform the patient of the presence of any developing organs if they were visible on the ultrasound, but it does not require that the physician inform the patient that the organs are not fully developed or mature. App. ¶ 48. Accordingly, the speech that the Act compels physicians to utter and women to listen to is not content neutral. *See Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2664 (2011) (finding regulation of speech to be based on content and stating that "[g]overnment's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans"). The "State cannot engage in content-based discrimination [of others' speech] to advance its own side of a debate." *Id.* at 2672.

Second, the Act requires physicians to engage in speech and women to be subjected to speech that is qualitatively different from the informed consent topics that are viewed as standard both by Texas law and medical experts – the risks of the procedure to the patient and the risks of any alternatives. Indeed, Texas has created a Medical Disclosure Panel to "determine which

---

[4] As discussed in Plaintiffs' briefing in support of the preliminary injunction, the Act is a content-based regulation of speech because, *inter alia*, it mandates speech that physicians and patients would not otherwise make. *See, e.g., Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795 (1988); *see also Stuart*, 2011 WL 5042110, at *2.

risks and hazards related to medical care and surgical procedures must be disclosed by health care providers . . . ." Tex. Civ. Prac. & Rem. § 74.102(a). This panel is composed of three attorney members and six medical practitioners. *Id.* at 74.102(c).[5] Like Plaintiffs' experts, this panel has opined that, in order for physicians to have the benefit of a rebuttable presumption that they obtained informed consent for an abortion procedure, the only information they must disclose is the risks to the patient of the procedure itself, such as hemorrhage, and the risks of any alternatives. *See* Tex. Admin. Code tit 25, § 601.2(g)(13)-(14); App. ¶ 47.

It was this type of standard information "about the risks of abortion, and childbirth," that the Supreme Court held was subject to reasonable regulation in *Casey*. *See Casey* Chart (listing requirements of 18 Pa. Const. Stat. § 3205(a)(1)); 505 U.S. at 884 (finding no "constitutional infirmity in the requirement that the physician provide the information mandated by the State *here*") (emphasis added). The information that the Act requires physicians to deliver and women to listen to is entirely different from the "risks" information considered in *Casey*. *See Stuart*, 2011 WL 5042110, at *5 (holding that the North Carolina ultrasound law, which has similar requirements to the Act, "goes well beyond requiring disclosure of those items traditionally a part of the informed consent process, which include in this context the nature and risks of the procedure and the gestational age of the fetus" and therefore is subject to strict scrutiny under the First Amendment). For all the reasons stated here and in Plaintiffs' briefs in support of their motion for a preliminary injunction, the Act therefore falls outside the "normal" regulation of medicine and must be judged under strict First Amendment standards.

---

[5] *See also generally* Tex. Civ. Prac. & Rem. § 74.101 (defining informed consent as disclosure of "risks and hazards" related to the medical care or surgical procedure that could influence a reasonable person to give or withhold consent).

### III. The Act Discriminates Against Women on the Basis of Sex by Treating Them as Incompetent Decisionmakers and Thereby Violates the Equal Protection Clause.

The only possible rationale for the various requirements in the Act, including *mandating* women to view images of their ultrasounds and listen to a detailed description of an embryo or fetus, is the false assumption, based on outdated stereotypes, that women do not understand what they are doing when they choose to terminate a pregnancy and that they are incompetent decision makers who are incapable of determining with their doctors what information they need to make an informed decision. Imposing these requirements on women based on such outdated stereotypes constitutes gender discrimination and violates women's right to equal protection.

The Act creates a sex-based classification by imposing intrusive and medically baseless requirements in order for women to provide legally valid consent to a particular medical procedure. Under the Act, a woman cannot give legal consent to an abortion until she has met with the same physician twice, at least 24 hours apart, has been subjected to medically unnecessary procedures to obtain information from her body, has been forced to view images of her body, and has been forced to listen to a description of those images. *See* §§ 171.012(a)(1)-(2); 171.012(a)(4)-(6); 171.012(b); 171.0122.

Texas does not impose any similar requirements on any procedures chosen by men, including those that implicate potential life. App. ¶ 54. For example, no such requirements are imposed on couples who dispose of unused frozen embryos created for assisted reproduction, even though those actions, like abortion, have consequences for potential life. *Cf. Roman v. Roman*, 193 S.W.3d 40, 50 (Tex. App. – Houston [1st Dist.] 2006, pet. denied) (holding that embryo agreement providing that frozen embryos were to be destroyed in the event of couple's divorce was enforceable).

The Equal Protection Clause prohibits classifications based on sex unless the state can establish an "exceedingly persuasive justification." *United States v. Virginia*, 518 U.S. 515, 524 (1996). To meet this burden, the State must show at least that a challenged classification serves important governmental objectives and does so in a way that is substantially related to achieving those objectives. *Id.* at 533. Gender stereotypes cannot provide such justification, *e.g., Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 730 (2003); impermissible stereotypes of women include their "need for special protection," *Orr v. Orr*, 440 U.S. 268, 283 (1979), and that they are "the center of home and family life," *Califano v. Westcott*, 443 U.S. 76, 88-89 (1979).

There is no "exceedingly persuasive justification" for the Act. The Act's treatment of women rests upon and perpetuates impermissible stereotypes about women's capacities. The Act assumes that women "suffer from an inherent handicap" preventing them from making competent and informed decisions. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724-25 (1982). The Act's various requirements are intended as an "educational aid[] that make[s] it easier to understand the abortion procedure," House Research Org., Bill Analysis, 82nd Leg., R.S., H.B. 15 (2011) at 5, ostensibly so that the woman has "a clearer view of what she is choosing with an abortion and who was affected by the choice." *Id.* But the assumption that women need such special "education" is based on an "invidious, archaic" view that they do not understand what it means to end a pregnancy. *J.E.B. v. Alabama ex rel. T.B*, 511 U.S. 127, 138 (1994).

The factual premise for this assumption is indisputably false. Women understand what is at stake in choosing to terminate a pregnancy, both for themselves and for the embryo or fetus. App. ¶¶ 8-9. Indeed, 61% of women obtaining an abortion already have children, and 34% have two children or more, thus making the State's contention that women seeking abortions need

"education" about the embryonic and fetal development associated with pregnancy to be particularly baseless. *See id.* at ¶ 8.

Further, the Act itself contradicts the notion that requiring women to obtain an ultrasound at least 24 hours in advance of an abortion procedure, and to meet twice with the same physician in person at least 24 hours apart, should qualify as an important governmental objective. The Act allows women to obtain some of the state-mandated information by telephone and to wait only two hours after the ultrasound before having an abortion if they live 100 miles or more from the nearest licensed abortion provider. *See* §§ 171.012(a)(4)-(6); 171.012(b)(2). If telephonic consultation and a two-hour delay after the ultrasound is sufficient for some women to provide legally valid consent, based just on their residence, then the State cannot argue persuasively that it is insufficient for all women.

Moreover, to the extent additional information about the embryo or fetus may be helpful to women, WRKA satisfies this alleged interest by making such information *available* to women, if they choose to review it. Mandating that women must be subjected to unnecessary medical procedures and be forced to listen to state-chosen information is not substantially tailored to achieving any important state interest. *See*, *e.g.*, Ltr. of Texas Med. Ass'n (attached as Ex. B to Campbell Decl.) (opposing requirements in the Act and stating that "[t]he Legislature's role should not be to dictate how physicians and patients communicate with one another or what procedures and diagnostic test must be performed on a given patient").

Because the Act imposes restrictions on women on the basis of gender stereotypes, it violates the Equal Protection Clause. *See Hibbs* 538 U.S. at 730; *Virginia*, 518 U.S. at 541-42. For these reasons, the Court should permanently enjoin §§ 171.012(a)(1); 171.012(a)(4)-(6);

171.012(b)(1)-(2); 171.0122(d) of the Act, as well as Tex. Health & Safety Code §§ 241.007, 243.017, 245.024, and Tex. Occ. Code § 164.0551 to the extent they incorporate those sections.

## IV.     The Act Is Unconstitutionally Vague.

Plaintiffs incorporate and rely upon the vagueness arguments made in their Motion and Supplemental Brief In Support of Their Motion for Preliminary Injunction (Docket Nos. 18, 41). In addition, to clarify the Court's ruling regarding unplanned physician substitutions, Plaintiffs submit that §§ 171.012(a)(1) and (4) are vague in the common situation when a patient asks to re-schedule her abortion procedure to a date and time when the physician with whom she originally met is unavailable. In this situation, it is unclear whether the patient has to start over and receive intrusive tests such as the ultrasound and the state-mandated information again with a different physician and return for a third visit, or whether the requirement that she receive the state-mandated procedures and information from "the physician who is to perform the abortion" is satisfied because at the time those steps were taken that physician was scheduled to perform her abortion. For all of these reasons, the Court should permanently enjoin the following provisions of the Act as unconstitutionally vague: §§ 171.002(4); 171.012(a)(1); 171.012(a)(4)-(6); 171.0122(d) & (e); 171.0123, as well as Tex. Health & Safety Code §§ 241.007, 243.017, 245.024, and Tex. Occ. Code § 164.0551 to the extent they incorporate those sections.

## V.     The Act Violates the Fourth Amendment.

The Act violates the Fourth Amendment by authorizing "random, unannounced" searches of physicians' offices without a warrant. *See* Tex. Health & Safety Code § 245.006(a) (as amended by the Act). The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Unless a search falls within a specific exception, it must be authorized by a warrant in order to be

reasonable. *See*, *e.g.*, *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978) (warrant required for search of plumbing business pursuant to OSHA regulations).

The warrant requirement applies to commercial premises, such as Plaintiffs' offices and facilities. *See*, *e.g.*, *id.* at 311. Although an exception to the warrant requirement exists for searches of "closely regulated" industries such as vehicle dismantling, *New York v. Burger*, 482 U.S. 691 (1987), medical offices have never been held to be closely regulated. *See Ferguson*, 532 U.S. at 77; *Margaret S. v. Edwards*, 488 F. Supp. 181, 216 (E.D. La. 1980) (noting "history of respect towards the recognized need for privacy in the doctor-patient relationship" and concluding that physicians were not closely regulated). Moreover, the Supreme Court has held that when patients seek medical care there is a *heightened* expectation of privacy. *Ferguson*, 532 U.S. at 78.

Accordingly, the State should be required to obtain a warrant before searching Plaintiffs' offices and facilities, unless it receives consent or there is an emergency. *Barlow's*, 426 U.S. at 323; *see also Camara v. Mun. Court*, 387 U.S. 523, 534 (1967); *See v. City of Seattle*, 387 U.S. 541, 543 (1967) (warrant required for search of commercial warehouse). Because the Act authorizes warrantless searches in all circumstances, it violates the Fourth Amendment.

## CONCLUSION

For all of the above reasons, and for the reasons stated in Plaintiffs' briefing in support of the preliminary injunction, Plaintiffs respectfully request that the Court permanently enjoin portions of the Act.

Dated: November 7, 2011

Respectfully submitted,

 /S/ Dicky Grigg
Dicky Grigg, TX Bar #08487500
Spivey & Grigg, LLP
48 East Avenue
Austin, TX 78701
(512) 474-6061
(512) 474-8035 Fax
dicky@grigg-law.com

Susan Hays, TX Bar #24002249
Godwin Ronquillo, PC
1201 Elm Street, Suite 1700
Dallas, TX 75270
(214) 557-4819
(214) 432-8273 Fax
shays@godwinronquillo.com

Julie Rikelman*
Bebe J. Anderson*
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600
(917) 637-3666 Fax
jrikelman@reprorights.org
banderson@reprorights.org

Jamie A. Levitt*
J. Alexander Lawrence*
Morrison & Foerster, LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 336-8638
(212) 468-7900 Fax
alawrence@mofo.com

*Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I, Dicky Grigg, hereby certify that true and correct copies of Plaintiffs' Motion for Summary Judgment; Appendix of Facts Supporting Plaintiffs' Motion for Summary Judgment and Exhibits 1-9 Thereto; and [Proposed] Order Granting Plaintiffs' Motion for Summary Judgment were served by ECF on the 7th day of November, 2011, upon all counsel of record.

                                                    */S/ Dicky Grigg*_____
                                                    Dicky Grigg