**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**TEXAS MEDICAL PROVIDERS PERFORMING ABORTION SERVICES, et al.,**
**Plaintiffs,**

**-vs-** **Case No. A-11-CA-486-SS**

**DAVID LAKEY, M.D., et al.,**
**Defendants.**

**O R D E R**

BE IT REMEMBERED on January 20, 2012, the Court held a hearing in the above-styled cause, during which it specifically considered the parties' motions for summary judgment [##92, 94, 97], Plaintiffs' motions to amend their complaint [##115, 117], Defendants' motion to amend their answer [#119], and the judgment of the Fifth Circuit Court of Appeals [#113]. Having reviewed the documents, the relevant law, and the file as a whole, the Court now enters the following opinion and orders GRANTING the parties' motions to amend, and DISMISSING IN PART and GRANTING IN PART Defendants' motion for summary judgment.

**Background**

In this suit, Plaintiffs raise a variety of constitutional challenges to Texas House Bill Number 15, an Act "relating to informed consent to an abortion." Act of May 5, 2011, 82d Leg., R.S., ch. 73, 2011 Tex. Sess. Law Serv. ("H.B. 15" or "the Act"). Per their motion to amend, which the Court

has granted, Plaintiffs abandon all claims except their First Amendment compelled speech claim, and their vagueness challenges to various parts of the Act.[1]

On June 30, 2011, Plaintiffs moved for a preliminary injunction based on these claims, and the Court, on August 30, 2011, granted Plaintiffs' motion in part, and denied it in part. Specifically, the Court found Plaintiffs had a substantial likelihood of success on their First Amendment claims, and three of their vagueness challenges, and consequently enjoined enforcement of the relevant portions of the Act; and rejected the remainder of Plaintiffs' arguments and associated requests for injunctive relief. Defendants filed an interlocutory appeal on the same day. On January 10, 2012, a three-judge panel of the Fifth Circuit issued an opinion, vacating this Court's order, and remanding the case for further proceedings. This Court held a hearing on January 20, 2012, on the parties' motions for summary judgment, but the legal principles articulated by the panel left little room for meaningful discussion, particularly in light of Plaintiffs' stated intention to abandon all claims not previously addressed in this Court, or on appeal.

Still pending are the parties' motions for summary judgment. To the extent the motions address claims that have now been abandoned, they are dismissed as moot. Resolution of the remainder calls for brief discussion of the Fifth Circuit panel's opinion.

## I. First Amendment

In reversing this Court's temporary restraining order, Chief Judge Jones, writing for a majority of the panel, relied substantially on her interpretation of the Supreme Court's decision in

[1] Thus, although the Court has likewise allowed Defendants to amend their answer, the Court declines to issue an advisory opinion on the constitutionality of the various provisions of the Act that are no longer being challenged by Plaintiffs.

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992)—an interpretation far more expansive than this Court's, but one which the Court must nevertheless apply.

Regarding Plaintiffs' First Amendment challenges, the panel distilled four "rules" from the Supreme Court's decisions in *Casey* and *Gonzales v. Carhart*, 550 U.S. 124 (2007):

> First, informed consent laws that do not impose an undue burden on the woman's right to have an abortion are permissible if they require truthful, nonmisleading, and relevant disclosures. Second, such laws are part of the state's reasonable regulation of medical practice and do not fall under the rubric of compelling "ideological" speech that triggers First Amendment strict scrutiny. Third, "relevant" informed consent may entail not only the physical and psychological risks to the expectant mother facing this difficult moral decision, but also the state's legitimate interests in protecting the potential life within her. Finally, the possibility that such information might cause the woman to choose childbirth over abortion does not render the provisions unconstitutional.

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*, No. 11–50814, 2012 WL 45413, at *5 (5th Cir. Jan. 10, 2012) (quotations, citations, and footnote omitted).

These principles, taken together, describe a remarkable scope of state power in the context of regulating a woman's right to an abortion.[2] First, and most troubling, although the panel only specifically says strict scrutiny analysis does not apply to compelled speech by doctors where informed consent is concerned, it appears the panel has effectively eviscerated the protections of the First Amendment in the abortion context.[3]

---

[2]The panel's conclusion is also remarkable because, unlike *Casey*, this Court's opinion had nothing to do with the Fourteenth Amendment abortion rights of women. However, because the Court is obligated to yield to the panel's judgment, it bears noting that regardless of one's feelings about abortion, or whether one believes it is moral or immoral, right or wrong, it remains a right protected by the United States Constitution, as recognized by the Supreme Court.

[3] Two facts lead this Court to believe the panel did not reject strict scrutiny analysis in favor of some other First Amendment standard. First, and most obvious, the panel made no traditional First Amendment inquiry into the "fit" between the government's interests and the requirements of the Act. Second, as this Court noted in its opinion, Defendants in this case did not even attempt to justify the Act under such a framework, instead relying solely on *Casey*; and, of course, it would be very odd for the panel to base its decision on an argument not made by Defendants.

Apart from everything else, the Court questions whether the Supreme Court would have modified decades of First Amendment jurisprudence, through the incorporation of *Casey*'s Fourteenth Amendment undue burden inquiry, without an explicit statement to that effect. That general point aside, however, specific language in *Casey* suggests the Supreme Court did not intend to analytically merge the First Amendment rights of doctors with the Fourteenth Amendment rights of women, even in the context of informed consent to an abortion: "a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion is, for constitutional purposes, no different from a requirement that a doctor give certain specific information about any medical procedure."[4] *Casey*, 505 U.S. at 884. Of course, "undue burden" is not a constitutional standard applicable to medical procedures generally, but one that *Casey* adopted specifically to balance the sometimes competing interests of pregnant women, and state governments, in the context of abortion. The above-quoted language from *Casey* suggests informed consent is informed consent, regardless of what medical procedure is involved; by contrast, the panel's opinion seems to create a special rule for informed consent for abortions. Consequently, this Court respectfully disagrees with the panel's conclusion on this point.[5]

---

[4] This statement not only calls into question the panel's decision to import Fourteenth Amendment undue burden analysis into the First Amendment inquiry, but also emphasizes the intrusive nature of H.B. 15: in no other medical context does the government go so far in telling doctors what they must, and must not, do. As Plaintiffs' counsel suggested at the hearing, it is not clear the government has the power to compel doctors to make disclosures and presentations, like those required under the Act, to patients considering other medical procedures. There is a certain dark irony to this situation, as one might imagine the government would feel more free to regulate medical procedures that have not been explicitly recognized as implicating an established constitutional right.

[5] The Court also questions how a pregnant woman's informed consent, H.B. 15's nominal goal, is promoted by requiring "the physician who is to perform the abortion" to personally perform many of the mandated acts. If the Act is truly designed to inform women, and not simply to make abortions time- and cost-prohibitive for hospitals and clinics alike, it seems counter-productive to artificially limit the number of medically qualified people who can provide the relevant information. Informed consent requirements exist to protect the rights of patients, and to honor their autonomy, not to provide states with an excuse to impose heavy-handed, paternalistic, and impractical restrictions on the practice of medicine.

Second, the court observes that, by importing the panel's definition of "relevant" into its first rule, the result is that doctors may permissibly be compelled to parrot anything the state deems necessary to further its "legitimate interests in protecting the potential life within" the pregnant woman, provided the message does not impose an undue burden on the woman's right to have an abortion. That is, within the abortion context, the doctor's right to speak, or not to speak, is wholly dependent on the contours of a woman's right to an abortion.[6]

Finally, the Court suggests the panel may have assumed away the Act's potential constitutional infirmities, both by equating doctors' First Amendment rights with women's Fourteenth Amendment rights, and by declining to give definite meaning to the phrase "reasonable regulation."

With respect to the former, the panel noted, "the Appellees here do not contend that the H.B. 15 disclosures inflict an unconstitutional undue burden on a woman's substantive due process right to obtain an abortion," an omission the panel characterized as "significant." *Lakey*, 2012 WL 45413, at *5. Of course, Plaintiffs may have failed to make such allegations precisely because they were bringing First Amendment challenges on behalf of doctors, not Fourteenth Amendment challenges on behalf of women, and they—like this Court—were surprised by the panel's apparent importation of a Fourteenth Amendment "undue burden" standard into their First Amendment compelled speech

---

[6] An early point of departure between this Court's analysis and the panel's is that this Court takes Plaintiffs' claims at face value, and sees this as a case about doctors' freedom to enjoy their constitutional rights, and exercise their individual medical judgments, without unjustified state interference; whereas the panel apparently sees it as a case about women's right to an abortion—an issue specifically disclaimed by Plaintiffs in this suit. There is no question *Casey* speaks, extensively and authoritatively, on the question of a woman's right to an abortion; but it is almost silent on the First Amendment rights of doctors. The panel seems to assume *Casey*'s silence means the First Amendment is of limited, or no, independent force, with respect to doctors in the abortion context; whereas this Court interprets *Casey*'s silence as an indication that no substantial First Amendment issue was created by the specific requirements of the statute in that case—requirements which, as the Court has noted, were far less onerous than those imposed by the Act in this case.

claims. Under such circumstances, the Court sees little significance in Plaintiffs' omission.

With respect to the latter issue, reasonable regulation, this Court is concerned with the panel's implicit conflation of "reasonable regulation of medical practice," with "truthful, nonmisleading, and relevant disclosures"—particularly given the panel's broad definition of "relevant" in this context. As this Court reads the panel's opinion, an extended presentation, consisting of graphic images of aborted fetuses, and heartfelt testimonials about the horrors of abortion, would be "truthful, nonmisleading, and relevant." Accordingly, the government could apparently require doctors personally to make such presentations prior to performing abortions, all under the rubric of "reasonable regulation of medical practice"—but only to the extent such presentations did not impose an undue burden on the pregnant woman's right to an abortion.[7] The concept that the government may make puppets out of doctors, provided it does not step on their patients' rights, is not one this Court believes is consistent with the Constitution, in the abortion context or otherwise.[8]

---

[7] Of course, this Court's understanding of the panel's opinion may be incorrect. However, if that is the case, and the term "reasonable regulation of medical practice" is not coextensive with "truthful, nonmisleading disclosures that do not impose an undue burden on a woman's right to an abortion," the Court is confident the panel will clarify the distinction.

[8] Similarly, this Court wonders how "reasonable regulation of medical practice" can include statutory commands that preclude the use of reasoned medical judgment. For instance, the Act seems to assume there cannot be any circumstances, apart from those specifically imagined and enumerated by the Legislature, in which a caring and competent physician would agree with a patient's choice to have an abortion. Of course, it is the physician, not the Legislature, who is in the best position to make this determination as to each individual patient. The Act's one-size-fits-all approach strikes this Court as being wholly inconsistent with reasonable regulation of medical practice. Notably, it is also another way in which H.B. 15 differs from the statute considered in *Casey*:

> Our prior cases also suggest that the "straitjacket," of particular information which must be given in each case interferes with a constitutional right of privacy between a pregnant woman and her physician. As a preliminary matter, it is worth noting that the statute now before us does not require a physician to comply with the informed consent provisions "if he or she can demonstrate by a preponderance of the evidence, that he or she reasonably believed that furnishing the information would have resulted in a severely adverse effect on the physical or mental health of the patient." 18 Pa. Cons.Stat. § 3205 (1990). In this respect, the statute does not prevent the physician from exercising

## II. Vagueness

The Court also respectfully disagrees with the panel's analysis of Plaintiffs' vagueness challenges. Most notably, as Plaintiffs' counsel observed during the hearing, although both the panel and Defendants claim the Act's meaning is clear, they disagree about what that meaning is. Worse, until Texas agencies and courts weigh in on the proper interpretation of the Act, doctors are stuck in limbo—on one side, they have the State Defendants' informal representations about what the Act's provisions mean; and on the other, they have the opinion of a federal Court of Appeals panel, which of course may not make binding interpretations of state law. While this ambiguity is no doubt only a temporary problem, this Court does not believe doctors should have to risk their licenses and criminal records—for any amount of time—attempting to comply with a statute so ambiguous that none of the bodies to have considered it have reached the same conclusion about its meaning.

Perhaps most troubling, however, is the panel's "obvious solution" to the problem of what H.B. 15 requires doctors to do, under Texas Health and Safety Code § 171.0123,[9] when the doctor does not know whether a pregnant woman has decided to have an abortion. Apart from being factually questionable, the panel's statements seem to display an almost shocking lack of concern for the privacy and well-being of women considering abortions:

The obvious solution to any potential ambiguity about a knowledge requirement is

---

his or her medical judgment.

*Casey*, 505 U.S. at 883–84 (internal citation omitted). H.B. 15 contains no such exception, allowing for the exercise of medical judgment.

[9] "If, after being provided with a sonogram and the information required under this subchapter, the pregnant woman chooses not to have an abortion, the physician or an agent of the physician shall provide the pregnant woman with a publication developed by the Title IV-D agency that provides information about paternity establishment and child support, including [various specific items]."

> for a physician's office to disseminate the material whenever the woman fails to appear for her abortion. No extreme burden is placed on the physician, nor is the woman harmed if she receives the printed matter, whether or not she carried out an abortion. This vagueness complaint is, at bottom, trivial.

*Lakey*, 2012 WL 45413, at *12. It seems beyond question to this Court that some women might suffer great harm if such mailings were made indiscriminately. Indeed, the Act itself acknowledges that some women considering abortions might reasonably fear "retaliation resulting in serious bodily injury." *See* TEX. HEALTH & SAFETY CODE § 171.0122(d)(1). The plurality in *Casey* found likewise, offering a more detailed, and instructive, explanation:

> In well-functioning marriages, spouses discuss important intimate decisions such as whether to bear a child. But there are millions of women in this country who are the victims of regular physical and psychological abuse at the hands of their husbands. Should these women become pregnant, they may have very good reasons for not wishing to inform their husbands of their decision to obtain an abortion. Many may have justifiable fears of physical abuse, but may be no less fearful of the consequences of reporting prior abuse to the Commonwealth of Pennsylvania.
>
> . . . .
>
> Respondents attempt to avoid the conclusion that § 3209 [the notification provision] is invalid by pointing out that it imposes almost no burden at all for the vast majority of women seeking abortions. . . . [R]espondents argue, the effects of § 3209 are felt by only one percent of the women who obtain abortions. Respondents argue that since some of these women will be able to notify their husbands without adverse consequences or will qualify for one of the exceptions, the statute affects fewer than one percent of women seeking abortions. . . . We disagree with respondents' basic method of analysis.
>
> . . . .
>
> The analysis does not end with the one percent of women upon whom the statute operates; it begins there.

*Casey*, 505 U.S. at 893–94.

For the panel to dismiss this vagueness concern as trivial, and to say the potential for harm to women is nonexistent, is profoundly disturbing. Requiring doctors to take actions they believe are likely to cause harm to their patients is completely at odds with the most basic tenets of medical

ethics—and cannot, even under the most deferential interpretation of the phrase, be considered "reasonable regulation of medical practice."

**Conclusion**

There can be little doubt that H.B. 15 is an attempt by the Texas Legislature to discourage women from exercising their constitutional rights by making it more difficult for caring and competent physicians to perform abortions. The added time and expense required by the Act; the random, unannounced searches of abortion facilities authorized thereby, *see* TEX. HEALTH & SAFETY CODE § 245.006(a); and its mandate to doctors, at the risk of license and criminal fine, to deliver a prescribed message to women seeking to exercise their constitutional rights, will naturally limit the number of competent physicians who are willing to perform abortions—which is, of course, the single purpose of the statute.[10] This Court continues to believe these requirements are impermissible; or, at the least, that *Casey* does not provide justification for them.

At bottom, it seems the panel conflated doctors' First Amendment rights with women's Fourteenth Amendment rights because it was concerned *Casey* could not stand otherwise:

> If the disclosures are truthful and non-misleading, and if they would not violate the woman's privacy right under the *Casey* plurality opinion, then Appellees would, by means of their First Amendment claim, essentially trump the balance *Casey* struck between women's rights and the states' prerogatives. *Casey*, however, rejected any such clash of rights in the informed consent context.

*Lakey*, 2012 WL 45413, at *5.

---

[10] To clarify, the Court is not opposed to the Act's required disclosures as a categorical matter. Indeed, the mandated physician conduct and speech may well be appropriate in certain cases. However, they may equally well be injurious and destructive, mentally and physically, in others. This Court believes Texas overstepped its legitimate authority when it substituted its medical judgment for that of doctors, and imposed a uniform method of treatment for all patients, rather than allowing physicians to make medically appropriate, case-by-case determinations.

As explained in part above, the Court disagrees with this assessment. There is no question *Casey* allows the government to limit a woman's constitutional right to an abortion, provided it does not impose an undue burden on that right. However, it does not follow (logically, if not legally) that the government can do anything it desires, within that boundary, to create such limits. Texas may be free to craft a law that imposes restrictions on women seeking abortions, but that does not mean it is equally free to craft a law that imposes affirmative duties on those who come into contact with them.

Even within the context of "informed consent," this Court believes doctors' First Amendment rights have a force independent of the rights of their patients. And while the *Casey* court saw "no constitutional infirmity in the requirement that the physician provide" "information about the risks of abortion, and childbirth, in a manner mandated by the State" in that case, *Casey*, 505 U.S. at 885, that holding does not strike this Court as blessing all "truthful, nonmisleading, and relevant" disclosures—as those terms are defined by the panel.

Finally, and as previously noted, H.B. 15, unlike the statute at issue in *Casey*, substantially impairs a doctor's exercise of his or her medical judgment. *See* 505 U.S. at 884 ("In this respect, the statute does not prevent the physician from exercising his or her medical judgment."). The Act requires doctors to attempt to discourage their patients from obtaining abortions, in a variety of ways, even in cases where the doctors have determined that an abortion is, for any number of reasons, the best medical option. This one-size-fits-all approach seems to be the very antithesis of "reasonable regulation of medical practice."

Regardless of all the foregoing, however, this Court is required to defer to the panel's decision. And the Court believes the panel's opinion requires a grant of summary judgment in favor of Defendants.

Accordingly,

IT IS ORDERED that the parties' motions to amend [##115, 117, 119] are GRANTED;

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment [#97] is DISMISSED IN PART and GRANTED IN PART, as described above in this opinion;

IT IS FINALLY ORDERED that all other pending motions are DISMISSED as moot.

SIGNED this the 6th day of February 2012.

SAM SPARKS
UNITED STATES DISTRICT JUDGE